Alexander I. Dychter, Esq. (SBN: 234526)
**Dychter Law Offices, APC**
625 Broadway, Suite 600
San Diego, California 92101
Telephone: (619) 487-0777
Facsimile: (619) 330-1827
E-Mail: Alex@DychterLaw.com

Attorneys for James Carter and Roger Lengyel, Relators

FILED

2010 JUL -2  PM 4: 25

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, *ex rel.,*
JAMES CARTER and ROGER LENGYEL,

　　　　　Plaintiffs,

vs

BRIDGEPOINT EDUCATION, INC,
ASHFORD UNIVERSITY LLC, and DOES
1-500, Inclusive,

　　　　　Defendants.

Case No.

**10 CV 1401   JLS  WVG**

**COMPLAINT FOR DAMAGES, WITH DEMAND FOR JURY TRIAL**

**FILED IN CAMERA AND UNDER SEAL**

Causes of Action:

1. Knowingly False Statements to Get a False or Fraudulent Claim Paid or Approved, in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1).

2. Knowingly False Records or Statements to Get False or Fraudulent Claim Paid or Approved, in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(2).

1

Complaint

<u>Filed In Camera and Under Seal</u>

Plaintiffs and Relators James Carter and Roger Lengyel allege as follows:

## I. Introduction

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising out of false claims approved and presented by Defendants to obtain hundreds of millions of dollars annually from the United States Department of Education pursuant to the Higher Education Act, Title IV ("HEA"), from at least March 2005, continually through the present date. Defendants Bridgepoint Education and Ashford University (collectively "Defendants" or "AU") are one of the largest recipients of HEA federal student financial aid funds from the United States Department of Education. In requesting and receiving up to half a billion dollars annually, Defendants falsely represent every year that they are in compliance with HEA's prohibition against using incentive payments for recruiters for recruiting activities, which is a core prerequisite to eligibility for the Title IV funds. Defendants had, and continue to have, actual knowledge that they are not adhering to the HEA ban, that their representations of adherence were and are false, and that they therefore were and are submitting false or fraudulent representations of compliance. Alternatively, Defendants act and acted with deliberate indifference and/or reckless disregard as to the truth or falsity of the claims. Relators assert causes of action under the False Claims Act for submission of a knowingly false or fraudulent claims for payment or approval, and knowingly false records or statements to get a false or fraudulent claim paid or approved, in violation of 31U.S.C. § 3729(a)(1) and (2).

## II. Jurisdiction and Venue

2. This is an action brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331. This case arises from

Complaint                                                Filed In.Camera and Under Seal

the wrongful conduct of the Defendants incident to obtaining funds from the United States of Department of Education pursuant to the Higher Education Act, Title IV.

3. This Court has *in personam* jurisdiction over the Defendants under 31 U.S.C. §3732(a), which authorizes nationwide service of process.

4. 31 U.S.C. § 3732(a) provides "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant, can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." Venue is proper in the Southern District of California because Defendants maintain and operates its San Diego campus within this District. Additionally, Defendant Bridgepoint Education, Inc.'s principle place of business is located in San Diego, California.

### III. Plaintiffs

5. *Qui Tam* Plaintiff James Carter (hereinafter "Carter") is a citizen of the United States of America and is a resident of San Diego County, in the State of California. Carter has worked for Defendants AU from January 2007 through the present date as an Enrollment Advisor at Defendant's San Diego campus. Carter brings this action on behalf of the United States of America.

6. *Qui Tam* Plaintiff Roger Lengyel (hereinafter "Lengyel") is a citizen of the United States of America and is a resident of San Diego County, in the State of California. Lengyel has worked for Defendants AU from February 2009 through the present date as an Enrollment Advisor at Defendant's San Diego campus. Lengyel brings this action on behalf of the United States of America.

