TIMOTHY J. HATCH, SBN 165369
  thatch@gibsondunn.com
JAMES L. ZELENAY JR., SBN 237339
  jzelenay@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

Attorneys for Defendants,
BRIDGEPOINT EDUCATION, INC. and
ASHFORD UNIVERSITY, LLC

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JAMES CARTER AND ROGER LENGYEL,<br><br>Plaintiffs,<br><br>v.<br><br>BRIDGEPOINT EDUCATION, INC., ASHFORD UNIVERSITY LLC, AND DOES 1-500, INCLUSIVE,<br><br>Defendants. | CASE NO. 10-CV-1401-JLS-WVG<br><br>**SUPPLEMENTAL BRIEF RE: PRODUCTION OF DOCUMENTS FROM BACKUP TAPES AND THE FORMAT USED IN THE PRODUCTION OF EMAIL**<br><br>Judge:  Hon. William V. Gallo<br>Courtroom: 2A |

Gibson, Dunn & Crutcher LLP

SUPPLEMENTAL BRIEF RE: PRODUCTION OF DOCUMENTS FROM BACKUP TAPES AND THE FORMAT USED IN THE PRODUCTION OF EMAIL
CASE NO. 10-CV-1401-JLS-WVG

## I. INTRODUCTION

The Federal Rules affirmatively state that "[a] party need not provide discovery of electronically stored information from sources that the party identifies are not reasonably accessible because of undue burden or cost." Fed. R. Civ. P. 26(b)(2)(B). Defendants' backup tapes undoubtedly fall within that exclusion. Nevertheless, as a showing of good faith and a desire to cooperate, Defendants proposed to Relators prior to Relators filing their Motion to Compel that Defendants would restore backup tapes created in the latter part of 2011 and review and produce material from those tapes. Relators refused this offer and instead seek an unknown number of backup tape restorations and productions. (Relators have never identified exactly what they want in this process). However, given the number of tapes potentially involved (260 for 2011 alone) and custodians at issue (as many as 220) and the technological challenges posed with restoring Defendants' tapes, even complying with *Defendants*' offer would impose massive costs—as much as $560,607 for restoration, review, and production. The Court should not even order this restoration and production, let alone anything more. This is especially the case because Defendants were under no obligation to preserve the data on these tapes in active format at the time they were archived (years ago), and for the vast bulk of custodians at issue email communications are simply irrelevant. If backup tape restoration and production is ordered, and certainly if anything is ordered beyond Defendants' very generous offer, it should be at Relators' expense. *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 320 (S.D.N.Y. 2003) (*"Zubulake I"*).

Similarly, there is no reason to require Defendants to produce emails in native format, as opposed to TIF images. To date, Relators have not identified any reason why emails should be produced in native format, other than "searchability" and "metadata"—items that can both be equally achieved in TIF productions. Moreover, TIF productions are vastly more desirable because of the ability to redact TIF images (which will be necessary here to protect student information under the Family

1

Gibson, Dunn & Crutcher LLP

SUPPLEMENTAL BRIEF RE: PRODUCTION OF DOCUMENTS FROM BACKUP TAPES AND THE FORMAT USED IN THE PRODUCTION OF EMAIL
CASE NO. 10-CV-1401-JLS-WVG

Educational Rights and Privacy Act) and to work with documents throughout the litigation that are Bates numbered at the page level.  Further, Defendants have already agreed to produce natively those documents more easily viewed natively (such as Excel worksheets) and have also agreed to produce to Relators in native format any emails produced in TIF format, provided the request is not for a massive amount of documents and there is some good faith reason for the request.  This should be end of this matter.

## II.  LEGAL STANDARD ON BACKUP TAPES AND COST SHIFTING

Rule 26(b)(2)(B) states:  "A party need not provide discovery of electronically stored information from sources that the party identifies are not reasonably accessible because of undue burden or cost."  This provision recognizes that "some sources of electronically stored information can be accessed only with substantial burden and cost," making "the information on such sources not reasonably accessible." Fed. R. Civ. P. 26 advisory committee's note.  "[W]hether production of documents is unduly burdensome of expensive turns primarily on whether it is kept in an accessible or inaccessible format." *Zubulake I*, 217 F.R.D. at 318.  Backup tapes for disaster recovery are generally considered "inaccessible." *Id.* at 319–20.  As one court stated:

> [A] party that happens to retain vestigial data for no current business purposes, but only in case of an emergency or simply because it has neglected to discard it, should not be put to the expense of producing it.  In this case, the back-up tapes clearly fall into this category.

