1  TIMOTHY J. HATCH, SBN 165369
2    thatch@gibsondunn.com
   JAMES L. ZELENAY JR., SBN 237339
3    jzelenay@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
4  333 South Grand Avenue
   Los Angeles, CA  90071-3197
5  Telephone:  213.229.7000
   Facsimile:   213.229.7520
6

7  Attorneys for Defendants,
   BRIDGEPOINT EDUCATION, INC. and
8  ASHFORD UNIVERSITY, LLC

9

10              UNITED STATES DISTRICT COURT

11             SOUTHERN DISTRICT OF CALIFORNIA

12
   UNITED STATES OF AMERICA *ex*        CASE NO. 10-CV-1401-JLS-WVG
13 *rel.* JAMES CARTER AND ROGER
   LENGYEL,                             **DECLARATION OF MICHAEL**
14                                      **MARKS IN SUPPORT OF**
                                        **DEFENDANTS' SUPPLEMENTAL**
15              Plaintiffs,             **BRIEF RE: PRODUCTION OF**
                                        **DOCUMENTS FROM BACKUP**
16      v.                              **TAPES**

17 BRIDGEPOINT EDUCATION, INC.,
   ASHFORD UNIVERSITY LLC, AND
18 DOES 1-500, INCLUSIVE,

19              Defendants.

20

21

22

23

24

25

26

27

28

I, Michael Marks, state and declare as follows:

1.    I have been engaged in the document discovery industry with particular focus on automated document discovery for litigation for more than 25 years. Currently, I am a Senior Consultant with DiscoverReady with a focus on electronic discovery, a position that I have held for 15 years.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.

2.    In my experience in the document discovery industry, I have supervised the production of hundreds of millions of pages of documents in litigation matters.  In the last year alone, I supervised the production of tens of millions of pages of electronically produced images and data in litigation matters.

3.    DiscoverReady is a provider of corporate legal discovery services, including providing technological support, document review, predictive coding, discovery management, and consulting services to Fortune 500 legal departments and their outside counsel.

4.    DiscoverReady is a member of Sedona Working Groups of the Sedona Conference, including the Working Group on Electronic Discovery.  The Sedona Conference is a nonprofit legal policy research and educational organization which sponsors Working Groups on cutting-edge issues of law.  The Working Group on Electronic Discovery is comprised of judges, attorneys, and technologists experienced in electronic discovery and document management matters.

5.    In my capacity as a Senior Consultant with DiscoverReady, I work with attorneys and supervise the automation of the discovery process, including scanning and coding of hard-copy documents, collection of electronically stored information ("ESI"), processing guidelines of ESI, helping to design the review and production processes, and helping the legal team integrate all aspects into one coherent process.  I am Concordance Certified, SQL Server 2000 certified, iConnect NXT Certified, and

1   Relativity Certified.  I am familiar with litigation specific document management

2   applications, including I-Pro, Summation, and Doculex.

3        6.       DiscoverReady has been contracted to provide electronic discovery

4   services to Defendants Ashford University, LLC and Bridgepoint Education, Inc.

5   (collectively, "Bridgepoint") in this matter.  I serve as the project lead for

6   DiscoverReady for this litigation.  Through this role, I have familiarity with issues

7   pertaining to the collection and production of documents by Bridgepoint in this matter.

8        7.       My understanding of the information discussed herein is based on my

9   personal experience as well as communications with personnel at Bridgepoint,

10   including Richard McElroy and Shirzad Farsian, Steve Morgan with Data Recovery

11   Systems, and other employees at DiscoverReady.

12      **A.**      **Bridgepoint's Email Storage and Retention Practices**

13        8.       Since 2005, Bridgepoint has utilized Microsoft Exchange for the

14   management of emails.  Bridgepoint utilized Microsoft Exchange Version 2003 until

15   late 2009, when it transitioned to Microsoft Exchange Version 2010.

16        9.       Bridgepoint maintains eight severs for the storage of active email—four

17   each in San Diego and Phoenix.  At both locations, two of the servers are used to

18   maintain "hot" databases (meaning that they host active data) and two are backup

19   databases.  Additionally, Bridgepoint utilizes three client access servers that support

20   these main email servers.  Individual user email accounts at Bridgepoint are assigned

21   to a particular server at the time the account is created.  The assignment of accounts to

22   servers is based on available capacity, not geographic considerations.

23       10.      Beginning since at least 2010, the majority of Bridgepoint user email

24   accounts were restricted to 250 MB of active storage, although some employees were

25   permitted to have unlimited storage based on their particular needs.  When a user's

26   account approached the 250 MB limit, an automatic notice was sent informing the user

27   of this fact.  The user was then responsible for taking steps to delete material in order

28   to free up space for future emails.  If a user went over the limit, he or she would

1    continue to receive emails, but could send new emails until adequate material was

2    deleted to bring the account below the limit.  Since the decision to delete material was

3    done at the user level, there is no log identifying the particular emails deleted.

