Mark Labaton (Bar No. 159555)
ISAACS FRIEDBERG
 & LABATON LLP
555 S. Flower Street, #4250
Los Angeles, California  90071
Telephone: (213) 929-5534
Facsimile:  (213) 955-5794
mlabaton@iflcounsel.com

Timothy Cornell (*Admitted Pro Hac Vice*)
GARDNER CORNELL
A Professional Corporation
33 Mount Vernon Street
Boston, MA   02108
Telephone:  (603) 277-0838
tcornell@gardnercornell.com

*Attorneys for Relators*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JAMES CARTER and ROGER LENGYEL,<br><br>                    Plaintiffs,<br>     vs.<br><br>BRIDGEPOINT EDUCATION, INC., ASHFORD UNIVERSITY LLC, and DOES 1-500, INCLUSIVE,<br><br>                    Defendants, | Case No. 10-CV-1401-JLS-WVG<br><br>**RELATORS' RESPONSE TO COURT'S ORDER FOR ADDITIONAL BRIEFING ABOUT BACKUP TAPES DISPUTE**<br><br>**Hon. William V. Gallo** |

130477.1

## I. INTRODUCTION

This action alleges that defendants Bridgepoint Education Inc. and Ashford University LLC (together "Bridgepoint") systematically defrauded the United States from 2005 to 2011. To prove their case, Relators need relevant documents from Bridgepoint from this time period – including electronic documents – which, of course, they are entitled to obtain pursuant to the Federal Rules of Civil Procedure. Yet, in response to Relators' requests for documents, Bridgepoint seeks to confine its source of production to a single, largely useless, set of backup tapes from late-2011 and refuses to produce any documents from additional backup tapes from 2009-2011. There are no other sources for these documents. Bridgepoint's refusal is part of an orchestrated strategy to ensure that relevant documents remain concealed. Moreover, Bridgepoint has suggested that production of the relevant tapes may be suitable to shifting of the certain costs to the Relators. But doing so would be contrary to both controlling and guiding law and at a minimum, would be premature.[1]

## II. ARGUMENT

For numerous reasons, Relators are entitled to relevant emails and other documents that Bridgepoint saved in backup tapes because these documents are not available from any other means. First, a critical additional factor, noted in the 2006 Rules Advisory Committee and supported by law, is a party's "failure to produce relevant information that seems likely to have existed but is no longer available on easily-accessed sources." Second, Bridgepoint made these documents both inaccessible and far more costly than necessary to access, when it should reasonably have known it would need to provide such

---

[1] Bridgepoint also refuses to produce any recruiter emails even though this is a case about recruiter compensation. Adopting the argument by Bridgepoint made in a five-page joint discovery brief filed by the parties, addressing four issues, this Court has stated at a recent case management conference that it will not compel production of a single recruiter email, but the Court did add at any such ruling would be without prejudice and the relators can move at any time to revisit that issue. Given the centrality of such relevant evidence to this lawsuit, Relators intend to so move expeditiously.

1

130477.1

documents in the course of litigation, including this lawsuit.  Third, the cost of the production, even by Bridgepoint's mysterious cost estimates, pale when compared to the $2 billion at stake in this litigation – money that this False Claims action seeks to return to the federal treasury and the citizens of the United States.  As a billion-dollar-a-year public company that touts itself for its technological advances, Bridgepoint has far more resources to support the production and control its costs than Relators.  Accordingly, following the law set forth in the *Zubulake* cases, and elsewhere, Bridgepoint should be required to produce, and should bear the cost of producing, relevant emails from its backup tapes and archives.

Bridgepoint's failure to meet these burdens is clear.  Instead, Bridgepoint attempts improperly to shift that burden to relators.  Defendants purposely took relevant information from easily-accessed sources and intentionally rendered it inaccessible and expensive to retrieve.

As a matter of public record, in October 2010, the Senate Committee on Health, Education and Labor subpoenaed Bridgepoint for documents, including recruiters' emails– the very highly relevant documents sought here and which Bridgepoint went to extraordinary efforts to hide and keep hidden.  Harkin Report, App. 4 at 1.[2]  At that time, the Senate Committee was investigating the company for wrongdoing, including recruiter compensation fraud as well as other wrongdoing for which the company has, as would reasonably been expected and anticipated and inferred, been sued in consumer and securities lawsuits now pending.  Similarly, in February 2011, the Iowa Attorney General Office issued Bridgepoint a CID covering its recruiting practices and, on July 2, 2010,

---

[2] Relators will imminently file a brief with this Court addressing this issue. Bridgepoint also refuses to any recruiter emails even though this is a case about recruiter compensation.  Adopting the argument by Bridgepoint made in a five-page joint discovery brief filed by the parties, addressing four issues, this Court has stated at a recent case management conference that it will not compel production of a single recruiter email, but the Court did add at any such ruling would be without prejudice and the relators can move at any time to revisit that issue. Given the centrality of such relevant evidence to this lawsuit, Relators intend to so move.

this False Claims Act case was filed. Yet, faced with these inquiries, and the likelihood of litigation to come, Bridgepoint scrambled to make its emails legally inaccessible; it did this by intentionally switching to a system that placed emails into backup tapes that it now contends – regardless of their relevance – are simply too expensive to produce. While Bridgepoint did this under the pretext or excuse of a business purpose, the overwhelming facts partly set forth above, and including Bridgepoint's shifting explanations, indicate that it intended to conceal discoverable, highly relevant, emails.

