1
2
3
4
5

UNITED STATES DISTRICT COURT

6

SOUTHERN DISTRICT OF CALIFORNIA

7
8   UNITED STATES OF AMERICA *ex*
    *rel.* JAMES CARTER and ROGER
9   LENGYEL,                                        Case No. 10-CV-01401-JLS (WVG)
10                              Plaintiffs,
11                                                   **ORDER ON RELATORS'
                                                     RESPONSE TO COURT'S ORDER
12                                                   FOR ADDITIONAL BRIEFING
          v.                                         ABOUT ELECTRONIC FORMAT
13                                                   DISPUTE, DEFENDANTS'
                                                     SUPPLEMENTAL BRIEF RE:
14                                                   PRODUCTION OF DOCUMENTS
                                                     FROM BACKUP TAPES AND THE
15   BRIDGEPOINT EDUCATION, INC.,                    FORMAT USED IN THE
     ASHFORD UNIVERSITY LLC, and                     PRODUCTION OF EMAIL, AND
16   DOES 1-500, INCLUSIVE,                          RELATORS' RESPONSE TO
                                                     COURT'S ORDER FOR
17                                                   ADDITIONAL BRIEFING ABOUT
                              Defendants.            BACKUP TAPES DISPUTE**
18
19                                                   **(Doc. Nos. 67, 68, 69)**
20   I.   **INTRODUCTION**
21        Before the Court are the Relators' Response to Court's Order for Additional
22   Briefing About Electronic Format Dispute ("Plaintiffs' Response"), Defendants'
23   Supplemental Brief re: Production of Documents from Backup Tapes and the Format
24   Used in the Production of Email ("Defendants' Reply"), and Relators' Response to
25   Court's Order for Additional Briefing About Backup Tapes Dispute ("Plaintiff's Second
26   Response") (collectively, "Parties' Papers").[1] Therein, Plaintiffs and Defendants contest,
27   first, the types of electronically stored information ("ESI")–from backup databases to

28

---

[1] Two other orders shall be released within days of this order's docketing.

active emails to metadata–that Defendants must assemble and deliver at their own expense and, second, the specific format in which this ESI must be produced for Plaintiffs' examination during the course of discovery in accordance with the Federal Rules of Civil Procedure ("Rules")[2] and their overarching policy "to secure the just, speedy, and inexpensive determination of every action and proceeding."

For the Parties' arguments to be fully understood, this Court first clarifies some essential linguistic ambiguity.[3] "ESI" has been defined as any information stored electronically, regardless of the media or whether it remains in its original format, as opposed to those data stored in hard copy, *i.e.* paper. Three distinct varieties of ESI factor in this order: electronic information stored in unspecified databases, metadata, and a set of emails, electronic missives sent, received, and managed via a multitude of different structured data applications, such as Outlook or Lotus Note, or webmail programs like Gmail or Yahoo.[4] A type of ESI, a "file," a collection of related data or information stored as a unit under a specific name on a storage medium, can be produced in one of two formats: Native format ("Native") or Tagged Image File Format ("TIFF"). ESI in Native retains the file structure associated with and defined by the original creating application, and TIFF is a widely used and supported graphic file format for storing bit-mapped images, with many different compression formats and resolutions possible. A generic term, "metadata," colloquially known as "data about data," encompasses the structural information of a file that contains data about it as opposed to describing its actual substantive content. Often hidden and embedded within the original file, metadata does not normally appear on a printed page and thus survive TIFF regeneration; however,

---

[2]  Unless otherwise noted, "Rule" refers to the Federal Rules of Civil Procedure throughout this order.

[3] These definitions appear in a number of authoritative sources. See, e.g., THE SEDONA CONFERENCE, THE SEDONA CONFERENCE GLOSSARY: E-DISCOVERY & DIGITAL INFORMATION MANAGEMENT (4th ed. Apr. 2014); BARBARA J. ROTHSTEIN, RONALD J. HEDGES & ELIZABETH C. WIGGINS, MANAGING DISCOVERY IN ELECTRONIC INFORMATION: A POCKET GUIDE FOR JUDGES 23-24 (2007);  FED. JUD. CTR., MANUAL FOR COMPLEX LITIGATION § 11.446 (4th ed. 2004).

[4] Seemingly, since stray emails may reside within the relevant databases, the two categories may effectively overlap. As such, any non-active email can only now be found on Defendants' backup tapes.

it can be partially preserved or at least either recreated or appended to a TIFF document. Although each boasts advantages and demerits, both Native and TIFF are reasonably usable formats. Although it has no single definitive denotation, the "accessibility" of certain ESI is a function of its reproduction's expense in a particularly requested or desired format. "Active" ESI is data is currently or habitually in use and thus relatively cheaper to produce than "inaccessible data," generally considered to be ESI stored on backup tapes or which has been deleted, fragmented, or damaged.

Plaintiffs' demands for three discrete subsets of ESI–databases archived on backup tapes ("Backup Databases), active emails ("Active Emails"),[5] and this ESI's assorted metadata ("Metadata")–have precipitated the Parties' present disputes, effectively three in number. First, every iota of data on the backup tapes, Defendants insist, must be deemed inaccessible, and the cost associated with recovery and generation in any format, whether Native or TIFF, should be borne by Plaintiffs. Naturally, Plaintiffs disagree, arguing both that backup tapes are equally discoverable and that this data's inaccessibility is due to Defendants "intentional[] alter[ing] the format of its data so as to make it such relevant discovery inaccessible." Second, Plaintiffs have insisted that those emails not on backup tapes, i.e. active ESI, be provided in Native; Defendants prefer TIFF. Finally, though it is a disagreement buried within the latter in the Parties' Papers, Plaintiffs have also made clear their desire for the entirety of this ESI's metadata. Thus, in urging this Court to compel Native production, Plaintiffs emphasize that ESI in this format is cheaper to produce, retains otherwise discoverable metadata, and is easier to use, search, and sort.[6]

Although the case law regarding ESI is continuously evolving, certain definite tenets have emerged. Critically, they have been written into the Rules both before and after their 2006 emendation; critically, despite contrary applications, specific standards

---

[5] In this order and in accordance with Defendants' regular business practices,  (Doc. No. 68 at 4–6), inactive emails are subsumed within the latter category of ESI: "Backup Databases."

[6]  By virtue of metadata's uncertain relevance to a particular action and generally enormous cost of reproduction, precision in explaining this data's importance in an initial discovery request is often critical and occasionally dispositive. This general, albeit recent, rule of thumb figures in this Court's later explication.

have gained the judiciary's wide support. In accordance with these standards and the decided weight of precedent, as explained more fully below, this Court DENIES without prejudice Plaintiffs' demand for the Backup Data's production in any form, Native production of Active Data to the extent that ESI has already been provided by Defendants, and the provision of metadata already deleted and rendered inaccessible during Defendants' regular operations.

## II.   BACKGROUND

### A.   Relevant Facts

Bridgepoint Education, Inc. ("Bridgepoint"), a publicly traded company incorporated under Delaware law in May 1999 with its headquarters in San Diego, California, operates two brands: Ashford University ("Ashford"), purchased by Bridgepoint in March 2005, and the University of the Rockies, acquired by Bridgepoint in September 2007.[7/] Bridgepoint Education Inc., Securities Registration Statement 2, 5 (Form S-1) (Dec. 22, 2008).[8/] From 2008 through 2011, Ashford derived at least 83.5% of its revenues from Title IV, the federal government's financial program for students, as administered by the Department of Education.[9/] Id. at 11; see also, e.g., Bridgepoint Education Inc., Securities Registration Statement 7 (Form 10-K) (Aug. 4, 2014); Bridgepoint Education Inc., Securities Registration Statement 3 (Form 10-K) (Mar. 2,

---

[7/] For more on these entities' controversial history, see MAJ. STAFF OF S. COMM. ON HEALTH, EDUC., LABOR & PENSIONS, 112TH CONG., IS THE NEW G.I. BILL WORKING?: FOR-PROFIT COLLEGES INCREASING VETERAN ENROLLMENT AND FEDERAL FUNDS 293–314 (Comm. Print 2014). For uncertain reasons, Plaintiffs heavily cite this report in their response. (Doc. No. 69 at 3–4.) This reliance, however, ignores a critical fact. However accurate it may be, a congressional report is not a finding of fact or proof of a wrong committed as a matter of law, regardless of what it may be as "a matter of public record." (Id.) As this particular document's title indicates, moreover it is not even the formal congressional report accompanying an enacted bill, one of the rare pieces of legislative history occasionally worthy of some judicial solicitude.

[8/] Filings with the Securities and Exchange Commission ("SEC") are "matters of public record of which . . . [a] court can take judicial notice." Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014); Yates v. Mun. Mortg. & Equity LLC, 744 F.3d 874, 881 (4th Cir. 2014); FED. R. EVID. 201(b).

[9/] The program's name arises from its origins in Title IV of the Higher Education Act of 1965 ("HEA") as part of President Lyndon B. Johnson's Great Society. 20 U.S.C. § 1070 et seq. Its purpose "to assist in making available the benefits of postsecondary education to eligible students," Id. § 1070(a), the statute "was intended to benefit the student, and not the institution," Bowling Green Jr. Coll. v. U.S. Dep't of Educ., 687 F. Supp. 293, 296 (W.D. Ky. 1988).

2010). With these two brands in hand, Bridgepoint has long described itself as "a regionally accredited provider of post secondary education services." Bridgepoint Education Inc., Securities Registration Statement 3 (Form 10-K) (Dec. 22, 2008). Bridgepoint purposely and "generally structure[s] the tuition and fees for [its] programs to be below Title IV loan limits and average grant awards, permitting students who do not otherwise have the financial means to pursue an education the ability to gain access to . . . [its] programs." Id. at 7.