7. As required under the False Claims Act, 31 U.S.C. § 3730(a)(2), Relators, simultaneously with the filing of this Complaint, provided to the United States Attorney for the

3

Southern District of California a written disclosure of substantially all material evidence and information related to this Complaint.  This written disclosure statement supports the existence of "submission of a knowingly false or fraudulent claim for payment or approval," under the False Claims Act (31 U.S.C. § 3729(a)(1)).

8.  The United States of America is here named a plaintiff because funds of the United States of America ("Federal funds") were and are awarded to Defendant AU, pursuant to the HEA, Title IV, as a result of the false claims alleged in this Complaint.

## IV.  Defendants

9.  Defendant AU is the nation's fastest growing, for-profit higher education institution providing educational programs for working adult students.  AU maintains one traditional campus in Iowa.  But the bulk of AU's revenue arises from its online program (founded in San Diego).  AU is accredited by the Higher Learning Commission and is a member of the North Central Association of Colleges and Schools.  Through its online program, and learning centers, AU offers certificate programs, and graduate and undergraduate degree programs.

10.  Relators are unaware of the true names and capacities of the Defendants sued as Does 1 through 500.  Plaintiffs will amend their complaint when the true names and capacities have been ascertained.  Each Doe Defendant is responsible in some actionable manner for the events, occurrences, injuries and damages alleged herein.

11.  The terms "Defendants" will refer collectively to the aforesaid Defendants acting by and through their managerial employees, and each of them.

12.  Managerial employees of the Defendants, in doing the acts and things described in this complaint, were acting within the course and scope of their respective agencies and/or

4

employment with the Defendants, and each of them, with the knowledge and consent of the Defendants, and each of them, unless otherwise indicated.

13. At all relevant times each Defendant was the authorized agent of each other Defendant.

## V. Specific False Claims and Fraudulent Statements

### A.    Summary of the Fraudulent Conduct

14. HEA, Title IV, prohibits colleges and universities from providing "any commission, bonus or other incentive payment . . . " to recruiters based on recruiting activities. HEA, sections 487(a) and 487(a)(20). The statutory ban was enacted 1992 amid reports of numerous institutions enrolling unqualified students, just to receive the federal student-aid funds from the United States Government. The statutory incentive compensation ban is a core prerequisite for an educational institution's eligibility to request and receive Title IV funds.

15. The United States Government awards approximately $6 billion a year to help students obtain their educations at colleges and vocational schools. The federal funds however do not go directly to the students. Instead, the educational institution requests the funds of the United States Department of Education, or a private lender, and then the funds are directly transferred into the institutions' bank account. The institutions then credit their students for payment of tuition.

16. Students are responsible for paying back the United States Government once they graduate or stop attending the university. Students disqualified from a university, regardless of the reason, must still repay the federal loans. These students, unable to complete their education and obtain a decent paying job to repay their federal loans, are forced into dire financial situations. Or, rather than being dismissed from AU, AU requires the students to take additional

5

courses, costing them on average $1,000 per course.  The institutions, meanwhile, retain the fraudulently obtained federal funds.

17.  AU, in flagrant violation of the Title IV ban, compensates Enrollment Advisors, including Relators, based directly upon enrollment activities.  AU publishes charts (referred to as the "Matrix") setting forth the enrollment activity numbers necessary for a formal job performance rating, such as; "exceeds expectations," or "meets expectations."  Included in the matrix charts, AU publishes its salary schedules, with a salary range corresponding to each performance rating.  An Enrollment Advisor thus knows his or her salary range, based on her enrollment activities level.  AU furthermore ranks counselors based upon their number of enrollments.  The top ranking counselors are among the highest paid counselors, receiving the highest salary as well as the best leads, the best opportunities to serve as mentors, and the best opportunities to pursue management positions, based upon their enrollment numbers.

18.  To boost its enrollment numbers, AU's Enrollment division urges Enrollment Advisors to enroll students without reviewing their transcripts to determine their academic qualifications to attend the university.  AU requires Enrollment Advisors to maximize their "prospecting time" by openly discouraging Enrollment Advisors from providing any meaningful assistance to students after the students' fifth (5th) week of enrollment, after the loan funds are received.  This process leads to student disqualification from AU (or additional financial costs for the students to take additional classes) and financial disaster for the students forced to repay the federal loans while AU collects the federal funds for these fraudulently "enrolled" students.