*Rowe v. William Morris Agency, Inc.*, 205 F.R.D. 421, 431 (S.D.N.Y. 2002).  Thus, absent "a strong showing" that a party defaulted on its discovery obligations, "the court should not resort to extreme, expensive, or extraordinary means to guarantee compliance." *Diepenhorst v. City of Battle Creek*, 2006 U.S. Dist. LEXIS 48551, at *10 (W.D. Mich. June 30, 2006).  Moreover, when a plaintiff desires the restoration or production of inaccessible data, the court may shift the costs associated with those efforts to plaintiff. *Zubulake I*, 217 F.R.D. at 318.   Further, courts may likewise shift

Gibson, Dunn & Crutcher LLP

2

SUPPLEMENTAL BRIEF RE: PRODUCTION OF DOCUMENTS FROM BACKUP TAPES AND THE FORMAT USED IN THE PRODUCTION OF EMAIL
CASE NO. 10-CV-1401-JLS-WVG

the costs to the requesting party where discovery requests are not specific or the material on backup tapes is not likely to be relevant. *See id.* at 322–23.

### III  THE MATERIAL ON DEFENDANTS' BACKUP TAPES IS NOT REASONABLY ACCESSIBLE

#### A.     Defendants' Email Storage And Backup Practices

Defendants store email in two ways: on servers for "active" email (i.e., email that users are currently using) and on backup tapes, which are used for disaster recovery. Declaration of Michael Marks ("Marks Decl."), ¶¶ 9, 12. Defendants maintain eight servers for active email—four each in San Diego and Phoenix. *See id.*, ¶ 9. At both locations, two of the servers are used to maintain "hot" databases (i.e., those currently in use) and two are backup databases. *Id.*

Since approximately 2010, the amount of active storage available for any individual employee was dependent on whether the user's email account was limited or unlimited. While some email accounts had unlimited capacity, most accounts were limited—meaning the amount of "active" data was capped at 250 MB. *Id.*, ¶ 10. If a limited account approached the 250 MB limit, an automatic response was generated and sent to the user. *Id.* If a user failed to take steps to free up capacity, they were locked out of sending email until they did so. *Id.* Because this is done at the user level, there is no way to determine exactly what emails may have been deleted. *Id.*

Defendants have only used backup tapes for storage of email for a portion of the time period at issue in this case (2005 to 2011). *Id.*, ¶ 11. The first backup tape containing email was created in late 2009, during a software conversion process. *Id.*, ¶ 12. As this was a one-time backup, the precise contents of the tape are unknown. *Id.*

Defendants did not begin regular backups of email until December 2010, and a search has not revealed any additional backups between those made in late 2009 and those in December 2010. *Id.*, ¶¶ 14, 15. Beginning in December 2010, Defendants began backing up emails onto Linear Tape-Open ("LTO") technology using Symantec Backup at the end of each workday—resulting in substantial duplication from one tape

to the next. *Id.*, ¶¶ 14, 15. This process continued through the remainder of the relevant time period (i.e., the end of 2011). *Id.*, ¶ 15. There are 287 backup tapes, which are all encrypted, covering the time period between December 2010 and the end of 2011. *Id.* The amount of data stored on any individual tape can exceed one terabyte. *Id.* Additionally, these backup tapes are encrypted. *Id.*

### B. Restoration of Defendants' Backup Tapes Would Result in Considerable Burden and Expense

As outlined above, disaster recovery backup tapes—such as those at issue here—are generally considered inaccessible and therefore not subject to required review or production. *See Rowe*, 205 F.R.D. at 431. The characteristics of Defendants' backup tapes make that especially true. Unlike typical backup tapes, they are hardware-encrypted using a Quantum Scalar tape library. Marks Decl., ¶¶ 13, 14. Tapes encrypted in this method can *only* be restored by an identical library configured with encryption and with access to Defendants' encryption key. *Id.*, ¶ 17. Thus, restoring these tapes requires the replication of Defendants' hardware and software configuration and a communication path with the server holding the encryption key, which is located behind Defendants' firewall. *Id.* While Data Recovery Systems, a vendor previously used by Defendants to restore four dates of backup tapes (one within the relevant time period), has this environment, additional equipment may have to be purchased—at a cost of approximately $40,000—to conduct additional restoration and production here, depending on the size and timeframe of the project. *Id.*, ¶ 21.