4         11.    Bridgepoint employed backup tapes for some of the time period relevant

5    here (up to 2011), although the process changed over time.

6         12.   The earliest available backup in existence today is from late 2009, and that

7    was created as part of the process of Bridgepoint converting to Microsoft Exchange

8    Version 2010.  Because this was an early backup, it is unknown what precisely is

9    contained on this backup set of tapes or whether they are capable of being restored and

10    accessible.  Prior to this backup being created in 2009 and, afterward, until December

11    2010, there was no regular backup of email at Bridgepoint.  In fact, based upon

12    diligence to date, we have not been able to find any additional backups from this

13    period from late 2009 until December 2010.

14         13.    Beginning in December 2010, Bridgepoint began preparing backup tapes

15    for email using Symantec Backup at the end of each workday.  This process continued

16    through the end of 2011, and these tapes were made for disaster recovery purposes

17    only.  There are 287 backup tapes covering this time period from December 2010 to

18    the end of 2011.

19         14.    Bridgepoint uses Linear Tape-Open ("LTO") technology to store its

20    backups.  The amount of data stored on any individual tape can exceed one terabyte

21    and regularly exceeds 500 GB.  Additionally, Bridgepoint's backup tapes are

22    encrypted, as Bridgepoint utilizes Quantum Scalar Tape Library Hardware Encryption.

23    Bridgepoint's Encryption Key Manager server maintains the keys and regulates the

24    authorization to decrypt these tapes, which adds to the complexity of any potential

25    restoration.  In other words, to restore any tapes, one must replicate Bridgepoint's

26    backup environment and have a direct connection to Bridgepoint's Encryption Key

27    Manager server in order to begin the restoration process—a time-consuming process.

28

15.   Because the backup tapes were prepared on a daily (work day) basis from December 2010 until the end of 2011, there is almost certainly a high amount of duplication from one day's tapes to another day's tapes.

**B.   Cost of Restoring Bridgepoint's Backup Materials**

16.   Data Recovery Systems is a third party vendor that has restored backup tapes for Bridgepoint on one prior occasion, and has provided information to me as part of my diligence in providing this declaration.  Data Recovery Systems specializes in data recovery, data conversion, and e-discovery litigation support services, supporting nearly all server types, operating systems, file systems and email formats.

17.   Based on communications with Data Recovery Systems, Bridgepoint's backup tapes are non-typical, in that they are hardware-encrypted using a Quantum Scalar tape library.  This encryption method is specific to the Quantum Scalar tape library, and tapes encrypted with this method can only be restored by another Quantum Scalar library configured for encryption with access to Bridgepoint's encryption key server.  To restore these tapes, Data Recovery Systems must replicate the Bridgepoint hardware and software configuration in their own lab and setup a secure communication path from the Data Recovery Systems Quantum Scalar Tape Library to Bridgepoint's Encryption Key server located behind Bridgepoint's network firewall.

18.   It takes a significant amount of time to catalog and index the data from each of these tapes, which can hold up to 1.6 terabytes each natively.  Indeed, because of the unusually large quantity of email data stored on each of Bridgepoint's backup tapes, only one or perhaps two tapes are capable of being indexed per day.

19.   Once the data has been indexed, Data Recovery Systems must query the index for the target custodians.  This process can take two to four days depending on the quantity of email indexed and the number of custodians.

20.   After the custodians have been located, Data Recovery Systems must pull the data for each separate custodian, a process that can take three to four days

1    depending on the number of custodians located and the quantity of tapes that must be

2    mounted to extract the unique email for those custodians.

3        21.    Based on communications with Data Recovery Systems, the previous

4    restoration project mentioned above (of 44 tapes representing backups conducted on

5    four different dates) cost approximately $30,000 to restore email for 140 custodians.

6    Of note, only one of the four dates for which tapes were restored in this other matter

7    was from before 2012 (and was from November 2011).  Further, the cost of any

8    particular project is highly dependent on the number of tapes requiring index and

9    restoration, and the number of custodians.  Additionally, depending on the size of the

10   restoration or timeframe for production, Data Recovery Systems may need to purchase

11   additional equipment in order to construct a second environment to restore data from

12   tapes, which would cost approximately $40,000.

13   **C.    Costs Associated with Indexing, Cataloguing, Sorting,
         De-Duplicating, Processing, Hosting, Reviewing, and Producing Any**

14   **Restored Material.**

15       22.    In addition to the actual costs of restoration, there are additional costs that

16   would be incurred to index, catalog, sort, de-duplicate, process, host, review, and

17   produce documents form any restored tapes.  These are all costs that would be

18   involved in any restoration and production project, and they—like other costs—

19   increase as more tapes are subject to restoration, review, and production.

20       23.    Attached as Exhibit A hereto is a chart showing the estimated costs for

21   restoring, indexing, cataloging, sorting, de-duplicating, hosting, processing, reviewing,

22   and producing documents from tapes in this matter, depending upon the number of

23   tapes restored.  As the attached chart indicates, if just one date's set of tapes are

24   ordered to be restored, sorted, reviewed, and produced with respect to the data for 220

25   custodians (the approximately 140 that Bridgepoint previously agreed to produce plus

26   an additional 80 managers) the costs are estimated to be $565,607.   If just one

27   additional date's set of tapes are added, the total costs are estimated to be $708,359.