Knowing it created this situation, Bridgepoint now makes only vague, conclusory and ever-shifting representations about the alleged burden and costs of restoring the backup tapes. Meanwhile, it denies the Relators the relevant information necessary to test those representations. For example, Bridgepoint makes the straw man argument that Relators "continue to demand *all backup tapes ever in existence,*" (Jt. Stmt. at 9:20). Not so, never so. Similarly, Bridgepoint disingenuously argued that it "would take years to restore and cost millions of dollars." (Jt. Stmt. at 9:20-21). Yet, in refusing to answer basic questions regarding how its system for storing electronic documents works, Bridgepoint deprives Relators of the opportunity to evaluate any alleged cost of restoring the backup tapes or to make any reasonable alternative proposal.

Bridgepoint touts itself as "harness[ing] the latest technology" and yet it claims to keep backup tapes "for disaster recovery purposes" that would take years and millions of dollars in order to restore. (Jt. Stmt. at 9:10-12). This is absurd. Days before, Bridgepoint's counsel represented it would only cost $100,000 to restore the backup tapes. See Declaration of Mark I. Labaton ("Labaton Decl."), at ¶ 8. Following that, Bridgepoint represented it only cost Bridgepoint $15,000 to restore 20 backup tapes for another case. Labaton Decl., ¶ 12. Bridgepoint's moving target cost estimates vary depending on the day of the week. Moreover, Bridgepoint claims that the cost of "restoring, processing, and filtering data for *just the backup tapes for the end of 2011*, would easily exceed $50,000." (Jt. Stmt. at 9:12-16). But there is no way to know whether this estimate includes costs unrelated to restoration, such as running Boolean

3

130477.1

1  searches, attorney review and redaction. This use of blended costs should be out of
2  bounds to a cost-shifting analysis. *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 290
3  (S.D.N.Y. 2003) ("*Zubulake II*").[3]

4  Despite this, Bridgepoint continues to withhold from Relators critical information
5  regarding its electronic document retention system to which it must have the answers. At
6  the invitation of Bridgepoint's counsel, Counsel for Relators submitted a list of questions
7  regarding how Bridgepoint maintained, managed, stored, and backed up its electronic
8  documents. Labaton Decl., ¶ 11. The answers to these basic questions should have been
9  readily available to Bridgepoint as the company made lots of cost estimates beforehand,
10 and it is inconceivable how Bridgepoint could make any realistic estimates regarding the
11 burden or cost of restoring the backup tapes without knowing such facts. Yet, after
12 numerous follow-up emails, Bridgepoint at long last delivered only vague, confusing and
13 contradictory responses to just a portion of Relator's questions. *Id*., ¶¶ 12-13, Exh. B.
14 For example, Bridgepoint uses the terms "archive" and "backup" indiscriminately and it
15 is unclear whether the 20 tapes Bridgepoint restored for its other case were all for
16 November 2011. *Id*., ¶ 13, Exh. B. Without this information, there is no way to estimate
17 the cost of restoring the requested tapes.

18 Bridgepoint also claims it used Symantec Backup, *id*., a company that specifically
19 advertises its "easy-to-use backup and recovery" system and "fast and efficient" recovery
20 capabilities. Bridgepoint also reported it spent $15,000 to restore those 20 tapes, *id*., but
21 represented it would take years and millions of dollars to restore tapes containing most of
22 the relevant and requested discovery. (Jt. Stmt. at 9:20-21). Given the critical importance
23 of these documents, Bridgepoint's intentional conduct in rendering them inaccessible and

---

[3] Although decided in the Southern District of New York, *Zubulake I* and *Zubulake II* have been recognized as the leading federal cases regarding electronic discovery and cost-shifting, and have been followed by district courts across the country, including the Northern District of California. *See OpenTV v. Liberate Technologies*, 219 F.R.D. 474, 476-479 (N.D. Cal. 2003) (applying the *Zubulake* cost-shifting analysis to inaccessible electronic source code).

130477.1

the dearth of critical facts regarding the content of the backup tapes and the cost of restoring them, the question of burden-shifting is clearly unfounded. It is also premature.

Disputes regarding the scope and cost of electronic discovery, including the production of electronic data stored on backup tapes, should never be resolved based on assumptions and guesswork. *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 323-24 (S.D.N.Y. 2003) ("*Zubulake I*"). Because the Court needs a factual basis for its decision, it should require additional discovery if it believes there is a basis to consider cost-shifting. *Id*. The initial step in such an analysis is to "thoroughly understand the responding party's computer system, both with respect to active and stored data." *Id.* at 324. Here, if the Court believes some cost shifting might possibly be appropriate, it should first follow the approach set forth in *Zubulake I*. To this end, and because of facts indicating potential spoliation, Relators will imminently notice the deposition of Defendants' person most knowledgeable witness ("PMK") on topics relating to Bridgepoint's electronic storage system including its system specifications, record retention policy, backup system, disaster recovery policy, and restoration system. Labaton Decl., ¶ 13. As set forth above, the Court can, and should, find that no cost shifting should be required based on Bridgepoint's conduct. But if the Court has any questions relating to cost shifting, following the *Zubulake* cases' guidelines will provide with Court with a factual and reasoned basis for adjudicating that issue.

Dated: December 12, 2014       ISAACS FRIEDBERG & LABATON LLP

/s/  Mark I. Labaton
Mark I. Labaton
Attorneys for Relators

Dated: December 12, 2014       GARDNER CORNELL

/s/  Timothy Cornell
Timothy Cornell
Attorneys for Relators

5

130477.1