The Plaintiffs' relationship with Bridgepoint's Ashford subsidiary dates to 2008. From March 2008 through at least May 10, 2013, Mr. James Carter ("Carter") worked as an "enrollment advisor" on Ashford's "San Diego campus"[10/] (Doc. No.31 ¶ 5.) From January 2009 through September 2010, Mr. Roger Lengyel ("Lengyel") labored on the same "campus" and in the same capacity. (Id. ¶ 6.) As "enrollment advisors" (also called "recruiters"), Plaintiffs served as Defendants' recruiters and engaged in miscellaneous activities so directed. (Id. ¶ 17.) According to Plaintiffs, Ashford employs charts, formally refereed to as "Matrices," in which it records its enrollment advisors' performance by use of various criteria and publishes a salary range corresponding to each performance rating. (Id. ¶¶ 17–19, 21.) Defendants contend that this matrix, which includes numerous factors and data, determines how each enrollment advisor is paid and, during the relevant time, factored enrollment numbers as only one of many pertinent factors.[11/] In decided contrast, Plaintiffs maintain that enrollment advisors were instead paid "based *directly* upon enrollment activities." (Id. ¶¶ 17, 20 (emphasis added).) Due to this practice, in Plaintiffs' colorful language, with actual knowledge of, deliberate indifference to, or reckless disregard for the essential veracity of their certification to the Department of Education, Defendants "falsely represent[ed] every year between 2004 and

[10/] The accuracy of this particular statement is hard to gauge. Technically, Ashford has one physical location in Clinton, Iowa, and the University of the Rockies has its one physical campus in Colorado Springs, Colorado. Ashford's corporate headquarters is, however, in San Diego. This fact suggests that Carter worked not on the "San Diego campus" but at Ashford's corporate center in San Diego.

[11/] From 2002 to 2010, the period of this lawsuit, consideration of this data was permitted so long as recruitment numbers were not the sole determinant of an advisor's pay. See infra Part II.B.

2011 that they . . . [were] in compliance with [the Higher Education Act's] prohibition against using incentive payments for recruiters for recruiting activities, which is a core prerequisite to eligibility for Tittle IV Funds."[12] (Id. ¶ 1.)

**B.    Relevant Statutes**

Passed in 1863, the False Claims Act ("FCA"), also known as the "Abraham Lincoln Act," "*Qui Tam* Act,"[13] and "Informer's Act," allowed private persons to bring an action on behalf of the federal government for any fraud perpetrated upon it and receive fifty percent of any damages awarded and forfeitures ordered. 31 U.S.C. § 3730; Patricia Meador & Elizabeth S. Warren, The False Claims Act: A Civil War Relic Evolves into a Modern Weapon, 65 TENN. L. REV. 455, 458–59 (1998) (discussing the FCA's history); United States ex rel. Longhi v. Lithium Power Techs., Inc., 530 F. Supp. 2d 888, 891 (S.D. Tex. 2008); United States ex rel. Corsello v. Lincare, Inc., No. 1:98-CV-0204-ODE, 2003 U.S. Dist. LEXIS 27719, at *7 n.5, 2003 WL 25714876, at *2 n.5 (N.D. Ga. June 2, 2003); United States ex rel. Wilkins v. N. Am. Constr. Corp., 173 F. Supp. 2d 601, 625 n.20 (S.D. Tex. 2001). This "remedial statute . . . [was] intended to protect the [United States T]reasury against the hungry and unscrupulous host that encompass it on every side" and was animated by the belief "that one of the least expensive and most effective means of preventing frauds on the treasury is to make the perpetration of them liable to actions by private persons acting . . . under the strong stimulus of personal ill will or the hope of gain." United States v. Griswold, 24 F. 361, 366 (D. Ore. 1885), cited in United States v. O'Connell, 890 F.2d 563, 568 (1st Cir. 1989). While Congress constricted its scope in 1943, see United States ex rel. Wisconsin v. Dean, 729 F.2d 1100, 1103 (7th Cir. 1984), and relaxed its jurisdictional threshold once more in 1986, S. REP. NO. 99-345, at 4 (1986), the FCA's purpose has remained

---

[12] For a more detailed elucidation of the relevant statute and regulation, see infra Part II.B.

[13] That appellation traces its roots to the common law term for such actions: *qui tam pro domino rege, quam pro se ipso in hoc parte sequitur*, meaning "he who uses for the king as well as for himself." Little v. Shell Exploration & Prod. Co., No. H-07-871, 2011 U.S. Dist. LEXIS 41566, at *2–3, 2011 WL 1370565, at *1 (S.D. Tex. Apr. 8, 2011); BLACK'S LAW DICTIONARY 1262 (7th ed. 1999) (defining the phrase).

unchanged for more than a century, Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 949, 117 S. Ct. 1871, 1877, 138 L. Ed. 2d 135 (1997) (citing Griswold, 24 F. at 366); Thomas F. O'Neill III et al., The Buck Stops Here: Preemption of Third-Party Claims by the False Claims Act, 12 J. CONTEMP. HEALTH L. & POL'Y 41, 43 (1995).

In its present form, the FCA allows "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States Government," 31 U.S.C. § 3730(b)(1), and deems such persons "a relator," Vt. Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 769, 120 S. Ct. 1858, 1860, 146 L. Ed. 2d 836 (2000). Section 3729, in turn, subjects any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" to liability under the FCA. 31 U.S.C. § 3729(a)(1)(A), (B); United States ex rel. Spicer v. Westbrook, 751 F.3d 354, 360 n.6 (5th Cir. 2014) (31 U.S.C. § 3729(a)(1)(B)); United States ex rel. Grenadyor v. Ukranian Vill. Pharm., Inc., 772 F.3d 1102, 1105 (7th Cir. 2014) (citing 31 U.S.C. § 3729(a)(1)(A)). Once a person commences a suit under § 3729 and if the federal government, having received a copy of the complaint and supporting documentation, declines to intervene, the relator gains the exclusive right to conduct the action. 31 U.S.C. § 3730(b)(2), (4), (c)(3); United States ex rel. Grynberg v. Praxair, Inc., 389 F.3d 1038, 1041 (10th Cir. 2004) (discussing this statutory framework). The federal government is permitted to subsequently intervene only upon a showing of "good cause." 31 U.S.C. § 3730(c)(3). In the absence of such intervention, a relator "shall" receive a "reasonable" amount that "shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement," attorneys' fees and costs to be separately ascertained. Id. § 3730(d)(2); United States ex rel. Sharma v. Univ. of S. Cal., 217 F.3d 1141, 1143–44 (9th Cir. 2000).

The fraud at issue here arises from Defendants' purported violation of a particular encoded prohibition. Under the auspices of Title IV, the federal court dispenses funds to

institutions to assist students with the costs of higher education. To participate in this generous program, such entities must enter into a Program Participation Agreement with the Department of Education, binding these schools to a "panoply of statutory, regulatory, and contractual requirements." United States ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1168 (9th Cir. 2006). Among the many such constraints, Section 1094(a)(20) of the United States Code's twentieth title ("Incentive Compensation Ban") forbids "an institution of higher education" from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollment or financial aid to any persons or entities engaged in any student recruiting or admission activities . . . ." 20 U.S.C. § 1094(a)(20); United States ex rel. Lee v. Corinthian Colleges, 655 F.3d 984, 989 (9th Cir. 2011). One court has eloquently explained this proscription's aim: "The underlying concern here is that institutions . . . will recruit unqualified students who will then find themselves unable to repay these loans, causing a significant loss to the U.S. government." United States ex rel. Lopez v. Strayer Educ., Inc., 698 F. Supp. 2d 633, 635 (E.D. Va. 2010).

In ascertaining whether a violation of the Incentive Compensation Ban has occurred, the critical question is not whether an institution has crafted a written policy proclaiming fealty to its technical requirements. Rather, it is "the [the school's] implementation of its policy . . . that bears scrutiny," and this ban will be violated whenever "despite [a] Compensation Program's purported or documented reliance on something other than recruitment numbers, [] salary increases are *in practice* determined in the sole basis of recruitment numbers." Lee, 655 F.3d at 996. As a consequence, when institutions of higher education, for profit or nonprofit, engage in this kind of verboten conduct yet nonetheless, either implicitly or explicitly, certify their compliance with federal law in order to retain their eligibility for Title IV funds, they have committed the kind of fraud policed by the FCA by means of "fraudulent inducement" or, alternatively, "false certification." E.g., United States v. Educ. Mgmt. Corp., 871 F. Supp. 2d 433, 450–51 (W.D. Pa. 2012) (outlining the varied theories employed in such cases); United

States v. Univ. of Phoenix, 461 F.3d 1166, 1172–73 (9th Cir. 2006) (collecting such cases); Amanda Harmon Cooley, The Need for Legal Reform of the For-Profit Educational Industry, 79 TENN. L. REV. 515, 534–35 & n.131 (2012) (same). While a safety harbor once existed, allowing institutions to peg salary to recruitment so long as recruitment numbers were but one factor in their compensation scheme, it was extirpated from the Code of Federal Regulations on or around July 1, 2012. 34 C.F.R. § 668.14(b)(22)(I); United States ex rel. Klein v. Empire Educ. Corp., 959 F. Supp. 2d 248, 259 (N.D.N.Y. 2013) (so observing); Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co., 873 F. Supp. 2d 1070, 1073 (D. Minn. 2012) (discussing the safety harbor's history).[14/]

## C.    Summary of Disputes ## 1, 2, 3, and 4

As discovery began in earnest, four interrelated disputes implicating the production of Defendants' myriad ESI arose. Stated briefly, the Parties disagreed over the custodians to be searched ("Dispute #1"), the time periods for which Defendants were obligated to provide their business records ("Dispute #2"), the number of databases to be queried and their content produced by Defendants for Plaintiffs' examination ("Dispute #3"), and the production format of any and all ESI ("Dispute #4"). (Doc. No. 63 at 2.)  A fifth one–the production of ESI with its metadata intact–arose as well, one referenced in the Plaintiffs' Response.[15/] (Doc. No. 67 at 1.) The Parties met and conferred regarding these matters, but they were unable to reach an agreement. Accordingly, they summarized these disputes in the Joint Statement of the Parties on Plaintiffs Motion to Compel prior to a teleconference with this Court. (Doc. No. 63.)

The genesis of Dispute #1 was Plaintiffs' request for all documents "in the possession, custody, or control of Bridgepoint, including its officers, management, employees, agents, representatives, attorneys, insurers, any persons acting on its behalf,

---

[14/] As this suit covers actions that allegedly transpired between 2004 and 2010, this safety harbor was in force during the relevant time period. (Doc. No. 41 at 3.)