19.  *AU is fully aware of the illegality of its compensation scheme.*  Prior to going public, AU maintained and widely distributed to employees, including its Enrollment Advisors, a "Stack Ranking."  The Stack Ranking listed all enrollment advisors in order of the number of quarterly

6

enrollments. Those with the highest number of enrollments were at the top. Those with the least—typically brand new Enrollment Advisors—were listed toward the bottom. After it went public, however, it ceased distributing the list to all employees, including Enrollment Advisors. In approximately April or May 2010, however, AU widely distributed a current Stack Ranking to its Enrollment Advisors.

20. AU disguises its illegal compensation scheme in many ways. AU recruits, hires, and trains its Enrollment Advisors that they will be compensated with an annual salary. AU does not tell its Enrollment Advisors that their salaries will either increase or decrease based on a Matrix until they begin their first day on the job. In some cases, Enrollment Advisors do not realize their pay will increase or decrease until they have completed their first review. AU's enrollment directors and managers constantly track the number of phone calls, applications, and enrollments. Enrollment Advisors were at one point required to write their names and corresponding number of applications completed daily on dry-erase boards posted on the Floor. AU facilities department, however, removes these dry-erase boards prior to inspections and walkthroughs only to replace them later.

21. Relators Carter and Lengyel have each been informed by their managers that the number of enrollments (*i.e.* Net Student Completers), is the sole Matrix factor used to determine their salary levels. During one review, Lengyel's manager verbally praised his leadership skills and ability to work with other Enrollment Advisors; however, those review categories were marked in written form as "need improvement." When Lengyel asked his manager why he was getting poor written marks following her verbal praise, his manager stated that **the other Matrix categories are not even considered if the Enrollment Advisor fails to meet his or her student enrollment quota. Thus, she had to adjust his *leadership skills* and *ability to work***

7

*with other enrollment advisors* **down to correspond to his failure to meet his enrollment quota.**

    **B.    As Required by Law for Eligibility to Receive the Federal Funds, AU Must Issue Certifications of Compliance; AU's Certifications Are False**

    22.  Educational institutions request Title IV funds for eligible students through several programs, including the Federal Pell Grant Program ("Pell"), the Federal Supplemental Educational Opportunity Grant Program ("FSEOG"), the Federal Perkins Loan Program ("Perkins") and the Federal Family Education Loan Program ("FFELP").

    23.  For an educational institution to be eligible to receive these Title IV grant funds, the federal statutes and regulations require the institution to certify to the United States Government that the institution will comply with the incentive compensation ban through a Program Participation Agreement ("Agreement"). REA, Sec. 487(a) and (a)(20); 34 C.F.R. Sec.668.l4(a)(1) and (b)(22)). This certification is a core prerequisite for an institution's eligibility to request and receive Title IV funds.

    24.  An educational institution is ineligible to receive Title IV funds without the Agreement certification of compliance with the incentive compensation ban. The Agreement conditions the initial and continued participation of an eligible institution in any Title IV, HEA program. The Agreement expressly states, in bold print, highlighted in a box on the first page:

> The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program.

///

///

8

25.  The Agreement's first paragraph furthermore provides that the institution's participation in the Title IV program is "subject to the terms and conditions of this Agreement."

26.  One of the "terms and conditions" of the Agreement is the incentive compensation ban.  In the Agreement, the educational institution certifies that "[i]t will not provide . . . any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments . . . (Agreement, p. 5, para. 22, quoting directly from the HEA, Sec. 487(a)(2) and the federal regulations, 34 C.F.R. Sec. 668.l4(b)(22)).