Additionally, the large capacity of these tapes—holding up to 1.6 terabytes—creates further challenges in the restoration process. *Id.*, ¶ 18. Because there is only one environment that can be used to restore these tapes, only one tape can be restored at a time. As a result, only one or perhaps two tapes can even be indexed per day. *Id.* And after tapes are indexed, they must be queried to index for the target custodians—a process taking anywhere from two to four days. *Id.*, ¶ 19. Only then can data be pulled for each separate custodian, requiring another three to four days to complete.

4
SUPPLEMENTAL BRIEF RE: PRODUCTION OF DOCUMENTS FROM BACKUP TAPES AND THE FORMAT USED IN THE PRODUCTION OF EMAIL
CASE NO. 10-CV-1401-JLS-WVG

Gibson, Dunn & Crutcher LLP

*Id.*, ¶ 21.  Thus, the restoration of just one tape can take as long as week to complete. When the processes of getting documents prepared for review, reviewed, and produced are included, the total time for production is months.  Indeed, in the case involving Data Recovery Systems mentioned above, the restoration of Defendants' backup tapes required eight months to restore, filter, and begin producing materials.  *Id.*, ¶ 25. Much has been learned by Data Recovery Systems as a result of this prior work, but substantial costs and effort would be required here for any further restoration work.

### C. The Costs of Restoration and Production Would Be Substantial, and Must Be Paid By Relators.

Relators have not identified what exactly they seek in terms of restoration, but it must be more than the end-of-2011 (specifically November 2011) set of tapes Defendants proposed restored and produced.  But even what Defendants have proposed—which would require the re-indexing, sorting, deduplication, review and production of the November 2011 tapes identified above as part of Data Recovery Systems' earlier restoration processes would be an *extremely* expensive undertaking for the approximately 220 custodians potentially at issue (the 140 Defendants identified from Relators' parameters and the 80 managers ordered for sampling by the Court).  Based upon conservative assumptions,[1] the total costs for restoring, sorting, reviewing, and producing material from this one set of tapes alone is estimated to be $560,607.  *See id.*, Ex. A (chart outlining potential expenses).  These costs are clearly unduly burdensome.  *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 361–62 (1978) ("a threshold expense of $16,000 . . . hardly can be viewed as an insubstantial burden").  Adding just one more set of tapes would increase costs to $708,359; adding tapes from every available quarter during the relevant period would increase costs to $2,255,633.  These additional costs are unduly burdensome as well.  If restoration and

---

[1] These assumptions include:  25% percent of the identified custodians will not have data on the tapes, the majority of custodians will have approximately 250 MB of data per tape, and a 15% responsiveness rate.

5

SUPPLEMENTAL BRIEF RE: PRODUCTION OF DOCUMENTS FROM BACKUP TAPES AND THE FORMAT USED IN THE PRODUCTION OF EMAIL
CASE NO. 10-CV-1401-JLS-WVG

Gibson, Dunn & Crutcher LLP

production is ordered, and certainly if restoration and production beyond Defendants' offer is ordered, it should be at Relators' expense. *Zubulake I*, 217 F.R.D. at 318. This is especially true here, given the limited utility of email to the issues posed in this case.

### D. Defendants Were Under No Obligation to Maintain The Data At Issue Here in Active Format.

Despite Relators' unsupported allegations to the contrary, Defendants did not engage in "intentional spoliation." Defendants had standard data retention policies and practices, and the material on backups subject to this motion was placed on backup tapes long ago. As the *Zubulake* court stated, "[t]he duty to preserve is triggered when litigation is pending or reasonably foreseeable, at which time a party is required to preserve all relevant evidence and put into place a litigation hold to preserve relevant documents." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003). Relators have provided no evidence that Defendants were under an affirmative obligation at the time these backups were made to preserve in active format any and all emails for enrollment employees. Indeed, this case was not even unsealed until January 2, 2013, long after these backups were made.