28

24.   Further, all of these processes take considerable time to complete.  In the aforementioned case involving the restoration of four date sets of Bridgepoint backup tapes, I understand it has taken approximately eight months to restore, filter, review, and begin producing materials from those tapes.

### D.   Production of Emails in Native Format is Undesirable

25.   It is my understanding that Relators in this litigation seek the production of emails in native format, as opposed to a TIF image.  While it is possible to produce emails in their native format, I do not believe it is preferable for several reasons.

26.   First, it is not possible to truly redact a native file.  The act of redaction involves covering up information and restricting the ability of the party receiving the production to view the content.  With native files, it is not possible to create an overlay that redacts a document as it would be with a TIF image.  The only way to "redact" a native document is to modify the document by either deleting the parts to be redacted or inserting a fonted bar over the redacted material and save it as a new version.  Thus, to "redact" a native file, it is necessary to delete or insert something in a manner that overwrites the existing information.

27.   Additionally, when a document is produced in native format, there is no Bates number endorsed at a page level as is the case with a TIF image, nor can the Bates number be printed on the page when trying to use the document as an exhibit.  Instead, one whole document has one Bates number, rather than a different number for each page.  Similar issues arise with regard to the application of confidentiality tags.

28.   Families (emails with attachments) pose particular challenges when using native formats.  In a typical MSG email format, attachments are embedded with the main email message while in native format.  This makes it very difficult to withhold only "part" of the family on privilege grounds when that is what the producing attorney might otherwise do if the documents were in TIF (i.e., withholding the attachment while producing the cover email, or withholding the cover email while producing the attachment).  Because of the difficulty in separating out an attachment

from the parent email when dealing with native files, attorneys may opt to withhold the entire document family when they otherwise would not do so—this, I cannot imagine, is what Relators desire here.

29.     Finally, there is nothing gained from producing emails in the native format. Any information contained in the native format, including metadata, can be provided in TIF images and the corresponding data files. While there are some files (e.g. spreadsheets) that can be more difficult to work with in a TIF image format, my understanding is that Bridgepoint has agreed to produce these other files in native format. I simply see no reason or justification why email files—which are at issue here—should be produced in native, as opposed to TIF format. Native production posts a host of complications, and the same information and searchability available in native production is also available in a TIF production.


I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct and that this declaration was executed by me in Valencia, California on December 5, 2014.

Michael Marks

EXHIBIT A

**Estimated Costs of Restoring, Indexing, Reviewing, and Producing Documents From Backup Tapes**

| | One date used (from previously restored tapes from Nov. 2011) | One date restored (other than previously used tapes) | Two dates indexed and restored | Quarterly tapes restored | Monthly tapes restored | All tapes restored (288 total) |
|---|---|---|---|---|---|---|
| Indexing and Restoration | $10,000 | $15,000 | $20,000 | $30,000 | $60,000 | $262,800 |
| Filtering De-duping Hosting | $130,200 | $130,200 | $260,400 | $1,302,000 | $3,385,200 | $6,249,600 |
| Attorney review | $336,707 | $336,707 | $340,074 | $739,744 | $960,663 | $1,440,994 |
| Production costs | $83,700 | $83,700 | $87,885 | $183,889 | $238,806 | $358,209 |
| **Total costs** | $560,607 | $565,607 | $708,359 | $708,359 | $4,644,669 | $8,311,603 |

Assumptions:
- For one date of tapes restored, assumed 930 GB total data restored
  - Assumed that max review volume following application of search terms would be 165,000 documents for one date restored.  Defendants would argue search term application should used to generate significantly fewer than 165,000 documents for review, but are using this as an estimate here.
- For two dates, assumed that double the data will be processed and increased new data for review by 1%
- For quarterly tapes, assumed that 10 times the data (one tape at first and last day of each quarter) for one date will be processed and assumed 30% new data for review each quarter
- For monthly tapes, assumed that 26 times the data (one tape at first and last day of each month) for one date will be processed and assumed 10% new data each month

EXHIBIT A

- For all (288) tapes:
  - Assumed double the data volume of monthly tapes and that this would result in 50% more data for Hosting, Production, and Review
  - Purchase of three additional Quantum Scalar Tape Libraries with Indexing Appliances at a cost of $30,000 each.
- Other assumptions
  - 18 months of hosting and 10 users for estimating hosting fees
  - 10% responsive rate to estimate production volume
- Restoration costs:  New tapes - $50/catalog, $500/index, $100/custodian;  Previously indexed tapes - $2,000/20 custodians, $20/custodian to deduplicate (within custodian), extract, and package into PSTs (1 per custodian).
- Attorney review costs:  assuming a cost of approximately $2 per document, factoring in first and second level review.