[15/] Both Parties seem to overlook a critical fact: TIFF production can still contain metadata, depending on the software and process involved.

and affiliates and departments."[16/] (Doc. No. 63 at 2.)  Defendants initially sought to limit this class to managerial employees, including "over 100 custodians, including custodians at corporate headquarters who could have been involved in compliance or auditing, individuals in the legal departments, and individuals in charge of compensation adjustments" and a limited number of "Admissions Managers, the direct supervisors of the line-level Enrollment Advisors." (Id. at 3.) As both Plaintiffs and Defendants acknowledged, Defendants employed over 4,500 enrollment advisors from 2005 through 2010.

Dispute #2 involved the relevant time period for production. Plaintiffs demanded "production of documents from 2005 to present"; Defendants refused. (Id. at 4.) Defendants argued that the factual events allegedly underlying Plaintiff' claims, as embodied in the unsealed complaint, had transpired between 2005 and 2011. (Id. at 5.) Pursuant to their own complaint, therefore, Defendants contended that Plaintiffs were not entitled to any ESI from before 2005 or after 2011. In response, Plaintiffs emphasized, "[A]ny current documents would be relevant to prior company actions," and added, "The Complaint alleges claims extending 'through the present date'." (Id. at 5.) Defendants countered: "[T]he 'present date' is the date of filing, July 2, 2010, and therefore could not have related to any post-filing allegations." (Id. at 6.)

Summarized under the title "Backup Databases," Dispute #3 was engendered by Plaintiffs' request that Defendants produce "all documents within . . . [their] control." (Id. at 7.) Defendants objected on the grounds that many of their databases were stored in backup tapes and were therefore not "reasonably accessible because of undue burden and cost." (Id.) Without actually providing any concrete evidence, Plaintiffs insisted, this storage format "mean[t] that Bridgepoint intentionally altered the format of its systems in the face of state investigations and private securities and fraud actions." (Id. at 8.) Plaintiffs listed at least three such investigations and actions, including those by Iowa's

---

[16/] Though not particularly relevant at this stage, it is notable that this original request was remarkably broad. The same can be said about the demand that spawned Dispute #3. See infra Part II.C–D.

10-CV-01401-JLS-WVG

attorney general, the United States Senate's Health, Education, Labor and Pensions Committee, and private investors' securities ligation. (Id.) According to Plaintiffs, as a result of these investigations,[17/] "the relevant information Relators seek is neither 'inaccessible' nor unduly burdensome for Bridgepoint to produce."(Id.) In an accusation later to be reiterated, Plaintiffs declaimed: "Bridgepoint must have anticipated that such material would be requested from the company," but "in the face of litigation and investigation . . . Bridgepoint decided to intentionally alter the format of its data to make such relevant discovery inaccessible, invisible, and/or 'too costly' to access," thereby engaging in what "appears to be a form of intentional spoliation."  (Id. at 8–9.)

Dispute #4 arose from Plaintiffs' instruction to Defendants "to produce each original document with all non-identical copies and drafts of that document." (Id. at 11.) As to ESI, Defendants promised to produce the requested material in "single-branded TIFF images."  (Id.) Plaintiffs then objected, demanding that Native be used for even those emails stored on Defendants' backup tapes. (Id.) As Plaintiffs again echoed, by doing so, Defendants have refused to satisfy Rule 34(b)(2)(E)(ii), as TIFF is not the form in which the backup tapes' ESI is "ordinarily maintained or in a reasonably useable form."[18/] (Id.) "Bridgepoint," Plaintiffs declare, "once again seeks to conceal relevant information, including metadata, and to make it prohibitively costly for Relators to search for such information." (Id.)

To deal with this quartet, at an informal teleconference held in the late afternoon of December 2, 2014, this Court resolved Dispute #1, requiring production of emails from,

---

[17/] Technically, Plaintiffs employ the word "thus." (Doc. No. 63 at 8.) Because this adverb, as a linguistic matter, equates to "accordingly" or "consequently" in denotation, the Plaintiffs' own motion effectively contends that these investigations are the reason why the referenced ESI should not be deemed inaccessible. How this can be known, rather than inferred, is unclear.

[18/] Beyond the legal weaknesses in this contention, later to be detailed, this statement is factually and logically incorrect. TIFF, as numerous sources recognize, is a "reasonably usable form," and by definition ESI placed in inaccessible backup tapes in the regular course of business is "ordinarily maintained" in inaccessible form. To wit, regardless of the production format demanded, already inaccessible data is by definition *inaccessible*. These defects are further explored below. See infra Part III.

among others, a sampling of managers.[19] In regards to Dispute #2, this Court allowed Plaintiff access to records from March 2005 through December 31, 2011. The Court also ordered Defendants to produce the contents of one backup tape. (Doc. No. 68 at 6.) As Defendants have astutely perceived, in practical effect, the Court granted Plaintiffs access to every email but those between recruiters and students, amongst recruiters exclusively, and between recruiters and random third parties. (Doc. No. 72 at 4–5.)

**D.    First Two Subjects of this Order: Disputes ## 3 and 4**

At this conference's end, therefore, two controversies–Disputes ##3 and 4–were left undetermined, scheduled for briefing by the Parties as December and January unfolded: the specific format in which Defendants' backup tape-stored ESI would be produced. Defendants have insisted on the use of TIFF; Plaintiffs have demanded that Native be utilized for "all electronically stored information." (Doc. No. 67, at 2–3; Doc. No. 68, at 2–3.) The Parties' Papers articulate each side's arguments as to these narrow, albeit complicated, issues, in the process begetting one anew.[20]

Having delineated the relevant standard for ESI discovery, Defendants initially explain their process for storing ESI. "Active," currently utilized emails and documents are stored on readily available servers, but all other electronic data, defined in the negative, is automatically stored on backup tapes. (Doc. No. 68 at 4–5.) Intended to be used in case of disaster recovery, these backup tapes "are encrypted," and one alone "can exceed one terabyte." (Id.). Thereupon, Defendants propound six reasons for opposing Plaintiffs' demand for Native production. First, as much precedent attests, "disaster recovery backup tapes—such as those at issue here—are generally considered inaccessible and not subject to required review or production." (Id. at 5 (citing Rowe Entm't, Inc. v. The William Morris Agency, Inc., 205 F.R.D. 421, 431 (S.D.N.Y. 2002)).)

---

[19] This denial is the focus of Document Numbers 72 and 73, as Plaintiffs have petitioned for this order's reconsideration in the former motion.

[20] Despite the Court's briefing schedule, a cascade of papers continued unabated. Not only did this torrent hopelessly confuse the issues but it also eventually devolved into attacks of a peculiarly personal nature. This troubling pattern will be the subject of a separate order.

In Defendants' view, this case's peculiar circumstances strengthen this presumption, as the information will only be accessible via a unique restoration process ("one environment") that will allow indexing of, at most, one tape per day. (Id.) Conservatively estimated, "[t]he total time for production" will be "months" at "substantial costs and effort." (Id. at 6.) For these reasons, Native production will be "unduly burdensome." (Id. at 6, 7.) Second and relatedly, the cost will allegedly be astronomical, (Doc. No. 68 at 5), a conclusion supported by an expert's declaration, (Doc. No. 68-1). While it will cost $560,607 for the restoration, review and production of a backup tape encompassing ESI produced by 140 defendants identified from Plaintiffs' parameters and the 80 managers ordered for sampling by this Court, adding just one more set of tapes will increase the cost by $147,752 to $708,359, and completing the restoration of every backup tape to Native, as requested by Plaintiffs, will total $2,255,633. (Doc No. 68 at 6.) Third, this storage procedure has been Defendants' longstanding practice. (Id. at 4–5.) Indeed, in 2010, it actually made more ESI available for potential search and recovery, as it did not even commence regular backups of emails until December 2010. (Id. at 4–5.) Fourth, "[d]espite Relators' unsupported accusation to the contrary," Defendants deny they engaged in "intentional spoliation"; in other words, they did not purposefully render data normally stored in Native inaccessible with the intent of hindering such data's future discovery (Id. at 7.) This is so for two discrete reasons: first, as Defendants had already explained, their data retention policies predated this suit's unsealing,[21] and second, Plaintiffs have presented no evidence that Defendants were under a duty to preserve the data in active format, *i.e.* Native, prior to that critical date. (Id. at 7.) Fifth, Defendants contest Plaintiffs' conclusion that Native is both more searchable and allows surer access to metadata; "both . . . can be equally accomplished with TIFF productions." (Id.) Finally, Defendants enumerate the "host of problems" posed by the prospective use of Native for the backup tapes' ESI, above all the ease of redacting confidential information, Bates

---

[21] Once the government declined to intervene, the suit was unsealed on January 2, 2013. (Doc. No. 41 at 3.) Defendants claim to have been generally unaware of their potential legal liability until that precise date; Plaintiffs seem to mock this position. (Doc. No. 63 at 7–8; Doc. No. 72 at 4–8.)

stamping, and withholding attachments frequently embedded within the main email message from release. (<u>Id.</u> at 7–8.) In sum, "there is no reason to require production of email in native format[, a]nd there is more than sufficient reason why TIF[F] production is preferred." (<u>Id.</u> at 8.)