27.  Educational institutions violating the incentive compensation ban must return the Title IV funds, along with interest and special costs incurred by the DOE.  For example, University of La Verne was directed to refund $6,528,981 FFELP funds and $395,730 in Pell funds.  On December 13, 2001, Benedictine University was directed to return $25,521 Pen funds, $183,407 FFELP funds, and $13,060 FSEOG funds.  On September 4, 2002, Southern Wesleyan University was directed to return $18,346,658 FFELP funds, $1,079,565 Pell funds, $21,400 FSEOP funds, and $3,500 Perkins funds.

28.  AU, in requesting and receiving hundreds of millions of dollars in Title IV funds since 2004, falsely certifies to the DOE, every year, compliance with the incentive compensation ban in the Agreement it submits annually to the DOE.  AU falsely induces the Government to approve and/or payout the Title IV funds, based on its false promises to comply with the incentive compensation ban.  The promises when made are false.  Upon making its promises and certifications, AU knowingly engages in the illegal incentive compensation schemes detailed below.

/ / /

/ / /

9

29.  AU every year also falsely asserts compliance with the incentive compensation ban for an annual compliance audit.  AU must submit to the United States Government this annual compliance audit performed by an independent certified public accountant.  Participation in the Title IV program is conditioned upon AU submitting these audits certifying compliance with the REA incentive compensation ban.  AU is ineligible to submit any claims for REA funds unless it submits this annual audit.

30.  As a required part of the audit, AU certifies in a management assertion letter that it had "not paid to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments . . . for each year at issue."  AU knows this certification is false because AU intentionally violates the incentive compensation ban.

## C.     AU's Claims for the Federal Government Funds

31.  Upon entering the Program Participation Agreement with the United States Secretary of Education, AU is eligible to request the Title IV funds from the United States Secretary of Education (for Pell Grant funds) or from third party lenders (for government-insured loans).

32.  For Pell Grant funds, AU submits a request for those funds directly to the Secretary of the United States Department of Education.  The request for funds is not a student application but a request prepared and transmitted by AU to the Secretary of the United States Department of Education, stating the requested amount of funds.  The United States Department of Education transfers the Pell Grant funds electronically directly into an AU account.  Upon receiving the Pell Grant funds, AU credits various AU students for tuition paid.  AU students do not request or receive a dime of the Pell Grant funds.

/ / /

Complaint                                                                Filed In Camera and Under Seal

33. AU's claims for the Pell Grant funds are fraudulent. When AU requests, receives and retains the Pell Grant funds, AU knows it is ineligible for those funds because of its intentional violations of the Higher Education Act incentive compensation ban. AU knows that compliance with the Higher Education Act funding statute incentive compensation restriction is a core prerequisite for an institution's eligibility to request and receive Title IV funds.

34. For government-insured loans, including the FFELP, AU submits the request for those funds directly to a private lender. The AU request for government-insured loan funds, arranged, managed and prepared by AU, includes a student application that *contains an express certification by AU that the student is an eligible student under the Title IV program*. The claim for government-insured loans *must* include this AU certification. AU knows that this claim for funds is false because AU knows its students are *not* eligible under the Title IV program due to AU's violations of the HEA incentive compensation ban. Only students at eligible Title IV schools may receive credit for Title IV government-insured loan funds disbursed by private lenders to educational institutions. AU's fraudulent violations of the HEA incentive compensation ban make it an ineligible educational institution to request and disburse Title IV funds, and thus its students are ineligible under the Title IV program. The lender, typically a bank, transfers the government-insured loan funds directly into an AU account. Upon receiving the government-insured loan funds, AU credits various AU students for tuition paid.

35. AU's claims for the government-insured loan funds are fraudulent. When AU requests, receives and retains the government-insured loan funds, AU knows it is ineligible for those funds because of its intentional violations of the Higher Education Act incentive compensation ban. AU knows that compliance with the Higher Education Act funding statute

Complaint                                                    Filed In Camera and Under Seal

incentive compensation restriction is a core prerequisite for an institution's eligibility to request and receive Title IV funds.