### IV. TIF PRODUCTION, NOT NATIVE PRODUCTION, SHOULD BE ORDERED

Relators also seek the production of email in native format, rather than TIF image files and corresponding data files. Relators do this for some unknown reason. Thus far, the only reasons Relators have identified are "searchability" and the access to metadata—both of which can be equally accomplished with TIF productions. Native productions, by contrast, present a host of problems.

For one, redactions—which will be important here as this matter involves student information that will need to be redacted pursuant to FERPA—are much more difficult in native file productions. To truly redact material, it is necessary to cover up the information and restrict the ability of the recipient from viewing the underlying content. *Id.*, ¶ 26. TIF images allow a party to create an overlay that redacts the document. *Id.* Native files do not allow this. Rather, at best, to "redact" a native file,

one must alter the document itself, by either deleting the parts to be "redacted" or inserting a fonted bar over the "redacted" material, adding actual content to the document. *Id.* This is not desirable as it requires the reviewing party to alter the document itself prior to production.

For another, Bates stamping—important for keeping order of documents produced in the matter as it proceeds—is much more difficult in native file productions. *Id.*, ¶ 27. While in TIF productions, each page of an email is given a separate Bates number, this is not true with native productions where, at most, one whole document, which may have multiple pages, has one Bates number. *Id.* This makes it hard to keep track of pages under discussion in cases involving native file productions. The same is true for confidentiality designations. *Id.*

Finally, documents families (e.g., a parent email and an attachment) present issues when dealing with native files. *Id.*, ¶ 28. In a typical MSG email format, attachments are embedded with the main email message. *Id.* This makes it very difficult to withhold only "part" of the family on privilege grounds when that is what the producing attorney might otherwise do if the documents were in TIF (i.e., withholding the attachment while producing the cover email, or vice versa). *Id.* Because of the difficulty in separating an attachment from the parent email when dealing with native files, TIF productions are preferred.

In short, there are no reasons to require the production of email in native format. And there are more than sufficient reasons why TIF production is preferred. Further, Defendants have agreed to produce in native format any documents more easily read in native format (such as Excel spreadsheets), and to provide to Relators in native format any other emails they identify for native production (provided that the number of documents is not too burdensome and there is some good faith reason / justification for Relators' request). This is more than reasonable.

Dated: December 12, 2014

                                TIMOTHY J. HATCH
                                JAMES L. ZELENAY JR.
                                GIBSON, DUNN & CRUTCHER LLP


By: /s/ James L. Zelenay Jr.
      James L. Zelenay Jr.
      Attorney for Defendants Bridgepoint
      Education, Inc. and Ashford University, LLC
      Email: jzelenay@gibsondunn.com

101686132.6

Gibson, Dunn & Crutcher LLP

8

SUPPLEMENTAL BRIEF RE: PRODUCTION OF DOCUMENTS FROM BACKUP TAPES AND THE FORMAT USED IN THE PRODUCTION OF EMAIL
CASE NO. 10-CV-1401-JLS-WVG

# CERTIFICATE OF SERVICE

I, the undersigned, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 333 South Grand Avenue, Los Angeles, California 90071.

On December 12, 2014, I caused the following documents to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filings to all known counsel of record:

**SUPPLEMENTAL BRIEF RE: PRODUCTION OF DOCUMENTS FROM BACKUP TAPES AND THE FORMAT USED IN THE PRODUCTION OF EMAIL**

I declare under penalty of perjury under the laws of the United States of America and the State of California that the above is true and correct. Executed on December 12, 2014, at Los Angeles, California.

s/ James L. Zelenay Jr.
James L. Zelenay Jr.
Attorney for Defendants Bridgepoint Education, Inc. and Ashford University, LLC
Email: jzelenay@gibsondunn.com

1

SUPPLEMENTAL BRIEF RE: PRODUCTION OF DOCUMENTS FROM BACKUP TAPES AND THE FORMAT USED IN THE PRODUCTION OF EMAIL
CASE NO. 10-CV-1401-JLS-WVG