Both in their first and second filing, Plaintiffs present seven arguments in their favor. First, they stress the formats' relative utility and cost of production, deriding TIFF as "extremely expensive to produce, contain[ing] no metadata, and . . . not searchable by electronic means without extensive and expensive additional processing" and the "creation of additional layers of 'searchable' data (with inherent risks of errors and omissions)."(Doc. No. 67 at 2.) Its request, when considered overall, is "cheaper." (<u>Id.</u>) Second,"metadata is itself discoverable," and metadata "may be essential to a full understanding of the document" provided. (<u>Id.</u> at 2 (internal quotation marks omitted) (citation omitted).) Third, both the emails and the documents can be "redacted" so as to preserve confidentiality, and "any arguably privileged information" under federal law "would be covered under the existing protective order." (<u>Id.</u>) Fourth, multiple workarounds can allegedly be found that may fully address Defendants' final objection, itself disparaged by implication as a "hypothetical problem": "[P]roduction in native format cannot be bates-labeled." (<u>Id.</u> (internal quotation marks omitted) (citation omitted).) Fifth, Defendants possess "far more resources to support the production and control its costs than" Plaintiffs, as Bridgepoint is "a billion-dollar-a-year public company that touts itself for its technological advances." (Doc. No. 69 at 3.) Sixth, "the cost of production" in the form which Plaintiffs demand "pale[s] when compared to the $2 billion at stake in this litigation – money that this False Claims action seeks to return to the federal treasury and the citizens of the United States."[22/] (<u>Id.</u>)

Plaintiffs' most disconcerting reason, as expounded in several motions, are the sundry malefactions that it accuses Defendant of committing. These include "refusing to

---

[22/] Whatever one's thoughts regarding *qui tam* actions, this statements strike the Court as needlessly dramatic. Plaintiffs–and their counsel–will earn much if this action succeeds, and since a portion of the recovery goes to Plaintiffs, the sum of which the United States has been defrauded will not be entirely remitted to the Treasury.

answer basic questions regarding how its system for storing electronic documents works" and delivering only "vague, confusing and contradictory" explanations.  (Id. at 3.) As a result, Plaintiffs have been deprived of their ability both "to evaluate any alleged cost of restoring the backup tapes or to make any reasonable alternative proposal," concocting "absurd" stories "that [it] would take years and millions of dollars to restore" the relevant data, and possibly using figures that blend the costs of attorney review and redaction. (Id. at 4–5.) In this vein, Plaintiffs describe the ESI's relative inaccessibility to be a result of Defendants' own deliberate obstruction: "Bridgepoint made these documents both inaccessible and far more costly than necessary to access, when it should reasonably have known it would need to provide such documents in the course of litigation, including this lawsuit." (Id.) Having fail to append any expert declaration, Plaintiff's Second Response concludes: "Disputes regarding the scope and cost of electronic discovery, including the production of electronic data stored on backup tapes, should never be resolved based on assumptions and guesswork." (Id. at 5 (relying on Zubulake v. UBS Warburg LLC, 217 F.R.D. 309 (S.D.N.Y. 2003)).)

**E.    Final Subject of this Order: Dispute # 5**

In the course of this back-and-forth, a fifth dispute suddenly emerged. Notably, Dispute #5 was never clearly summarized in the Parties' original statements to this Court; notably, Dispute #5 involves a form of ESI that both Parties subsumed into their conflict over Native and TIFF. Thus, in pushing for Native production, Plaintiffs asseverated that one of this format's benefits was its perseveration of metadata. (Doc. No. 67 at 2–3). Indeed, Plaintiffs demanded all ESI–both the Backup Data and the Active Emails–be produced in Native due to metadata's general, but not case-specific, importance. (Id. at 2 ("Sometimes, the metadata may be essential to a full understanding of the document." (Internal quotation marks omitted)). Defendants did not expressly counter Plaintiffs' demands for metadata; instead, by insisting on TIFF's benefits, they implicitly argued for its non-production as to active data. (Doc. No. 68 at 7–8.) Because metadata is actually a distinct form of ESI, this Court considers Plaintiffs' capacious request for all

"documents" and Defendants' implicit opposition to metadata's manufacture to have created a fifth dispute.

## III.   <u>DISCUSSION</u>

## A.   Standard

## 1.   *ESI's Discoverability and the Expense of Its Production*

Rule 34(a) permits any party to serve on any other party requests to produce, inspect and copy, test or sample "any designated documents or electronically stored information--including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations--stored in any medium" which constitute or contain matters within the scope of Rule 26(b), FED. R. CIV. P. 34(a)(1)(A), and is "designed to permit the broadest sweep of access," <u>Morales v. Turman</u>, 59 F.R.D. 157, 158 (E.D. Tex. 1972) (internal quotation marks omitted) (citing WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2206 (1970)).  Whether accessible or inaccessible, ESI falls within this Rule's inclusive definition of "document." FED. R. CIV. P. 34(a) advisory committee's note to 1970 amendment ("The inclusive description of 'documents' is revised to accord with changing technology[ and] . . . makes clear that Rule 34 applies to electronic data compilations from which information can be obtained only with the use of detection devices . . . ."); <u>accord</u> <u>Seed Research Equip. Solutions LLC v. Gary W. Clem, Inc.</u>, No. 09-1282-EFM-KGG, 2011 U.S. Dist. LEXIS 99087, at *6–7, 2011 WL 3880895, at *2 (D. Kan. Sept. 1, 2011); David K. Isom, <u>Electronic Discovery Primer for Judges</u>, 1 FED. CTS. L. REV. 25, 29 (2006). Consequently, "electronic documents are no less subject to disclosure than paper records" so long as the relevance standard encoded in Rule 26(b) is satisfied. <u>Rowe</u>, 205 F.R.D. at 428; <u>accord, e.g.</u>, <u>Equal Emp't Opportunity Comm'n v. Beauty Enters.</u>, No. 3:01CV378 (AHN), 2008 U.S. Dist. LEXIS 60414, at *16, 2008 WL 3359252, at *5 (D. Conn. Aug. 8, 2008) ("Potentially discoverable evidence, of course, includes electronically stored information, such as email communications between and among the parties." (internal quotation marks omitted)); <u>Thompson v. U.S. Dept' of Hous. & Urban Dev.</u>, 219 F.R.D. 93, 96 (D. Md.

2003) (citing six cases to support the proposition that "[c]ourts similarly have held that e-mail and other electronically stored information is subject to the disclosure requirements of Rule 26(a)(1), as well as discovery by a Rule 34 document production request"); <u>Playboy Enters. v. Welles</u>, 60 F. Supp. 2d 1050, 1053 (S.D. Cal. 1999) (concluding that when a plaintiff requested "documents" under Rule 34 it "also effectively requested production of information stored in electronic form). Based on this case law, the three types of ESI at the center of the Parties' three disputes–the Active Data, Metadata, and the Backup Data–are discoverable so long as the relevance threshold set forth in Rule 26(b)(1) is met, regardless of their present format and level of accessibility, <u>see, e.g.,</u> <u>John B. v. Goetz</u>, 879 F. Supp. 2d 787, 877–78  (M.D. Tenn. 2010) (noting that "[d]eleted information in a party's computer's backup tapes is as discoverable as electronic documents in current use," though simultaneously observing that these emails may in fact be presently maintained "as replicant data, archival data or residual data"); <u>Zubulake</u>, 217 F.R.D. at 321–22 & n.68 ("Whether the data is kept for a business purpose or for disaster recovery does not affect its accessibility," and while "data that is inaccessible  is unlikely to be used or needed in the ordinary course of business," ESI retained for "no current business purpose, but only in case of an emergency" is inaccessible, the cost of production not fairly borne by the responding party.); <u>Antioch Co. v. Scrapbook Borders, Inc.</u>, 210 F.R.D. 645, 652 (D. Minn. 2002) (collecting cases, including <u>Rowe</u>, and noting that "it is a well accepted proposition that deleted computer files, whether they be e-mails or otherwise, are discoverable").

Per the Rules' plain text, for accessible or inaccessible ESI to be discoverable, the relevance test set in Rule 26(b) must be satisfied. Both broadly written and expansively construed, Rule 26(b)(1) allows the discovery of "[r]elevant information," even if inadmissible at trial, "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." FED. R. CIV. P. 26(b)(1). "Discovery is not limited to the issues raised by the pleadings" or "to the merits of the case." <u>Henderson v. Holiday CVS, L.L.C.</u>, 269 F.R.D. 682, 685 (S.D. Fla. 2010) (relying on <u>Oppenheimer Fund, Inc.</u>

v. Sanders, 437 U.S. 340, 352, 98 S. Ct. 2380, 2389, 57 L. Ed. 2d 253 (1978)). As a matter of custom, "the presumption is that the responding party must bear the expense of complying with discovery requests." Oppenheimer, 437 U.S. at 358; accord Country Vintner of N.C., LLC v. E. & J. Gallo Wintery, Inc., 718 F.3d 249, 261 (4th Cir. 2013); Lightguard v. Spot Devices, Inc., 281 F.R.D. 593, 598 (D. Nev. 2012) (citing Oppenheimer, 437 U.S. at 358). This presumption long applied even as to producing relevant ESI, whether classified as "accessible" or "inaccessible," for the requesting party's inspection, copying, testing, or sampling. See, e.g., McPeek v. Ashcroft, 202 F.R.D. 31, 32 (D.D.C. 2001); In re Brand Name Prescription Drugs Litig., No. 94 C 897, MDL 997, 1995 U.S. Dist. LEXIS 8281, at *5, 1995 WL 360526, at *2 (N.D. Ill. June 15, 1995); cf. Patricia Groot, Electronically Stored Information: Balancing Free Discovery with Limits on Abuse, 2009 DUKE L. & TECH. REV. 2 ¶¶ 16–25  (2009) (tracing case trends in cost-shifting prior to implying the pre-Rowe existence of a presumption against parties seeking cost-shifting).

## 2.    *Constraints on Discovery*

Even if evidence is discoverable and relevant under Rules 34 and 26, the Rules contain some express constraints, boundaries both "ultimate and necessary," Hickman v. Taylor, 329 U.S. 495, 506, 67 S. Ct. 385, 392, 91 L. Ed. 451 (1947), on discovery's otherwise sprawling reach. Most significantly, per Rule 26(b)(2)(C), on its own initiative or at a party's request, for example, a court may limit discovery for any one of three reasons: "the discovery sought is unreasonably cumulative or duplicative"; it is "obtainable from some other source that is more convenient, less burdensome, or less expensive; or "the burden or expense of the proposed discovery outweighs the likely benefit." FED. R. CIV. P. 26(b)(2)(C)(i)–(iii); see also, e.g., Nicholas v. Wyndham Int'l, Inc., 373 F.3d 537, 543 (4th Cir. 2012) (citing the factors enumerated in Rule 26(b)(2) and adding, "[t]he simple fact that requested information is discoverable under Rule 26(a) does not mean that discovery must be had"); Ameristar Jet Charter v. Signal Composites, Inc., 244 F.3d 189, 193 (1st Cir. 2001) (once more quoting Rule 26(b)(2) and adding,

"[t]he district court has the discretion to limit discovery"). In determining whether an "undue burden" exists, a court must consider "the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." FED. R. CIV. P. 26(b)(2)©; Crosby v. La. Health Serv. & Indem. Co., 647 F.3d 258, 264 (5th Cir. 2011). Rule 26© also authorizes strictures on discovery's extent for "good cause" and so as "to protect a party from annoyance, embarrassment, oppression, or undue burden or expense." FED. R. CIV. P. 26(c)(1). "Rule 26(b) has never been a license to engage in an unwieldy, burdensome, and speculative fishing expedition." Murphy v. Deloitte & Touche Grp. Ins. Plan, 619 F.3d 1151, 1163 (10th Cir. 2010). To wit, while many documents may be discoverable, "in determining whether a [particular] discovery request is overly costly or burdensome in light of its benefits, . . . [a] court . . . [must] . . . consider the necessity of discovery," Crosby, 647 F.3d at 258, "properly encouraged to weigh the expected benefits and burdens posed by particular discovery requests (electronic other otherwise)," Regan-Touhy v. Walgreen Co., 526 F.3d 641, 649 (10th Cir. 2008); see also S. Ute Indian Tribe v. Amoco Prod. Co., 2 F.3d 1023, 1029–30 (10th Cir. 1993) (discussing both the old presumption and the courts' powers to grant protection against "undue burden and expense" by shifting costs of discovery to the requesting party as a condition of discovery). The balancing approach encoded in Rule 26(b)(2) thus applies regardless of a document's original medium, whether it be code or pulp.