36. The United States Government pays all interest on the government-insured loans while the students are enrolled in classes and during authorized grace periods. The loans are guaranteed by state agencies or non-profit organizations (called "guarantee agencies"), and are subsidized and reinsured by the United States Department of Education. If a student defaults, the guarantee agency reimburses the lender. If the guarantee agency cannot collect from the student, the Department of Education reimburses the agency.

37. The United States Department of Education monitors loan defaults of postsecondary schools and calculates a "cohort default rate" every year for AU. The Department of Education calculates the loss to the United States Government relying upon this rate.

### D.   Counselors' Enrollment Activities Determine Their Salary

38. AU Enrollment Advisor compensation, including salary, is based upon the number of students they enroll and other enrollment activities (telephone calls, generation of leads, appointments). The AU Enrollment Department determines Enrollment Advisor salary using a chart called a "matrix" published by that Department.

39. AU's Matrix measures Enrollment Advisor performance based upon enrollments and enrollment recruitment activities (telephone calls soliciting students, appointments soliciting students to AU, leads, enrollments) under the following performance ratings: "always exceeds expectations," "often exceeds expectations," "meets expectations," "requires improvement," and "unsatisfactory." The matrix sets forth the minimum enrollment numbers and recruitment activities necessary for each performance rating.

/ / /

Complaint                                                                 Filed In Camera and Under Seal

40. Included in the matrix charts, AU publishes a salary range and salary merit increase or decrease corresponding to each performance rating on the matrix. An Enrollment Advisor thus knows his or her salary level, *based solely on her enrollment numbers and enrollment recruitment activities,* by comparing her matrix enrollment activity level performance rating with the salary schedule showing the salary for that rating.

41. The compensation scheme for Enrollment Advisors is developed, implemented and directed by AU Enrollment Department in San Diego. AU Enrollment Department tracks and verifies the numbers of students enrolled (called "starts") for all Enrollment Advisors. Based on these numbers, the Enrollment Department formerly published quarterly reports and "stack rankings" listing admissions counselors based upon their "starts."

42. AU meticulously tracks each counselor enrollment activities on a daily, weekly, monthly, quarterly and annual basis. AU's Enrollment Advisors meet daily with their team and Manager for "Start Meetings." Managers quiz Enrollment Advisors on the number of applications they have completed, whether they will meet the number of applications set by their matrix goals, and what the Enrollment Advisors plan to do to meet those goals. AU software programs track the number of calls made and received by Enrollment Advisors. The software automatically notifies managers every time an Enrollment Advisor begins to complete a student application.

43. AU Enrollment managers compile the daily and weekly numbers into monthly reports submitted to UA evaluating each counselors' performance for that month, including specific references to enrollment. Managers create daily, weekly, and monthly "Flash" reports. Flash reports track each Enrollment Advisor's schedules, appointments, applications, referrals, incoming calls, outbound calls, and the average time for each incoming and outgoing call.

13

44. Relator Carter, at AU for three years, has seen his salary increase and decrease dramatically based almost exclusively on upon his enrollment numbers. Although his salary was recently below even new Enrollment Advisors, a recent increase in enrollments have set him up for a salary increase and even consideration for the mentorship program and management opportunities.

**E. Low Enrollment Numbers Leads to Reductions in Lead Quality, Salary Reduction, and/or Employment Termination**

45. AU reduces the salaries paid to Enrollment Advisors who fail to reach acceptable enrollment activity levels. Enrollment Advisors are hired at approximately $39,000.00 to $45,000.00 per year. After hire, AU evaluates enrollment advisors with the primary focus directed to the number of enrollments made. Enrollment Advisors with low enrollment numbers have their salaries decreased. Relator Carter had his salary decreased to approximately $29,000.00 annually. Besides salary reduction, UA provides low performers with poor quality leads, and potential applicants who have already been called numerous times and declined to enroll at AU. This practice further perpetuates poor performance and increases the likelihood the enrollment advisor will "fail to hit their numbers" and thus be subject to another decrease in salary, more poor quality leads, and in some cases, termination.