It was the modern proliferation and prevalence of ESI over hard copy[23] that prompted the courts to reconsider their disinclination to authorize cost shifting. In Rowe Entertainment, Inc. v. William Morris Agency, Inc., a court identified eight factors

---

[23] "The overwhelming majority of information today is created and stored electronically . . . Information that historically would have been kept in 'hard copy' in a filing cabinet, now originates and largely remains in electronic format, perhaps never reduced to paper." Francis F.X. Pileggi, Kevin F. Brady & Jill Agro, Inspecting the Corporate "Books and Records" in a Digital World: The Role of Electronically Stored Information, 37 DEL. J. CORP. L. 163, 165 (2012). This fact was already true more than a decade ago. For example, according to one estimate, 93% of all information created in 1999 was done so electronically. Philip J. Favro, A New Frontier in Electronic Discovery: Preserving and Obtaining Metadata, 1 B.U. J. SCI. & TECH. L. 1, 2 (2007).

relevant for this shifting analysis: "(1) the specificity of the discovery requests; (2) the likelihood of discovering critical information; (3) the availability of such information from other sources; (4) the purposes for which the responding party maintains the requested data; (5) the relative benefit to the parties obtaining the information; (6) the total cost associated with production; (7) the relative ability of each party to control costs and its incentive to do so; and (8) the resources available to each party." Rowe, 205 F.R.D. at 429. The list was slightly refined in another seminal case, Zubulake v. UBS Warburg, L.L.C., which extirpated the Rowe's fourth factor and evaluated production costs in relation to the specific parties' resources rather than objectively or absolutely. 217 F.R.D. 309, 322 (S.D.N.Y. 2003). Tellingly, this decision noted that "of the handful of reported opinions that appl[ied] Rowe or some modification thereof, *all of them* have ordered the cost of discovery to be shifted to the requesting party." Zubulake, 217 F.R.D. at 320 (emphasis in original).[24] Oft overlooked yet crucial nonetheless, this standard says nothing as to whether the ESI at issue is discoverable but rather seeks to apportion the costs for the production of ESI already discoverable under the language of Rule 26(b). In cases governed by this rule's pragmatism, therefore, upon the parties lies the burden of first showing the ESI's discoverability and then, depending on the circumstances, disproving their financial responsibility for its recovery and reproduction in a singular format. Relevance remains the touchstone for discoverability, but it is not the sole determinant of the rightful cost bearer's identity.

As such, from Rowe and Zubulake, as extrapolated in an ever growing count of cases and the Sedona Conference thereafter,[25] originates the two-tiered approach to the production of ESI now widely utilized by the federal judiciary. Generally, courts have

---

[24] While the Rules were altered in 2006, the substantive rules to discovery of ESI articulated in these cases and their progeny were left undisturbed.

[25] The Sedona Conference has created a framework for the best electronic discovery practices that attempts to account for both this evolving case law and new technologies. See Larson v. AT&T Mobility LLC, 687 F.3d 109, 130 n.33 (3d Cir. 2012). The Conference itself and its publications have been described as "the leading authorities on electronic document retrieval and production." Ford Motor Co. v. Edgewood Props., Inc., 257 F.R.D. 418, 424 (D.N.J. 2009).

repeatedly stressed that the primary source of ESI to be produced during discovery's progression should be *active* ESI, typically defined as ESI currently or habitually in use by the requested entity.[26/] THE SEDONA PRINCIPLES: BEST PRACTICES RECOMMENDATIONS & PRINCIPLES FOR ADDRESSING ELECTRONIC DOCUMENT PRODUCTION 139 (2d ed. 2007). Thus, "it cannot be argued that a party should ever be relieved of its obligation to produce accessible data merely because it may take time and effort to find what is necessary." Peskoff v. Faber, 244 F.R.D. 54, 62 (D.D.C. 2007); accord, e.g., Juster Acquisition Co., LLC v. N. Hudson Sewerage Auth., No. 12-3427 (JLL), 2013 U.S. Dist. LEXIS 18372, at *10, 2013 WL 541972, at *3 (D.N.J. Feb. 11, 2013) ("[A]ctive, online data, near-line data, and offline storage/archives are typically identified as accessible electronic data."); Zubulake, 216 F.R.D. at 284 ("When a discovery request seeks accessible data—for example, active on-line or near-line data—it is typically inappropriate to consider cost-shifting."). With its potential relevance under Rule 26(b)(2) unquestioned, the metadata of both archival and active ESI has been found to be discoverable. Aguilar v. U.S. Immigration & Customs Enforcement Div., Dep't of Homeland Sec., 255 F.R.D. 350, 355-56 (S.D.N.Y. 2008). As with other types of ESI, the extent to which the requested party must supply metadata depends on the form in which the ESI whose metadata is sought is kept in the ordinary course of business. (Id. at 355.) Assuming a precise and detailed demand has been tendered by the propounding party–and a claim for any and all "documents" will rarely suffice– *active* ESI and its metadata is discoverable and producible at the requested party's expense.

In contrast, when "backup tapes and erased, fragmented, or damaged data" is requested, such ESI is generally defined as "inaccessible." Quinby v. WestLB AG, 245 F.R.D. 94, 101–02 (S.D.N.Y. 2006) (nicely differentiating between "accessible" and "inaccessible data," again by citing to the Zubulake line of cases); see also Jessica Lynn Repa, Adjudicating Beyond the Scope of Ordinary Business: Why the Inaccessibility Test in Zubulake Unduly Stifles Cost-Shifting During Electronic Discovery, 54 AM. U. L.

---

[26/] For this reason, even inaccessible ESI may be deemed "active," so long as it is currently and regularly used.

REV. 257, 275 & n.113 (2004) (outlining the <u>Zubulake</u> test and characterizing it as "contain[ing] both a rigid rule of accessibility and flexible standards when dealing with cost-shifting"). As employed in this jurisprudence, the term "inaccessible" does not necessarily indicate the relevant ESI is physically damaged or written in an obscure format; rather, "inaccessible" simply means that expenditure of resources required to access the contents is itself unreasonable. <u>See, e.g.</u>, <u>Best Buy Stores, L.P. v. Developers Diversified Realty Corp.</u>, No. 05-2310 (DCD/JJG), 2007 U.S. Dist. LEXIS 7580, at *2, 2007 WL 333987, at *1 (D. Min.. Feb. 1, 2007) (affirming magistrate judge's decision that ESI sought by plaintiff was not "reasonably accessible" because of undue burden and cost). If data is so found, shifting the cost of production to the requesting party has been considered appropriate. <u>Zubulake</u>, 216 F.R.D. at 284; <u>accord, e.g.</u>, <u>Dahl v. Bain Capital Partners, LLC</u>, 655 F. Supp. 2d 146, 148 (D. Mass. 2009) (adopting the general principle, though declining to shift costs at the same time); <u>OpenTV</u>, 219 F.R.D. at 477–78 (relying on <u>Zubulake</u>, 216 F.R.D. at 284).  To obtain this ESI at the other's expense, the requesting party must demonstrate need and relevance that outweigh the costs and burdens of retrieving and processing this provably inaccessible information. THE SEDONA PRINCIPLES at 139; <u>accord, e.g.</u>, <u>Wiginton v. CB Richard Ellis, Inc.</u>, 229 F.R.D. 568, 577 (N.D. Ill. 2004) (splitting costs, with plaintiffs responsible for 75% of the discovery cost of restoring the tapes, searching the data, and transferring it to an electronic data viewer); <u>Hagemeyer N. Am., Inc. v. Gateway Data Scis. Corp.</u>, 222 F.R.D. 594, 601 (E.D. Wis. 2004) ("A number of district courts have recognized the unique burden of producing documents stored on backup tapes and, by invoking Rule 26© to fashion orders to protect parties from undue burden or expense, have conditioned production on payment by the requesting party."); <u>McPeek</u>, 202 F.R.D. at 34 ("The more likely it is that the backup tape contains information that is relevant to a claim or defense, the fairer it is that . . . [the requested party] search at its own expense.").[27] In fact, though rooted in case law, this

---

[27] Significantly, the dangerous incentives created by this division for certain defendants to render more data inaccessible than they would normally do so was recognized prior to the Rules' formal adoption of the <u>Zubulake</u> approach. Nonetheless, the Committee on Rules of Practice and Procedure recognized that the possibility of sanctions would take care of this "gaming" concern. COMM. ON RULES OF PRACTICE &

approach is now compelled by Rule 26(b)(2)(B), which recognized a whole new category of discoverable ESI that is "not reasonably accessible because of undue burden or cost," FED. R. CIV. P. 26(b)(2)(B); FTC v. Boehringer Ingeleim Pharm., Inc., 898 F. Supp. 2d 171, 174 (D.D.C. 2012), and embraced the logic in Zubulake and Rowe, see Fed R. Civ. P. 26(b)(2) advisory committee's note to 2006 amendments ("Under this rule, a responding party should produce electronically stored information that is relevant, not privileged, and reasonably accessible . . . ."); Baker v. Gerould, No. 03-CV-6558L, 2008 U.S. Dist. LEXIS 28628, at *6–7, 2008 WL 850236, at *2 (W.D.N.Y. Mar. 27, 2008) (construing FED. R. CIV. P. 16(b)(2), Zubulake, and Rowe together in elaborating a party's obligation to produce inaccessible data); Jacob Smith, Electronic Discovery: The Challenges of Reaching into the Cloud, 52 SANTA CLARA L. REV. 1561, 1567 (2012) ("The Judiciary Committee borrowed heavily from Scheindlin's framework to draft the 2006 Amendments to the FRCP.");  Maria Perez Crist, Preserving the Duty to Preserve: The Increasing Vulnerability of Electronic Information, 58 S.C. L. REV. 7, 15 (2006) (maintaining that the "series of rulings by Judge Scheindlin in the Zubulake litigation have shaped the contours of electronic discovery and provide an example of how electronic discovery issues emerge within litigation").