**F. AU Pressure to Enroll Students Who Could not Academically Qualify and to Discontinue Speaking with Students Who Have Been Enrolled Over Five Weeks**

46. At all times, AU has been aggressive in requiring Enrollment Advisors to relax and/or discontinue reviewing potential students qualifications to enroll at AU. Under threat of salary reduction, poor lead disbursement, and/or employment termination, AU directed

Complaint

Filed In Camera and Under Seal

Enrollment Advisors to increase their enrollment numbers by disregarding potential students' qualifications to attend AU.

47. To "make the numbers" and "hit the matrix," Lengyel has been instructed to enroll individuals he felt should not qualify for enrollment. Management told Lengyel and other Enrollment Advisors that they could not tell potential applicants outright that they *will* receive approximately $4,000.00 after the loans are funded; instead, they were instructed to tell applicants they *may or may not* receive a check for $4,000.00. The clear intent was to provide an incentive to those who, in some cases, would not have sufficient funds.

48. UA directs Enrollment Advisors to stop reviewing academic qualifications with potential students. Counselors were told to stop "counseling" students and reviewing academic transcripts. These counseling measures, fundamental to protect prospective students, take Enrollment Advisors away from enrollment activities that would otherwise be spent increasing their overall enrollment numbers. This is especially true where the student has been enrolled for more than five (5) weeks because the student loans have already been processed and money has already been distributed to AU. Relator Lengyel was repeatedly counseled for speaking with current students during peak "Prospecting Time," which is defined as 8:00 a.m. to 11:00 a.m., and 1:00 p.m. to 5:00 p.m. Retention hours are only from 11:00 a.m. to 1:30 p.m., and AU requires enrollment advisors to take their one (1) hour lunch during the "Retention Hours." AU permits prospecting during Retention Time; it prohibits retention activities during peak "Prospecting Time."

## G. Defendant Has Knowledge of Its Fraudulent Practices

49. AU's deceptive tactics include the following:

///

15

(a) Removing any reference to the boiler-room sales environment in which the Enrollment Advisors work. Recently, AU provided investors a walkthrough of its facilities. Prior to the walkthrough, it required Enrollment Advisors to remove from visible areas any awards based on the number of enrollments made. AU also washed and removed dry-erased boards where managers and enrollment advisors recorded enrollment numbers for other enrollment advisors to see. After the walkthrough had passed, AU immediately repositioned the dry-erase boards and allowed enrollment advisors to place their enrollment-awards in visible areas.

(b) AU does not inform its potential enrollment advisors that they will be subject to a decrease in salary until after they start their first day at work. At all times during the hiring process, AU repeatedly tells enrollment advisor candidates they will be paid a salary with the potential to earn more money.

(c) AU Salary Policy Changes: Salaries to No Longer Decrease. Up to the filing of this complaint, AU Enrollment Advisors' salaries rose or fell every six months (and in some cases, more frequently), depending upon the performance category corresponding to their enrollment activities for that evaluation period. To further mask that its compensation scheme is tied directly to enrollment activity, AU is quietly changing its Enrollment Advisor salary policy so that salaries could no longer decrease. Recently, AU implemented a pilot group of enrollment advisors whose salaries will not decrease. All other enrollment advisors are, as of present, still subject to review and decrease in pay.

(d) Compensation Based Solely on Enrollments: As stated in paragraph 21, above, Relators have been told that the number of successful enrollments determines if other non-enrollment activities may be considered. AU's Matrix is designed to appear as if successful

16

enrollments are not the only factor to be considered for compensation, when in practice, the number of successful enrollment *is* the only factor that matters.

## First Cause of Action:

**Knowingly False Statements to Get a False or Fraudulent Claim Paid or Approved, in Violation of the False Claims Act, 31 U.SC. § 3729(a)(1)**

50. Plaintiffs re-allege, and fully incorporate herein by reference, paragraphs 1 through 49 herein.

51. In performing all of the acts set out herein, Defendants defrauded the United States of America by knowingly presenting, or causing to be presented, to one or more officers, employees or agents of the United States of America, a false and fraudulent claim for payment or approval, in contravention of the False Claims Act (31 U.S.C. § 3729(a)(3)), to the damage of the treasury of the United States of America, by causing the United States to payout money it was not obligated to pay.

52. Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America is in excess of a half billion dollars per annum, from January 1,1997, through the present date.

## Second Cause of Action:

**Knowingly False Records or Statements to Get a False or Fraudulent Claim Paid or Approved, in Violation of the False Claims Act, 31 U.S.C. §3729(a)(2)**

53. Plaintiffs re-allege, and fully incorporate herein by reference, paragraphs 1 through 52 herein.

/ / /

/ / /

Complaint                                                                 Filed In Camera and Under Seal

54.  By virtue of the acts described above, Defendants have knowingly made, used or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States of America, in contravention of the False Claims Act (31 U.S.C. §3729(a)(2)), to the damage of the treasury of the United States of America, by causing it to pay out money it was not obligated to pay.

55.  Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America is in excess of a half billion dollars per annum, from January 1, 1997, through the present date.

## **Prayer for Relief**

WHEREFORE, Plaintiffs request the following relief:

1.  Judgment in favor of the United States of America against Defendants, jointly and severally, by reason of the violations of the False Claims Act as set forth above, in an amount equal to three times the amount of damages the United States of America has sustained because of Defendants' actions, plus a civil penalty of not less than Five Thousand Dollars ($5,000.00), and not more than Ten Thousand Dollars ($10,000.00), for each violation, plus three times the amount of damages which the United States Government has sustained, pursuant to 31 U.S.C. § 3729(a);

2.  Award to Relators, as the *Qui Tam* plaintiffs, of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act on the United States' recovery;

3.  Award to Relators of all reasonable expenses which the Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs;

4.  Punitive damages on all causes of action, to the extent allowable by law; and

5.  Such other and further relief as the Court deems proper.

18

Complaint

Filed In Camera and Under Seal

## **Demand for Jury Trial**

Plaintiffs demand a trial by jury, pursuant to FRCP 38.

DATED:  July 2, 2010                                  **DYCHTER LAW OFFICES, APC**


By _____
                    Alexander I. Dychter
Attorneys for James Carter and Roger Lengyel, Relators

19

Complaint

<u>Filed In Camera and Under Seal</u>

JS 44 (Rev. 12/07)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS

UNITED STATES OF AMERICA, ex rel., JAMES CARTER and ROGER LENGYEL

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Dychter Law Offices, APC, 625 Broadway, Suite 600, San Diego, CA 92101; Telephone: (619) 487-0777; Alexander I. Dychter

### DEFENDANTS

BRIDGEPOINT EDUCATION, INC., ASHFORD UNIVERSITY, LLC, and DOES 1-500

County of Residence of First Listed Defendant      San Diego
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

'10 CV 1401      JLS  WVG

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

### V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
31 U.S.C. Section 3729(a)(1); 31 U.S.C. Section 3729(a)(2)

Brief description of cause:
knowingly false statements to get a false or fraudulent claim paid or approved.

### VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

### VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____      DOCKET NUMBER _____

DATE
07/02/2010

SIGNATURE OF ATTORNEY OF RECORD
Alexander I. Dychter

**FOR OFFICE USE ONLY**

RECEIPT #  15223      AMOUNT $350      7/2/10  BH      APPLYING IFP _____      JUDGE _____      MAG. JUDGE _____

```
-t Name: USDC California Southern
 ision: 3
eipt Number: CAS015223
 ashier ID: bhartman
T nsaction Date: 07/02/2010
 r Name: DYCHTER LAW OFFICES
 -------------------------------
 L FILING FEE
 ·: CARTER V BRIDGEPOINT
 e/Party: D-CAS-3-10-CV-001401-001
 unt:      $350.00
 -------------------------------
 K
 ck/Money Order Num: 1047
  Tendered:  $350.00
 -------------------------------
 l Due:      $350.00
 l Tendered: $350.00
 ge Amt:     $0.00


 e will be a fee of $45.00
 ged for any returned check.
```