Even as it has gained in prominence, this preference for cost-shifting has been extended beyond merely inaccessible ESI. As Zubulake's own author has observed, such balancing is proper even as to accessible data so long as the factors set forth in Rule 26(b)(2)(C) evidence cost-shifting's suitability. SHIRA A. SCHEINDLIN & DANIEL J. CAPA, ELECTRONIC DISCOVERY AND DIGITAL EVIDENCE 314 (2009) ("Costshifting is available even for accessible data based on the proportionality factors set forth in Rule 26(b)(2)(C)."); accord, e.g., Zeller v. S. Cent. Emergency Med. Servs., No. 1:13-CV-2584, 2014 U.S. Dist. LEXIS 68940, at *25 n.6, 2014 WL 2094340, at *9 n.6 (M.D. Pa.

---

PROCEDURE OF THE JUDICIAL CONFERENCE OF THE U.S., SUMMARY OF THE REPORT OF THE JUDICIAL CONFERENCE ON THE COMMITTEE ON RULES OF PRACTICE AND PROCEDURE 32 (2005); CRAIG BALL, WHAT JUDGES SHOULD KNOW ABOUT DISCOVERY FROM BACKUP TAPES 4 (2007). Thus, so long as the ESI's inaccessibility occurs in the ordinary course of business and in the absence of any imputation of malicious intent, the modern era's cost shifting paradigm should be applied.

May 20, 2014); <u>Cochran v. Caldera Med., Inc.</u>, 2014 U.S. Dist. LEXIS 55447, at *8, 2014 WL 1608664, at *3 (E.D. Pa. Apr. 22, 2014). As such, so long as "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues," FED. R. CIV. P. 26(b)(2)(C)(iii), the cost of even accessible ESI's production may be shifted to a party that has not shown its peculiar relevance to the claims and defenses at hand.

**B.    Application: Backup Databases**

As precedent compels, this Court will apply the prevailing framework embedded in Rules 34(b)(2)(E)(ii) and 26(b)(2)(B) and construed in the <u>Zubulake</u> and <u>Rowe</u> jurisprudence to determine whether the ESI stored on Defendants' backup tapes must be produced in Native at Defendants' expense. Accordingly, this Court will first consider the Backup Data's discoverability and then their apparent inaccessibility. It will thereupon decide the extent, if any, the costs must be shifted for the kind of production (Native) Plaintiffs have now demanded.

*1.    Discoverability*

As a threshold matter, this Court deems the Backup Databases to be discoverable ESI under Rule 34 and regards Defendants as having been responsible for its preservation. FED. R. CIV. P. 34(a); <u>Zubulake</u>, 217 F.R.D. at 324; <u>Simon Prop Grp. v. MySimon, Inc.</u>, 194 F.R.D. 639, 640 (S.D. Ind. 2000); <u>Anti-Monopoly, Inc. v. Hasbro, Inc.</u>, No. 94-CV-2120 (LMM) (AJB), 1995 U.S. Dist. LEXIS 16355, at *1–2, 1995 WL 649934, at *2 (S.D.N.Y. Nov. 3, 1995); <u>see also</u> THE SEDONA PRINCIPLES at 19. This determination, however, does not obviate this Court's obligation to weigh the data's inaccessibility and then consider, if it must, whether Plaintiffs have properly shown their need for this production in the format they now seek: Native. (Doc. No. 67 at 2–3.) This Court now does so.

//

//

## 2.   *Inaccessibility of ESI Stored on Backup Tapes*

Consideration of ESI's accessability involves two discrete determination: first, the extent to which the data at issue is actually inaccessible, and second, the apparent reasons for this status. In general, inaccessible ESI "is not readily useable and must be restored to an accessible state before the data is usable."[28/] Zubulake, 217 F.R.D. at 3; see also Grant J. Esposito & Thomas M. Mueller, Backup Tapes, You Can't Live with Them and You Can't Toss Them: Strategies for Dealing with the Litigation Burdens Associated with Backup Tapes under the Amended Federal Rules of Civil Procedure, 13 RICH. J.L. & TECH. 13, ¶¶ 6–8 (2007). In particular, regardless of the cause of their inaccessibility, "[b]ackup tapes are considered an inaccessible format, and, thus, shifting the costs of producing data from backup tapes may [always] be considered." Quinby, 245 F.R.D. at 101–02; accord, e.g., Semsroth v. City of Wichita, 239 F.R.D. 630, 641 (D. Kan. 2006); THE SEDONA PRINCIPLES at 144–45.  Such ESI may, of course, have been rendered inaccessible for varied reasons. Thus, if a party "convert[s] into an inaccessible format data that it should have reasonably foreseen would be discoverable material at a time when it should have anticipated litigation, then it should not be entitled to shift the costs of restoring and searching the data." Quinby, 245 F.R.D. at 104; see also Zubulake, 220 F.R.D. at 217–18 ("While a litigant is under no duty to keep or retain every document in its possession . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." (internal quotation marks omitted) (quoting Turner v. Hudson Transit Lines, Inc., 142 F.R.D.68, 72 (S.D.N.Y. 1991))). The threat of "probable," not merely "possible," litigation, however, must be reasonably apparent for this rule to be triggered, Emery v. Harris, No. 1:10-cv-01947-JLT (PC), 2014 U.S. Dist. LEXIS 22666, at *20, 2014 WL 710957, at *6 (E.D. Cal. Feb. 21, 2014) (internal quotation marks omitted) (citations omitted); see also Calderon v. Corporacion

---

[28/] As previously noted, see supra Part I, the distinction between "accessible" and "inaccessible" formats tends to "correspond[] closely to the expense of production." Zubulake, 217 F.R.D. at 318.

1    <u>Puertorriquena De La Salud</u>, 992 F. Supp. 2d 48, 51–52 (D.P.R. 2014), and this litigation

2    hold does not apply to data "typically maintained solely for the purpose of disaster

3    recovery[], which may continue to be recycled on the schedule set forth in the company's

4    policy,"[29] <u>Zubulake</u>, 220 F.R.D. at 218; <u>accord</u> <u>Treppel v. Biovail Corp.</u>, 249 F.R.D. 111,

5    (S.D.N.Y. 2008) ("As a general rule, [] a party need not preserve all backup tapes even

6    when it reasonably anticipates litigation." (internal quotation marks omitted)). In both

7    parts, this preliminary analysis is objective, weighing the data's present status and the

8    propounded party's general storage policies.

9        Applying the foregoing precepts, this Court finds that Defendant has met its burden

10   of showing this particular ESI's inaccessibility. Again and again, "district courts have

11   recognized the unique burden of producing documents stored on backup tapes and, by

12   invoking Rule 26(c) to fashion orders to protect parties from undue burden or expense,

13   have conditioned production on payment by the requesting party." <u>Hagemeyer N. Am.,</u>

14   <u>Inc.</u>, 222 F.R.D. at 601. Indeed, the Defendant's own description of its storage system

15   (Doc. No. 68 at 4–5) makes it impossible to deem this ESI as anything but inaccessible.

16   As Defendant writes, they have only "used backup tapes for storage of email for a potion

17   of the time period at issue in this case"; "they did not begin regular backups of email until

18   December 2010." (Doc. No. 68 at 4.) Whatever the wisdom of this policy, "[b]ackup

19   tapes are [generally] . . . an inaccessible format." <u>Quinby</u>, 245 F.R.D. at 101–02.

20       To this fact, Plaintiffs only unleash a torrent of conclusory–and

21   inapposite–allegations. "Bridgepoint scrambled to make its emails legally inaccessible,"

22   they write. (Doc. No. 69 at 4.) Even in making this accusation, Plaintiff acknowledge that

23   this ESI has been placed onto "backup tapes," (<u>id.</u>), thereby accepting Defendants' own

24   description of the relevant ESI as "inaccessible." Dangerously, Plaintiffs have chosen to

25   describe this storage system as adopted "under the pretext or excuse of a business

26   purpose," (<u>id.</u>), even though the use of backup tapes for non-active ESI has become

27   standard business practice. Isom, <u>Electronic Discovery Primer for Judges</u>, at 41–42

28   _____
[29] Conversely, destruction of the *resulting backup tapes* themselves would be grounds for an adverse inference.

(discussing the various reasons business use backup tapes). Plaintiffs may feel free to decry Defendants' contentions that it will take years and millions to restore this ESI to Native form, but these declamations do not disprove Defendants' assertion that the Backup Data has become inaccessible as part of their typical data retention schematic. And such ESI has been held, by dozens of jurists, to be inaccessible as a purely technological matter. See supra Part III.B.2.

### 3.    *A Showing of Particular Need and an Absence of Special Relevance*

Having found the Backup Data to be inaccessible, this Court turns to the Zubulake factors to ascertain which party must bear the expense of its production. The famed seven read: (1) "[t]he extent to which the request is specifically tailored to discover relevant information"; (2) "[t]he availability of such information from other sources"; (3) "[t]he total costs of production, compared to the amount in controversy"; (4) "[t]he total costs of production, compared to the resources available to each party"; (5) "[t]he relative ability of each party to control costs and its incentive to do so"; (6) "[t]he importance of  the issues at stake in the litigation"; and (7) "[t]he relative benefits to the parties of obtaining the information." Zubulake, 217 F.R.D. at 322. Notably, the list should be read in descending order of importance. Id. at 323. More generally, under Zubulake and per Rule 26(b)(2)(C), when balancing the cost, burden, and need for ESI in a particular format, a court should consider the technological feasibility and realistic cost of preserving, retrieving, reviewing, and producing ESI as well as the nature of the litigation and amount in controversy. THE SEDONA PRINCIPLES at 35. Logically, if the ESI is provided in some usable form, even if it is not the one most desperately sought by the requesting party, this balance favors shifting cost of production in the desired format to the latter. In utilizing the Zubulake factors, "the central question must be[:] . . . how important is the sought-after evidence in comparison to the cost of production?" Zubulake, 217 F.R.D. at 309.

In looking at these factors, the balance here favors cost-shifting as to any ESI from additional backup tapes based on both the Backup Data's minimal apparent relevance and

27

Defendants' adherence to a common ESI policies. First, during this litigation and pursuant to this Court's prior dictates, Defendants have restored the contents of one backup tape to Native form and thereby afforded Plaintiffs access to every email between enrollment advisors and their managerial superiors. The only ESI presently excluded from Plaintiffs' embrace at Defendants' expense are those emails exchanged by recruiters amongst themselves and with third parties. It is thus overwhelmingly certain that Plaintiffs now have or will soon obtain an unfettered ability to examine almost every potentially relevant quantum of ESI; at best, the as-of-yet unproduced emails will divulge varied recruiters' subjective, even if accurate, impressions regarding Defendants' compensation structure, but those emails will not evidence a fraud if unsupported by the statements of directors and managers. To the latter persons' missives, as this order has already stressed, Plaintiffs have already been granted access, leaving the relevance of the undiscovered data at best dubious. Second, while TIFF may not be as easy to scan or search as Native in Plaintiffs' eyes, TIFF is still a widely used ESI format. KYLE C. BISCEGLIE, LEXISNEXIS PRACTICE GUIDE: NEW YORK E-DISCOVERY AND EVIDENCE § 3:10 (2012). In light of this apparent verity, even though Defendants is obligated to produce the ESI requested in the format in which it is regularly stored, Plaintiffs now also demand that Defendants undertake the burden of restoring the Backup Data to its unnatural format: Native. They must do this, Plaintiff insist, despite two likelihoods never actually discounted in Plaintiffs' filings: first, Defendants' storage practices accord with much of corporate America's approach to storage of non-active data for business purposes, and second, pursuant to this Court's prior orders and in accordance with Defendants' previous offers, almost every bit of probably relevant ESI will still be provided to Plaintiffs in a commonly utilized electronic form.  In spite of Plaintiffs' belief to the contrary, the Rules do not compel Defendants to produce inaccessible ESI in the form most helpful for Plaintiffs' case at Defendants' expense. No, the Rules compel no more than production of ESI in its usual form, with Plaintiffs themselves obligated to pay for the production of inaccessible ESI in an accessible form.

Meanwhile, Plaintiffs have yet to cogently counter Defendants' substantial cost estimates. Admittedly, the costs involved in the production in Native of the Backup Databases are not necessarily definite and ascertainable at this time. Yet, while Defendant did provide a declaration from an actual expert detailing these possible financial burdens, (Doc. No. 68-1), Plaintiffs afforded only their lawyers' words and emails, (Doc Nos. 67-1, 69-1). This very dearth of an actual expert declaration, though the Court specifically suggested the Parties append any such supporting documentation to their briefs, is a telling sign of the Plaintiffs' inadequate argumentation on this precise issue.  By no means can this Court be sure that Defendants' estimations are correct and unquestionable, but this Court can be certain that when offered the opportunity to contest Defendants' worst projections, Plaintiffs offered an expert's silence and a lawyer's opinions. Projected to cross $ 2 million, these ostensible costs cannot be deemed as insubstantial, with at least partial shifting having been repeatedly ordered when similar sums have been alleged. Medtronic Sofamor Danek, Inc. v. Michelson, 229 F.R.D. 550, 557 (W.D. Tenn. 2003) ("several million" dollars); Wiginton, 229 F.R.D. at 570, 577 ("$249,000"); Zubulake, 216 F.R.D. at 283 ("$165,594.67").

Finally, having examined the Parties' Papers, the Court notes the inherent vagueness in the Plaintiffs' requests for "documents" and "databases." (Doc. No. 63 at 7, 11.) As numerous courts have ruled, if a party fails to identify the form or forms in which it wishes ESI to be produced and any particular fields or types of metadata sought, the non-requesting party may rightly provide the ESI sought in the form in which it is regularly maintained. With Plaintiffs' request ambiguous as to form and format, Defendants were certainly reasonable in refusing to provide reasonably *in*accessible ESI.

To meet their burden, Plaintiffs propounded a slew of reasons, but none convince this Court. First, to base their demand for Native production on Defendants' purported misdeeds, allegations that Plaintiffs have yet to prove in a court of law, in defiance of the Rules' plain text would require this Court to permit extraordinary discovery based merely on unproven accusations. Because Defendants *may* be guilty of a host of federal

violations, Plaintiffs essentially contend, this Court must impose upon them a burden greater than thrust on parties generally. Neutrally worded, the Rules are not so written as to permit a court to adjudicate guilt by the surreptitious means of onerous discovery obligations' imposition. Repeatedly, Plaintiffs rest much of their insistence on forcing Defendants to bear the cost of resorting the backup ESI to Native on wild accusations, unsupported by credible evidence, that Defendants used a commonly employed method of storage with the intent of preventing this data's discovery in subsequent litigation. (Doc. No. 69 at 4.)  To show intentional spoilation, they do not explain how Defendants' storage process is unusual or even how this ESI is uniquely inaccessible, the Defendants having adopted a procedure few businesses have themselves endorsed. Nor do they show that Defendants, even if aware of their potential liability, deliberately created a policy of storing ESI that would make particularly relevant emails suddenly inaccessible to any and all potential litigants.  Indeed, even if ligation was threatened, Plaintiffs would have to provide some indicia of any such purpose for cost-shifting to be foreclosed and spoilation to be found. To wit, whether their accusations are true or not, they must be supported by some credible evidence, not implications and innuendo, for a defendant remains free to operate their business in its ordinary course in the absence of the reasonable probability of a certain lawsuit and so long as it does not render data inaccessible purely with the intent of stymying such legal action. Plaintiffs needed something more to shift the balance; littered with unproven and unknowable assertions, their two motions do not do so.  Just as maddeningly, Plaintiffs labels Defendants' projections "absurd," (Doc. No. 69 at 4), yet it was they who failed to provide an expert's declaration to substantiate this assertion.[30] Plaintiff deride Defendants' answers to their questions about how the backup tapes are used as "vague" and "confusing," (Doc. No. 69 at 5), but this Court does not find them so. The email at issue, indeed, is quite clear in its explanation of the

---

[30] Plaintiffs ask the Court for more time to depose a person in Defendant's employ who is most knowledgeable about this format. In short, they ask for more time, though they have not even deigned to provide the Court with their own expert's sworn oath. The Defendants met their burden; the Court will not give the Plaintiffs a second–or a third–chance to satisfy their own.

Defendants' storage policies and the potential expenses involved,(Doc. No. 69-3), numbers and assertion further buttressed by Defendants' own expert, (Doc. No. 68-1). Neither Defendants' "conduct" nor their numbers have been credibly tainted by Plaintiffs' motions, and this Court is thus compelled to regard Defendants' at least marginally-supported claims regarding the Backup Data as accurate. Plaintiffs will have much ESI to sift through in the months ahead; if they want more, under <u>Zubulake</u>, <u>Rowe</u>, and Rule 26(b), it is fair they pay the price of its production in the Native form they deem so invaluable for the prosecution of their own case.[31/]

## C.    Application: Native versus TIFF

The Parties' dispute over the proper format for active emails is governed by a similar cost-shifting analysis. While Native and TIFF both exhibit notable weaknesses and strengths, "[i]n current practice, many parties, local rules and courts have endorsed the use of image production formats, principally . . . TIFF and Adobe Portable Document Format ("PDF") formats." THE SEDONA PRINCIPLES at 190; <u>see also</u> <u>Osbrone v. C.H. Robinson Co.</u>, No. 08 C 50165, 2011 U.S. Dist. LEXIS 123168, at *19, 2011 WL 5076267, at *7  (N.D. Ill. Oct. 25, 2011). The reasons for the widespread utilization of this static format are threefold: (1) TIFF documents can be Bates numbered and (2) redacted, and (3) it is harder, albeit not impossible, to alter data presented in TIFF inadvertently or deliberately. THE SEDONA PRINCIPLES at 190–91. In short, for all its acknowledged shortcomings, TIFF can be considered a reasonable form of production, <u>see</u> <u>Melian Labs, Inc. v. Triology LLC</u>, No. 13-cv-04791-SBA (KAW), 2014 U.S. Dist. LEXIS 124343, at *5, 2014 WL 4386439, at *2 (N.D. Cal. Sept. 4, 2014) (after requested party produced documents in "paper, PDF or TIFF" format, commenting "[t]hat producing the documents in a [more] searchable format [*i.e.* Native] would ease Triology's review does not render Melian's production deficient"), and it can even "be converted to word text-searchable images using an Optical Character Recognition

---

[31/] The Court, however, will grant one exception. As to any ESI produced after this suit's unsealing, this Court will split the costs, for it can be reasonably presumed that at that point in time Defendants were surely aware of their legal liability and future plaintiffs' likely need for active data. <u>See</u> <u>infra</u> Part IV.

software program," thereby obviating one of its more obvious weaknesses, FED. R. CIV.
P. 34 advisory committee's note. As to this very issue, the United States Court of Appeals
for the Third Circuit has quoted <u>The Sedona Principles</u>: considered a "near- native"
format, <u>EEOC v. SVT, LLC</u>, No. 2:13-CV-245-RLM-PRC,  2014 U.S. Dist. LEXIS
50114, at *8, 2014 WL 1411775, at *3 (N.D. Ind. Apr. 10, 2014), TIFF "is a widely used
and supported graphic file format for storing bit-mapped images, with many different
compression formats and resolutions," <u>Race Tires Am., Inv. v. Hoosier Racing Tire
Corp.</u>, 674 F.3d 158, 161 n.2 (3d Cir. 2012) (quoting THE SEDONA CONFERENCE
GLOSSARY). Critically, moreover, Rule 34(b)(2)(ii) allows its use in the absence of a
request that does not specify a particular form. FED. R. CIV. P. 34(b)(2)(ii); <u>Anderson
Living Trust v. WPX Energy Prod., LLC</u>, 298 F.R.D. 514, 526 (D.N.M. 2014)
(reminding that "[i]t is only if the requesting party declines to specify a form that the
producing party is offered a choice between producing in the form in which it is ordinary
maintained — native format — or in a reasonably useful form or form"). Subparagraph
(iii) adds: "A party need not produce the same electronically stored information in more
than one form." FED. R. CIV. P. 34(b)(2)(iii). In such cases, "court[s] should consider
shifting some or all of the cost of the second production to the requesting party." THE
SEDONA PRINCIPLES at 199; <u>see also, e.g.</u>, <u>Eastman Kodak Co. v. Sony Corp.</u>, Nos. 04-
CV-6095T, 04-CV-6547T, 2006 WL 2039968, at *2 (W.D.N.Y. July 20, 2006).

  The language utilized in Plaintiffs' filings makes clear it did not make a specific
request for Native production. In describing its position regarding Dispute #4, titled
"format of emails to be produced," Plaintiffs described its initial request in the following
terms: "Plaintiff instructed Bridgepoint to 'produce each original document with all non-
identical copies and drafts of that documents'." (Doc. No. 63 at 11.) The term "original"
is certainly not sufficiently precise, as much case law demands, for Defendants to have
volunteered Native production at their own initiative. <u>Cf.</u> <u>Johns v. Bayer Corp.</u>, No.
09-CV 1935 DMS JMA, 2014 U.S. Dist. LEXIS 126879, at *4–5 (S.D. Cal. Dec. 1,
2010) (ordering production of "original document[s]" in TIFF). In fact, this conclusion is

buttressed by Plaintiffs' reliance on Rule 34(b)(2)(E)(ii) to support their request for Native production, as this subparagraph is only triggered "[i]f a request does not specify a form for producing electronically stored information." (Doc. No. 63 at 11.) Logically, then, Plaintiffs have impliedly conceded they did not "specify" a format when they first proffered their document requests.[32]

Because Plaintiffs did not demand Native production with express precision, this Court must then consider who must bear the cost of Native production, if ordered. See, e.g., Cenveo Corp. v. S. Graphic Sys., No. 08-5521 (JRT/AJB), 2009 U.S. Dist. LEXIS 108623, at *6–7, 2009 WL 4042898, at *2 (D. Minn. Nov. 18, 2009). Per Rule 26(b)(2)(C), the relevant factors include "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." FED. R. CIV. P. 26(b)(2)(C). As with the backup databases, the balance here favors Defendants' usage of TIFF for three reasons. First, being a reasonably useable form whose content is searchable with, at most, relatively minor modifications, TIFF, even if regarded as an alternative form, is a suitable and proper response to a generic request for "original documents," especially absent an explicit reference to ESI. Second, Plaintiffs have yet to show how this kind of production had denuded Defendants' ESI of data invaluable for the prosecution of a single claim or defense in this proceeding. Instead, they have merely asserted the general importance of the extirpated metadata, not its specific import, and have made assertions contradicted by at least one authoritative source, THE SEDONA PRINCIPLES at 190–91 (enumerating some of the benefits of TIFF production). Finally, pursuant to Rule 34, "[a] party need not produce the same electronically stored information in more than one form." FED. R. CIV. P. 34(b)(2)(iii). Defendants have promised to present active emails in TIFF; even if that

---

[32] This finding would not affect the Court's subsequent analysis. Even if Plaintiffs' requests had been detailed and precise, this cost-shifting analysis in this order's next two parts would remain mostly unchanged.

production is not the one Plaintiffs prefer, it is a reasonable format for the production of active ESI.

**D.    Application: Metadata**

Metadata, as Plaintiff correctly insist, is discoverable. Doc. No. 67 at 2; see, e.g., United States v. Rubin/Chambers, Dunhill Ins. Servs., 825 F. Supp. 2d 451, 453 (S.D.N.Y. 2011); FSP Stallion 1, LLC v. Luce, No. 2:08-cv-01155-PMP-PAL, 2009 U.S. Dist. LEXIS 68460, at *12, 2009 WL 2177107, at *3 (D. Nev. July 21, 2009). Despite this fact, courts have generally only ordered "the production of metadata when it is sought in the initial document request and the producing party has not yet produced the documents in any form." Aguilar, 255 F.R.D. at 357; see also, e.g., In re Prosche Cars N. Am., Inc., Plastic Coolant Prods. Litig., 279 F.R.D. 447, 449 n.5 (S.D. Ohio 2012) ("If the requesting party does not specify a form, therefore, the producing party is within its right to produce the ESI in static image form (TIFF or PDF) with no metadata."); R.F.M.A.S. Inc. v. So, 271 F.R.D. 13, 45 (S.D.N.Y. 2010) (observing that even "if we assume that defendants were obligated to respond at all to the broad requests in 'Plaintiff's First Request' and that digital photographs of Mimi So jewelry were responsive, defendants were not obligated under Rule 34 -- which is specifically incorporated into plaintiff's definition of 'document' --to produce the metadata for the digital photographs"). In the words of a frequently quoted article, "if a party wants metadata, it should 'Ask for it. Up front.'" Adam J. Levitt & Scott J. Farrell, Taming the Metadata Beast, N.Y.L.J., May 16, 2008, at 4. Additionally, courts have required the requesting party to show "a particularized need for the metadata," not simply a generalized view as to its importance. Ky. Speedway LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc., No. 05-138-WOB, 2006 U.S. Dist. LEXIS 92028, at *23–24, 2006 WL 5097354, at *8–9 (E.D. Ky. Dec. 18, 2006). This principle was a response, as a case cited by Plaintiffs notes, to metadata's status as "'the new black,' with parties increasingly seeking its production in every case, regardless of size or complexity," a trend well-represented by oft-made requests that "all metadata for all electronic

documents . . . be produced, both because the metadata is relevant to . . . [parties'] claims and because it will enable them to search and sort the documents more efficiently." Aguilar, 255 F.R.D. at 359. This fact may even explain why a *weak* presumption against the production of metadata has taken hold, Williams v. Sprint/United Mgmt. Co., 230 F.R.D. 640, 651 (D. Kan. 2005); see also, e.g., Wyeth v. Impax Labs., Inc., 248 F.R.D. 169, 170 (D. Del. 2006) (quoting Williams, 230 F.R.D. at 651); Elliot Paul Anderson, What Lies Beneath: Native Format Production and Discovery of Metadata in Federal Court, OKLA. BAR J., Apr. 14, 2007, at 1002, rooted in two more Sedona principles generally seen as relevant to the status of metadata: first," absent a showing of special need and relevance a responding party should not be required to preserve, review, or produce deleted, shadowed, fragmented, or residual data or documents," and second, "unless it is material to resolving the dispute, there is no obligation to preserve and produce metadata absent agreement of the parties or order of the court," Williams, 230 F.R.D. at 650;[33/] see also, e.g., Lucia Cucu, Note, The Requirement For Metadata Production under Williams v. Sprint/United Management Co.: An Unnecssary burden for Litigants Engaged in Electronic Discovery, 93 CORNELL L. REV. 221, 229–37 (2007) (discussing Williams and the varied reasons why production of unspecified metadata is problematic); Mike Breen, Comment, Nothing to Hide: Why Metadata Should be Presumed Relevant, 56 KAN. L. REV. 439, 448 (2006) ("Williams approach is not rogue; it has been followed in other jurisdictions.").

For two reasons, this Court will not order Defendant to produce any active ESI's full metadata. First, in defiance of present custom, Plaintiffs never specifically submitted detailed and express requests for any ESI's Metadata. Such specificity, as the very case they cite makes clear, is often an essential prerequisite for a court to order metadata's production at the requested party's expense. Aguilar, 255 F.R.D. at 357, cited in Doc. No. 67 at 2. Second, Plaintiffs have not yet articulated any precise reason why the metadata of any ESI is specifically relevant to a claim or a defense in this proceeding. Indeed, while

---

[33/] Williams factored in the Aguilar decision upon which Plaintiffs rely. (Doc. No. 67 at 2.)

they cite to Moore's Federal Practice ("Moore's"), a most authoritative treatise, they quote its self-evidently general statements regarding metadata's value–"*Sometimes*, metadata *can be* essential to a full understanding of the document," (Doc. No. 67 at 2 (emphasis added) (quoting 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 37A.03))–without addressing these words' central import: quite simply, while metadata can occasionally be relevant, that relevance must be determined on a "case by case basis," based on the facts and evidence presented by the requesting party as to the sought metadata's significance for its very case. Stating, as Plaintiffs have done, why this case implicates important national interests or why the emails' content may be relevant does not establish why this active ESI's metadata is uniquely important to understanding its import. In fact, Moore's itself discounts Plaintiffs' only apparent reason as insufficient to prove the kind of essential need for metadata both case law and the Rules as widely construed require. True, metadata may be "essential" for divulging critical data, but in an addendum fatal to Plaintiffs' generic argument for all and any metadata, Moore's continues: "[P]arties typically request a native-file production format so that they can use the systems-file metadata to easily search and sort the files." MOORE, supra, § 37A.03. Plaintiffs' demand, in other words, far too much resembles the "black box" requests inconsistent with the approach to metadata pioneered in Aguilar, Williams, and Sedona, Arizona. As such, this Court is unpersuaded by Plaintiffs' threadbare reasoning for forcing the production of any metadata belonging to ESI already provided by Defendants.

## IV.   CONCLUSION

Having waded through this case law, this Court is driven to one conclusion: had the Parties adhered to the spirit of Rule 26(f)(3)©, nearly every dispute dissected in this lengthy order may have been avoided. Unfortunately, they did not strive to avoid later difficulties or ease their resolution via compromise and accommodation; unfortunately, access to ESI that may have been more broadly available based on compromise and mutual understanding of the costs and complexities involved will now be delimited by

1  court order rather than these adversaries' agreement. Accordingly, based on the preceding
2  analysis, this Court orders as follows:
3       Plaintiffs' requests for the production of the Backup Databases, the Active Emails
4  in Native, and the Metadata are DENIED without prejudice.
5       As to all ESI, whether accessible or inaccessible, post-dating this suit's unsealing
6  in January 1, 2013, Plaintiffs will bear the cost of searching and recovery. Defendants,
7  however, will bear the cost of production.
8
9  IT IS SO ORDERED.
10 DATED:   February 17, 2015
11
12                                           _____
                                             Hon. William V. Gallo
13                                           U.S. Magistrate Judge
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28