1  Jeffrey B. Isaacs, Esq. (SBN 117104)
2  Jerome H. Friedberg, Esq. (SBN 125663)
   Mark Labaton, Esq. (SBN 159555)
3  **ISAACS FRIEDBERG & LABATON LLP**
4  555 S. Flower Street,, Suite 4250
   Los Angeles, California   90071
5  Telephone: (213) 929-5534
6  Facsimile:  (213) 955-5794
   *mlabaton@iflcounsel.com*
7
8  *Attorneys for Relators*
9  [Additional Counsel listed on next page.]
10
              **UNITED STATES DISTRICT COURT**
11
              **SOUTHERN DISTRICT OF CALIFORNIA**
12

| | |
|---|---|
| 13  UNITED STATES OF AMERICA *ex rel.* JAMES CARTER and ROGER LENGYEL, | **Case No. 10-CV-1401-JLS-WVG** |
| 14 | |
| 15          Plaintiffs,  vs. | **RELATORS JAMES CARTER AND ROGER LENGYEL'S [CORRECTED] MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' RULE 12(b)(1) MOTION TO DISMISS PURSUANT TO THE PUBLIC DISCLOSURE BAR** |
| 16  BRIDGEPOINT EDUCATION, INC., ASHFORD UNIVERSITY LLC, and DOES 1-500, INCLUSIVE, | |
| 17 | |
| 18 | |
| 19          Defendants. | [Previously filed with Objections to Exhibits to the Declaration of James L. Zelenay, Jr. (ECF No. 100) and Declaration of Justin Bringas (ECF No. 101)] |
| 20 | |
| 21 | Hon. Janis L. Sammartino |
| 22 | HEARING |
| 23 | Date:        June 11, 2014  Time:        1:30 PM  Place:       Courtroom 4A |
| 24 | |

25
26
27
28
--

Alexander I. Dychter (SBN 234526)
**DYCHTER LAW OFFICES, APC**
1010 Second Ave., Suite 1835
San Diego, California 92101
Telephone: (916)487-0777
Facsimile:  (619)330-1827
*alex@dychterlaw.com*


Christopher A. Olsen (SBN 236928)
**OLSEN LAW OFFICES**
1010 Second Ave., Suite 1835
San Diego, California 92101
Telephone:  (619)550-9352
Facsimile:   (619)923-2747
*caolsen@caolsenlawoffices.com*


Timothy Cornell (*Admitted Pro Hac Vice*)
**GARDNER CORNELL, P.C.**
A Professional Corporation
33 Mount Vernon Street
Boston, MA   02108
Telephone:  (603) 277-0838
*tcornell@gardnercornell.com*

1

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION. ............................................................................. 1

II.   LEGAL BACKGROUND ................................................................. 3

III.  SUMMARY OF RELATORS' ALLEGATIONS. ........................... 4

IV.   PROCEDURAL HISTORY. .............................................................. 7

V.    DEFENDANTS' 12(B)(1) MOTION TO DISMISS. ....................... 7

VI.   ARGUMENT. ...................................................................................... 9

      A.   The False Claims Act's Public Disclosure Bar. .......................... 9

      B.   The FAC Cannot Be Dismissed for Lack of Jurisdiction. ........ 10

      C.   Legal Standards for Determining Whether a Public
           StatementTriggers the Public Disclosure Bar. ......................... 12

      D.   The Online Comment Does Not Qualify as a Public Disclosure. ............ 15

      E.   Defendants' Proffered Exhibits Do Not Come Close to Establishing
           Public Disclosure of Alleged Fraud. ........................................ 16

           1.   The Exhibits Discussing the OIG's Preliminary Findings of
                "Noncompliance." ........................................................... 16

                a)   The Exhibits Do Not Sufficiently Describe the Fraud. ....... 16

                b)   The Exhibits Fail to Mention Defendants' Other
                     Fraudulent Acts. ................................................... 18

                c)   The Exhibits Concern a Much Narrower Time
                     Period than that of the FAC. ............................... 18

                d)   The Exhibits Make No Mention of Defendants' *Scienter*. ... 18

                e)   The Draft OIG Report was Not Publicly Disclosed. ............ 19

                f)   Summary. ............................................................ 19

**TABLE OF CONTENTS (Cont.)**

**PAGE**

2.   *The Anonymous Online Comment.* ................................................ 20

3.   *The* Frontline *Segment.* .................................................................. 21

F.   The FCA Does Not Require that Relators Be Original
     Sources of the Information Set Forth in the FAC. ................................. 22

G.   If The Court is Inclined to Grant Defendants's Motion,
     Relators Should be Granted Leave to Amend .......................................... 23

VII.  CONCLUSION ................................................................................................. 25

CERTIFICATE OF SERVICE ..................................................................................... 1

# TABLE OF AUTHORITIES

**CASES:**                                                                        **PAGE(S)**

*A-1 Ambulance Service, Inc. v. California,*
    202 F.3d 1238 (9th Cir. 2001)............................................................2, 12, 13, 17

*Allison Engine Co. v. United States ex rel. Sanders,*
    553 U.S. 662 (2008) ........................................................................ 13

Ass'n of Private Sector Colleges v. Duncan,
    681 F.3d 431 (D.C. Cir. 2012) .......................................................... 3

*Balistreri v. Pacifica Police Dept.,*
    901 F.2d 696 (9th Cir. 1990)............................................................ 25

*Berg v. Honeywell Intern., Inc.,*
    502 Fed. Appx. 674 (9th Cir. 2012) ................................................. 19

*Foman v. Davis,*
    371 U.S. 178 (1962) ......................................................................... 25

*Foundation Aiding the Elderly v. Horizon West,*
    265 F.3d 1011 (9th Cir. 2001)......................................................14, 15, 17, 21

*Gualandi v. Adams,*
    385 F.3d 236 (2d Cir.2004) .............................................................. 11

*Harrison v. Westinghouse-Savannah,*
    176 F.3d 776 (4th Cir. 1999)............................................................ 13

*Landgraf v. USI Film Products,*
    511 U.S. 244 (1994) ......................................................................... 12

*Little v. Shell Exploration & Prod. Co.,*
    690 F.3d 282 (5th Cir. 2012)............................................................ 14

*Northstar Financial Advisors, Inc. v. Schwab Investments,*
    779 F.3d 1036 (9th Cir. 2015)......................................................... 24

*Owens v. Kaiser Foundation Health Plan, Inc.,*
    244 F.3d 708 (9th Cir. 2001)........................................................... 25

*Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.,*
    966 F. Supp. 2d 282 (S.D.N.Y. 2013)............................................. 11

1

2

### TABLE OF AUTHORITIES (Cont.)

**PAGE(S)**

3

4

*Rockwell Int'l Corp. v. United States,*
    549 U.S. 457 (2007) ........................................................................................ 11

5

6

*U.S.  ex rel. Anderson v. Northern Telecom, Inc.,*
    52 F.3d 810 (9th Cir. 1995) ........................................................................... 12

7

*U.S. ex rel. Bly-Magee v. Premo,*
    470 F.3d 914 (9th Cir. 2006) ........................................................ 2, 14, 17, 22

8

9

*U.S.  ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.,*
    2014 WL 4375638 (E.D. Pa. Sept. 4, 2014) .................................................. 16

10

11

*U.S. v. Education Mgmt. Corp.,*
    871 F. Supp. 2d 433 (W.D. Penn. 2012) ..................................................... 3, 4

12

13

*U.S. ex rel. Galmines v. Novartis Pharm. Corp.,*
    --- F. Supp. 3d ---, 2015 WL 851837 (E.D. Pa. Feb. 27, 2015) ...................... 24

14

15

*U.S.  ex rel. Goldberg v. Rush Medical University,*
    680 F.3d 933 (7th Cir. 2012) ......................................................................... 14

16

17

*U.S. ex rel. Hagood v. Sonoma County Water Agency,*
    929 F.2d 1416 (9th Cir. 1991) .............................................................. 9, 13, 19

18

*U.S. ex rel. Hendow v. University of Phoenix,*
    461 F.3d 1166 (9th Cir. 2006) .......................................................................... 3

19

20

*U.S.  ex rel. Hochman v. Nackman,*
    145 F.3d 1069 (9th Cir. 1998) ....................................................................... 19

21

22

*U.S. ex rel. Hoggett v. Univ. of Phoenix,*
    2012 WL 2681817 (E.D. Cal. July 6, 2012) ................................................. 18

23

24

*U.S. ex rel. Kelly v. Boeing Co.,*
    9 F.3d 743 (9th Cir. 1993) ............................................................................... 9

25

26

*U.S. v. Kiewit Pacific Co.,*
    2013 WL 5770514(N.D. Cal. Oct. 23, 2013) .......................................... 10, 11

27

28

*U.S. ex rel. Lee v. Corinthian Colleges,*
    655 F.3d 985 (9th Cir. 2011) ........................................................... 4, 7, 18, 21

# TABLE OF AUTHORITIES (Cont.)

**PAGE(S)**

*U.S. ex rel. May v. Purdue Pharma L.P.,*
737 F.3d 908 (4th Cir. 2013) ......................................................... 10

*U.S. ex rel. Parikh v. Citizens Med. Ctr.,*
302 F.R.D. 416 (S.D.Tex. 2014) ..................................................... 12

*U.S. ex rel. Paulos v. Styker Corp.,*
2013 WL 2666346 (W.D. Mo. June 12, 2013) ............................... 12

*U.S. ex rel. Rost v. Pfizer, Inc.,*
507 F.3d 720 (1st Cir. 2007) .......................................................... 13

*U.S. ex rel. Simpson v. Bayer Corp.,*
2013 WL 4710587 (D.N.J. Aug. 8, 2013) ....................................... 16

*U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn,*
14 F.3d 645 (D.C. Cir. 1994) ..................................................... 9, 14

*U.S. ex rel. Whipple v. Chattanooga-Hamilton Cnty. Hosp. Auth.,*
782 F.3d 260 (6th Cir. 2015) .......................................................... 13

*Wang v. FMC Corp.,*
975 F.2d 1412 (9th Cir. 1992) ........................................................ 23

**STATUTES:**

20 U.S.C. § 1094 ............................................................................. 3

31 U.S.C. § 3729 ............................................................................. 9

31 U.S.C. § 3730 ........................................................... 7, 9, 10, 12

**RULES:**

Fed. R. Civ. P. 8 ............................................................................. 7

Fed. R. Civ. P. 9 ............................................................................. 7

Fed. R. Civ. P. 12 ................................................................ 7, 10, 11

Fed. R. Civ. P. 15 ........................................................................... 25

**TABLE OF AUTHORITIES (Cont.)**

**PAGE(S)**

**REGULATIONS:**

34 C.F.R. § 668.14 ...................................................................................... 4

**OTHER AUTHORITIES:**

Wright, Miller, & Kane, Federal Practice and Procedure: Civil 3d ........................... 24

# I.   INTRODUCTION.

Defendants Bridgepoint Education, Inc. and Ashford University LLC ("Defendants") have filed a motion to dismiss for lack of jurisdiction under Federal Rule 12(b)(1) (the "Motion"), arguing that Relators' claims are subject to the Public Disclosure Bar of the False Claims Act ("FCA").  Defendants' Motion is procedurally flawed, based on inadmissible evidence, and simply ignores the fact that none of the purported public documents allege a fraud against the government, let alone the material elements of the fraud alleged in the FAC.

First, Rule 12(b)(1) is not the correct vehicle for seeking dismissal of the FAC. The Public Disclosure Bar was amended in 2010 and no longer provides a jurisdictional defense.  Because the FAC alleges fraudulent conduct occurring after the 2010 Amendment, Defendants' motion to dismiss the entire FAC for lack of jurisdiction must be denied.

Second, the Court cannot properly consider Defendants' exhibits upon which their Motion depends.  Because the Public Disclosure Bar no longer provides a jurisdictional defense, a motion to dismiss must be brought under Rule 12(b)(6). Motions to dismiss filed under that Rule can only be based on the complaint, the attachments to the complaint and matters of public record which may be judicially noticed.  Defendants have instead based their Motion on exhibits attached to a declaration of counsel.  Moreover, the purported public disclosures on which Defendants base their motion are not properly authenticated, are inadmissible hearsay and the meaning of their contents are in dispute.

Third, even if the Court were to consider Defendants' public disclosure claims, their argument is easily defeated, factually and legally.  None of Defendants' exhibits disclose the elements of the fraudulent scheme alleged.  More specifically, none of them mentions enrollment numbers, starts, leads, qualitative measures, bonuses, incentive payments, promotions, false certifications, scienter, or, for that matter, the object of the fraud – obtaining hundreds of millions of dollars in federal student aid

1  through the making of false certifications to knowingly conceal violations of federal

2  law.  In fact, none of the disclosures that may be considered under the Public

3  Disclosure Bar even mention Defendants' performance evaluation Matrix, which is at

4  the core of Defendants' fraudulent scheme.  Instead, they make cryptic references to a

5  preliminary finding of noncompliance involving unspecified recruiter compensation

6  regulations in the context of a routine audit.

7        The law in this Circuit is clear that "[t]he public disclosure of 'mere

8  information' relating to the claims is insufficient to trigger a jurisdictional bar to an

9  FCA action; instead, the material elements of the fraudulent transaction must be

10  disclosed."  *U.S. ex rel. Bly-Magee v. Premo*, 470 F.3d 914, 919 (9th Cir. 2006).

11  Furthermore, "transactions" underlying a relator's complaint have only been publicly

12  disclosed when "the material elements of the fraudulent 'transaction[s]' are in the

13  public domain."  *A-1 Ambulance Service, Inc. v. California*, 202 F.3d 1238, 1243 (9th

14  Cir. 2001).  Defendants do not come close to satisfying these standards.

15        Defendants also argue at length that the relators do not qualify as "original

16  sources" under the FCA.  Defendants are correct, but there is no requirement that a

17  *qui tam* plaintiff be an original source.  Where, as here, the fraud detailed in the

18  operative complaint was not publicly disclosed before the action was filed, relators

19  who are not original sources may maintain a *qui tam* action.

20        Finally, should the Court be inclined to grant Defendants' Motion, Relators

21  request leave to amend to allege the additional facts recounted in the concurrently

22  filed Declaration of Justin Bringas, a former Ashford recruitment director.  Mr.

23  Bringas' detailed declaration leaves no doubt that the scheme to defraud the federal

24  government that has been exposed by this action was not the subject of any prior

25  public disclosures.

26        Accordingly, Defendants' Motion to Dismiss – and their efforts to prematurely

27  end this action so that they can avoid accountability for their conduct – should be

28  denied.

## II.       LEGAL BACKGROUND.

Under Title IV of the Higher Education Act ("HEA"), schools that wish to participate in the Guaranteed Student Loan Program must sign a contract with the DOE called a Program Participation Agreement ("PPA").  By signing the PPA, the school agrees to "comply with all the relevant program statutes and regulations."  *U.S. v. Education Mgmt. Corp.*, 871 F. Supp. 2d 433, 439 (W.D. Penn. 2012) (internal quotation marks omitted).  The PPA automatically terminates on the date the institution no longer qualifies as an eligible institution.  *See id.*

The Incentive Compensation Ban is one of the statutes that educational institutions certify compliance with when they execute PPAs.  The Incentive Compensation Ban provides that:

> The institution will not provide any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in student recruiting or admission activities . . . .

20 U.S.C. § 1094(a)(20).

The Incentive Compensation Ban extends to "any" form or amount of "commission, bonus or other incentive payment based directly or indirectly on securing enrollments."  20 U.S.C. § 1094(a)(20).  When Congress drafted the statute, it intended that "incentive payment" be construed broadly to "cover abuses that Congress had not enumerated." *Ass'n of Private Sector Colleges v. Duncan*, 681 F.3d 431, 444 (D.C. Cir. 2012).  "Incentive" means anything that is "inciting or motivating," and "payment" means "that which is paid."  *Id.* at 443.  Accordingly, the form of incentive is not restricted to money.  Instead, because Congress's clear purpose for the ban was to reduce predatory recruiting tactics, compensation extends to anything a recruiter would regard as having value.  *See U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1169 (9th Cir. 2006) (compensation in the form of trips and home electronics could be basis for FCA violation).

In 2002, the DOE promulgated a Safe Harbor Provision, which provided that the Incentive Compensation Ban was not violated by:

The payment of fixed compensation, such as a fixed annual salary or a fixed annual wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid.

34 C.F.R. § 668.14(b)(22)(ii)(A)(2010).  The Safe Harbor Provision was eliminated effective July 1, 2011.  *See Education Mgmt. Corp.*, 871 F.Supp.2d at 441 n. 2.

In *U.S. ex rel. Lee v. Corinthian Colleges*, 655 F.3d 985, 993-94 (9th Cir. 2011), the Ninth Circuit held that the mere inclusion of performance ratings in a for-profit school's compensation program was not determinative of whether its method of awarding salary increases falls within the Safe Harbor Provision.  The court explained that:

Under such a system, educational institutions could entirely circumvent the HEA incentive compensation ban by simply formalizing, through a performance rating system, the basic requirements expected of any employee, that is, the requirements of employment itself. Allowing the Safe Harbor Provision to shield such a program from HEA's recruiter compensation requirements would render meaningless the "purpose or objective" of the statute.

*Id*. at 994.  The Ninth Circuit concluded that, if the performance rating of at least "Good" requires an employee merely to fulfill basic performance requirements that are expected of any employee (such as showing up on time), then construing the Safe Harbor Provision so that these ratings serve as an independent basis for compensation increases would lead to an "absurd result."  *Id*.

## III.  SUMMARY OF RELATORS' ALLEGATIONS.

From at least March 2005 through 2011, Defendants falsely represented to the federal government that they had complied with the Incentive Compensation Ban to continue to receive federal funds.  First Amended Complaint ("FAC"), ECF No. 31, ¶ 1.  Defendants made these representations when they entered into a PPA with the DOE to receive federal funds (*id*. ¶ 31), when they certified an annual compliance audit (*id*., ¶ 29), and when they submitted claims for federal Pell Grants and government-insured loans (*id*. ¶¶ 32-34).  Defendants received as much as half a

billion dollars per year in federal aid based on these false certifications. *Id.* ¶¶ 1, 52, 55.

Relators allege that Defendants violated the Incentive Compensation Ban by paying their recruiters based solely on the numbers of students they enrolled, as well as the recruiters' performance in other recruiting activities, such as making telephone calls, generating leads and meeting with prospective students. *Id*. ¶¶ 17, 38. To determine compensation, Defendants purportedly relied on a chart, called "the Matrix," which rated recruiters' performance in a variety of categories. *Id*. ¶ 38-39. Recruiters are rated on whether their performance "always exceeds expectations," "often exceeds expectations," "meets expectations," "requires improvement," or was "unsatisfactory." *Id*. ¶ 39. A recruiter's score on the Matrix determined his or her salary for the next six months. *See id.* ¶ 49(c).

The Matrix purportedly measured both enrollment recruiting success and other factors, such as leadership and ability to work with others. *Id*. ¶ 21. It did so in order to appear to comply with the Safe Harbor Provision. *See id*. ¶ 1. In practice, however, a recruiter's salary depended *solely* on his or her performance in the enrollment recruiting categories. *Id*. ¶ 40. As this Court succinctly stated in its January 8, 2014 Order denying Defendants' previous Motion to Dismiss:

> [T]he gravamen of Relators' pleading appears to be that Ashford's compensation plan was implemented in such a manner that salary adjustments were ultimately based on enrollment numbers alone, with other factors manipulated to maintain the appearance of a multi-faceted evaluation. Relators allege that their managers made clear that "the number of enrollments (i.e., Net Student Completers) [was] the sole Matrix factor used to determine . . . salary levels." Relators also allege that factors besides enrollments, such as "leadership skills" and "ability to work with other enrollment advisors," were regularly altered to correspond with an enrollment advisor's success, or lack thereof, in recruiting students.

ECF No. 41, p. 8 (alteration in original, citations omitted).

Indeed, Relators' managers expressly told them that the number of students a recruiter enrolls "is the sole Matrix factor used to determine their salary levels." ECF No. 31, ¶ 21. Although Relator Lengyel's manager verbally praised his leadership skills and ability to work with others, he was nevertheless rated as "need improvement," in those categories. *Id.* The manager explained that these categories "are not even considered" if the recruiter "fails to meet his or her student enrollment quota." *Id.*

Recruiters operated in a boiler-room atmosphere under which "enrollment advisors" really acted as telemarketers. *See id.* ¶ 49. Defendants constantly and meticulously monitored recruiters' activities, including the number of phone calls made, applications processed and enrollments achieved. *Id.* ¶¶ 20, 42. Their software tracked the number of calls made and received by recruiters, and notified managers every time a recruiter began a student application. *Id.* ¶ 42. Recruiters were also required to post on a large board the number of applications they completed each day for their fellow recruiters to see. *Id.* ¶ 20.

Defendants were solely concerned with enrollment, not whether their programs were suitable for their students. "Enrollment Advisors" were instructed to stop reviewing academic qualifications with potential students. *Id.* ¶ 48. Counselors were told to stop "counseling" students and reviewing academic transcripts. *Id.*

In addition to manipulating the Matrix, Defendants rewarded their highest enrolling recruiters with the best "leads," that is, prospective students assigned to the recruiter. *Id.* ¶ 17. In contrast, the low-performing recruiters were given low quality leads, such as individuals who had already indicated that they did not wish to enroll. *Id.* ¶ 45. The high quality leads were a type of incentive payment offered to the top recruiters because they ensured that these recruiters would receive better evaluations, and therefore higher salaries, in their next review. *Id.* ¶¶ 17, 45.

## IV.   PROCEDURAL HISTORY.

Relators filed this action under seal on July 2, 2010.  ECF No. 1.  After receiving several extensions of time to complete its investigation under 31 U.S.C. § 3730(b), the government served notice of its election to decline intervention on January 2, 2013.  ECF. No. 21.  That same day, the Court ordered that the Complaint be unsealed and served on Defendants.  ECF No. 22.

By stipulation, Relators filed their FAC on May 10, 2013.  ECF No. 31.  The FAC alleged the same fraudulent scheme as the original Complaint, which is described above.  However, the FAC alleged that the fraudulent conduct continued after the date of the initial pleading and through 2011.  It also corrected the dates of Relator Carter's employment with Ashford, and likewise corrected certain typographical and grammatical errors.

On June 24, 2013, Defendants filed a Motion to Dismiss the FAC for failure to state a claim pursuant to Fed. R. Civ. P. 8(a), 9(b) and 12(b)(6), arguing that Defendants' compensation practices were permitted under the Safe Harbor Provision, and that Relators failed to allege any knowing violations of law.  ECF No. 32.

On January 8, 2014, the Court denied Defendants' Motion to Dismiss.  ECF No. 41.  The Court held that Relators' allegations "support an inference that Ashford engaged in a fraudulent course of conduct by certifying its compliance with the HEA even as it compensated enrollment advisors exclusively on the basis of recruitment success."  *Id.*, at p. 11 (citing *Corinthian Colleges*, 655 F.3d at 995-96).

Shortly after their motion to dismiss was denied, Defendants answered the FAC.  ECF No. 42.

## V.   DEFENDANTS' 12(b)(1) MOTION TO DISMISS.

On February 20, 2015, Defendants filed a motion to dismiss for lack of jurisdiction under Federal Rule 12(b)(1), arguing that Relators' claims are subject to

the Public Disclosure Bar.  Defendants argue that Bridgepoint publicly disclosed the alleged fraud in a prior SEC filing.

Specifically, on September 4, 2009, Bridgepoint filed an Amendment to its Form S-1 with the SEC, in which it announced that the DOE's OIG conducted a compliance audit of Ashford.[1]  Ex. A to Zelenay Decl., ECF No. 84-4, at 20.  According to the announcement, "[t]he scope of the audit covered Ashford University's administration of Title IV program funds, including compliance with regulations governing institutional and student eligibility, awards and disbursements of Title IV program funds, verification of awards, returns of unearned funds and compensation of financial aid and recruiting personnel."  *Id.*

In its SEC filing, Bridgepoint noted that the OIG tentatively found "certain instances of noncompliance with provisions of the Higher Education Act and regulations governing Ashford University's administration of Title IV programs." *Id.*  Bridgepoint listed six "preliminarily identified" areas of noncompliance, including "compensation policies and practices with respect to enrollment advisors[.]" *Id.*  In the same filing, however, Bridgepoint contested these preliminary findings, stating that it believes that "Ashford University operates in substantial compliance with the regulations of the U.S. Department of Education which are applicable to the areas under review," and that, "due to the preliminary nature of the OIG's findings, [it] cannot predict the extent of the OIG's ultimate findings." *Id.*

Multiple news sources reported on Defendants' SEC filing, and the subsequent drop in Bridgepoint's stock price, including the ten examples accompanying Defendants' motion to dismiss.  *See, e.g.*, Exhs. H-Q to Zelenay Decl.  All of these news reports, however, merely republished the same statements already reported in

---

[1]    In their moving papers, Defendants refer to this OIG audit as "routine." Def.'s Mot., ECF 84-01, p. 1.

1  the SEC filing and offered no additional information about the nature, extent, or

2  other specifics of the OIG's anticipated "noncompliance" finding.  *See id.*

3        In their motion to dismiss, Defendants rely on these and other purported public

4  disclosures, including an anonymous online comment and a *Frontline* segment that

5  discussed the pressure Defendants placed on recruiters.  Defendants argue that these

6  public documents disclosed the fraud described in the FAC.  Defendants further

7  argue that the relators are not "original sources" under the FCA, and therefore cannot

8  base a *qui tam* action on publicly disclosed information.  These arguments – all

9  without merit – are addressed below.

10              **VI.   ARGUMENT.**

11  **A.   The False Claims Act's Public Disclosure Bar.**

12        The FCA is the federal government's "primary litigative tool for combating

13  fraud."  *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 745 (9th Cir. 1993)

14  (quoting Senate Judiciary Committee, False Claims Amendments Act of 1986, S.

15  REP. NO. 345, 1986 U.S.C.C.A.N. 5266).  The FCA provides for treble damages and

16  penalties for anyone who knowingly submits or causes the submission of a false or

17  fraudulent claim to the United States.  *See* 31 U.S.C. § 3729(a)(1).  The statute allows

18  a private whistleblower, known as a "relator," to bring and litigate a lawsuit on behalf

19  of the United States against persons who knowingly submitted or caused the

20  submission of false or fraudulent claims to the United States.  *See* 31 U.S.C. §

21  3730(b)(1).

22        There is no requirement that the relators have actual knowledge of all of the

23  elements of the fraud at issue.  *See U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*,

24  14 F.3d 645, 656-67 (D.C. Cir. 1994).  Relators can pursue FCA actions whenever the

25  core contentions in their complaint have not previously been publicly disclosed.  *See*

26  31 U.S.C. § 3730(e)(4)(A); *U.S. ex rel. Hagood v. Sonoma County Water Agency*, 929

27  F.2d 1416, 1419 (9th Cir. 1991).  But a limited or circumscribed public disclosure

28  restriction, commonly referred to as the "Public Disclosure Bar," requires dismissal of

an FCA complaint if "substantially similar" allegations or transactions comprising all of the elements of the claim were previously disclosed publicly in certain specified public fora, including government hearings, reports, audits, or investigations, or from the news media, and the relator is not an original sources of the allegations.  31 U.S.C. § 3730(e)(4)(A)-(B).

The Public Disclosure Bar was amended during the time in which the wrongful conduct alleged in the FAC occurred.  Prior to March 23, 2010, 31 U.S.C. § 3730(e)(4) provided that,

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

On March 23, 2010, this statue was amended, *inter alia*, to eliminate the jurisdictional aspects of the Public Disclosure Bar.  The 2010 Amendment provides:

> (4)(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed –
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accounting Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A); *see U.S. ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 916 (4th Cir. 2013) ("It is apparent . . . that the public-disclosure bar is no longer jurisdictional."); *United States v. Kiewit Pacific Co.*, No. 12-CV-02698, 2013 WL 5770514, *5 (N.D.Cal. Oct. 23, 2013) (concluding that amended Public Disclosure Bar is not jurisdictional and citing cases).

**B.    The FAC Cannot Be Dismissed for Lack of Jurisdiction.**

Defendants have improperly filed a motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1).  Because the 2010 Amendment eliminated the

jurisdictional basis of the Public Disclosure Bar, the FAC's allegations of FCA violations from March 23, 2010 through 2011 are not subject to a motion to dismiss under Fed. Rule 12(b)(1).[2]  *See U.S. ex rel. Fryberg v. Kiewitt Pacific Co.*, No. 12-CV-02698-JST, 2013 WL 5770514, at *5 (N.D. Cal. Oct. 24, 2013) (holding that the amended public disclosure bar is not jurisdictional, and treating motion to dismiss as a Rule 12(b)(6) motion); *Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F.Supp.2d 282 (S.D.N.Y. 2013) (treating a motion to dismiss under the amended public disclosure bar as a Rule 12(b)(6) motion).  Since the entire action cannot be dismissed for lack of jurisdiction, Defendants are not entitled to the requested relief, and their motion must be denied for this reason alone.

At this juncture in the proceedings, Defendants are barred from filing another motion to dismiss under Rule 12(b)(6), since they have already answered the FAC. *See* Fed. R. Civ. P. 12(b).

Further, a motion to dismiss under Rule 12(b)(6) cannot be based on factual material unless it appears on the face of the complaint, is attached to the complaint, or is judicially noticed.  *See Kiewitt Pacific Co.*, 2013 WL 5770514, at *5.  Here, Defendants' Motion relies on purported public disclosures that are not contained in or attached to the FAC, and for which Defendants have not requested judicial notice.

Nor can Defendants' Motion be treated as a motion for summary judgment.  *See Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004) ("[A] motion to dismiss for lack of jurisdiction cannot be converted in a Rule 56 motion . . . .").  Accordingly, Defendants' motion to dismiss is procedurally defective.

---

[2]     The FAC is the relevant pleading for purposes of determining whether the Court has jurisdiction over this action.  "[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction."  *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007).

In their motion, Defendants contend that the prior version of Public Disclosure Bar applies, but this is incorrect with respect to the alleged conduct which occurred after the 2010 Amendment – a span of over 21 months.  The 2010 Amendment undeniably applies to that conduct.  *See Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994) ("[T]he legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place . . . ."); *U.S. ex re. Paulos v. Styker Corp.*, 2013 WL 2666346 (W.D.Mo. June 12, 2013) (where case straddled two versions of the Public Disclosure Bar, amended version of statute applied to conduct occurring after amendment was passed, and prior version applied to conduct occurring before amendment was passed); *United States ex rel. Parikh v. Citizens Med. Ctr.*, 302 F.R.D. 416, 421 (S.D. Tex. 2014) (whether alleged conduct occurred before or after 2010 amendments to FCA determined whether amendments applied); *cf. United States ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 814 (9th Cir. 1995) (where relevant conduct occurred after 1986 amendment to section 3730(e)(4)(A), post-amendment version of FCA applied to claim).

## C.  Legal Standards for Determining Whether a Public Statement Triggers the Public Disclosure Bar.

Under both the original and the amended statutes, the determination of whether a disqualifying public disclosure has occurred requires a two-step inquiry.

First, the Court must "decide whether the public disclosure originated in one of the sources enumerated in the statute." *A-1 Ambulance Service*, 202 F.3d at 1243. Under the current statute, these sources are: "(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media," 31 U.S.C § 3730(e)(4)(A).[3]

---

[3] Under the prior statute, the enumerated sources were (i) in a criminal, civil, or administrative hearing; (ii) in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation; or (iii) from the news media." 31 U.S.C § 3730(e)(4)(A) (2010).  For purposes of this motion, this change is insignificant.

1   "Public" means public.  Thus, the "fact that the disclosures are contained in

2   government files someplace, or even that the government is conducting an

3   investigation behind the scenes, does not itself constitute public disclosure." *United*

4   *States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 728 (1st Cir. 2007), *overruled on other*

5   *grounds by Allison Engine Co. v. United States ex rel. Sanders,* 553 U.S. 662 (2008);

6   *see also United States ex rel. Whipple v. Chattanooga-Hamilton Cnty. Hosp. Auth.*,

7   782 F.3d 260 (6th Cir. 2015).  In *Whipple*, the Sixth Circuit held that a hospital's

8   fraudulent billing practices were not publicly disclosed by an inspector general audit

9   even though certain information was divulged to certain parties and entities.  *Id.* at

10  269.  The reason for this is that even though the existence of an ongoing audit was

11  known, the contents of the audit were not yet made public.  *Id*. at 270; *see also*

12  *Sonoma County Water Agency*, 929 F.2d at 1419 (government knowledge of falsity

13  does not preclude recovery under the FCA).[4]

14          Second, if a "public disclosure" is made in one of the statutorily enumerated

15  sources, the Court "must then determine whether the content of the disclosure

16  consisted of the 'allegations or transactions' giving rise to the relator's claim, as

17  opposed to 'mere information.'" *A-1 Ambulance Service*, 202 F.3d at 1243.

18  "Transactions" underlying a relator's complaint have only been publicly disclosed

19

20          _____

21          [4] There are good reasons for this.  The FCA's public disclosure bar replaced a
    much more restrictive "government knowledge bar," in 1986 as part of a massive
22  overhaul of the FCA in which Congress sought "to encourage more private
    enforcement suits." S. REP. NO. 99-345, at 23-24, *reprinted in* 1986 U.S.C.C.A.N.
23  5266, 5288-89.  "In the face of sophisticated and widespread fraud," Congress
    concluded then, "only a coordinated effort of both the Government and the citizenry
24  will decrease this wave of defrauding public funds."  *Id*. at 2; 5267.  The goal of the
    1986 Amendments, including the enactment of the misnamed public disclosure bar,
25  was to incentivize whistleblowers to expose procurement fraud.  *See, e.g*., *United*
    *States ex rel. Harrison v. Westinghouse-Savannah*, 176 F.3d 776, 778 (4th Cir. 1999)
26  (Congress enacted *qui tam* provisions "to aid the government in discovering fraud and
27  abuse by unleashing a posse of *ad hoc* deputies to uncover and prosecute frauds
    against the government.").
28

when the material elements of the fraudulent transactions (*i.e.*, the misrepresented state of facts and the true state of facts) were in the public domain. *See Foundation Aiding the Elderly v. Horizon West*, 265 F.3d 1011, 1015 (9th Cir. 2001) (citing *Quinn*, 14 F.3d at 654; *see also Bly-Magee*, 470 F.3d at 919 ("The public disclosure of 'mere information' relating to the claims is insufficient to trigger a jurisdictional bar to an FCA action; instead, the material elements of the fraudulent transaction must be disclosed.").

In *Horizon West*, the Ninth Circuit used the following formula to determine the threshold for triggering the Public Disclosure Bar:

> [I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.,* the conclusion that fraud has been committed . . . . Congress sought to prohibit *qui tam* actions *only* when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain . . . .

265 F.3d at 1015 (emphasis in original).

In addition, the Public Disclosure Bar is only triggered when the relators' allegations are "substantially similar" to the publicly disclosed information, *see Bly-Magee*, 470 F.3d at 919, which means that the publicly disclosed allegations or transactions must be as "broad and as detailed as those in the relator's complaint." *Little v. Shell Exploration & Prod. Co.*, 690 F.3d 282, 293 (5th Cir. 2012). Thus, "[w]hen specifics are alleged, it is crucial to consider whether the disclosures correspond in scope and breadth. A guiding query is whether one could have produced the substance of the complaint merely by synthesizing the public disclosures' description of a scheme." *Id.* (citations omitted). As the Seventh Circuit warned in *United States ex rel. Goldberg v. Rush Medical University*, 680 F.3d 933 (7th Cir. 2012) (Easterbrook, C.J.), when reviewing claims of a prior public disclosure, "boosting the level of generality in order to wipe out *qui tam* suits that rest on genuinely new and material information is not sound." *Id.* at 936.

*Horizon West* is instructive in this regard.  In that case, two prior lawsuits had revealed instances of fraud by the defendants, but not the particular fraudulent conduct alleged in the subsequently filed FCA action.  In one of the prior lawsuits, plaintiffs alleged that "defendants generally misrepresented to them the level of care provided by the particular nursing facility."  265 F.3d at 1015.  In the other one, plaintiffs alleged that defendants fraudulently concealed from residents, employees, government officials and others the improper and deficient care of residents and hazardous health conditions at the facility due to asbestos contamination.  *Id*. at 1015-16.  In contrast, the later FCA lawsuit alleged that defendants "misrepresented the level of care to the government and received payment for that alleged substandard care."  *Id*. at 1015.  The court concluded that:

> Although "fraud" may have been generally alleged against some of the current Appellees in certain contexts, none of the evidence in the record "fairly characterizes" the kind of fraud alleged by Appellants here.  To put is somewhat differently, it is [im]possible to say that the evidence and information in the possession of the United States at the time the False Claims Act suit was brought was sufficient to enable it adequately to investigate the case and to make a decision whether to prosecute.  Therefore, we conclude that this action is not barred by the previous disclosure of the fraud at issue.

*Id*. at 1016 (citation and internal quotation marks omitted; alteration in original).

**D.      The Online Comment Does Not Qualify as a Public Disclosure.**

Defendants argue that an anonymous online comment made on May 14, 2010 in response to an online news article about Bridgepoint in the *San Diego Reader* qualifies as a public disclosure that warrants dismissal of this case.  *See* Def.'s Mot., Exh. T, ECF No. 84-23.  This evidence is not properly before the Court because it has not been properly authenticated and is also inadmissible hearsay.  *See* Relators' Objections to Exhs. to Zelenay Decl., filed concurrently herewith.  In any event, an online comment does give rise to a Public Disclosure Bar defense because it does not fall into any of the statutorily enumerated categories for public disclosure.

Anonymous comments to informal online discussions on community web forums do not constitute "news media" for purposes of the Public Disclosure Bar.

*See United States ex rel. Simpson v. Bayer Corp.*, 2013 WL 4710587, at *15 (D.N.J. August 8, 2013).  As the *Simpson* court found "[u]nlike an article on a website maintained by a recognized news outlet, a trade journal, or even a promotional website geared toward the dissemination of information, the anonymous postings in this case amounted to nothing more than vague allegations in an informal forum discussion without indicia of reliability or substantiation . . ."  *Id*. at *7; *cf. United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 2014 WL 4375638 (E.D. Pa. Sept. 4, 2014) ("a publicly available website may qualify as 'news media' where the information provided is to some extent curated . . . and where the information bears at least some of the 'indicia of reliability or substantiation' common to more traditional news media sources").  Similarly, the *San Diego Reader* comment is an anonymous posting consisting of "vague allegations in an informal forum discussion without any indicia of reliability or substantiation."  *Simpson*, 2013 WL 4710507, at *7.

**E.    Defendants' Proffered Exhibits Do Not Come Close to Establishing Public Disclosure of Alleged Fraud.**

### 1.    *The Exhibits Discussing the OIG's Preliminary Findings of "Noncompliance."*

Defendants rely on several exhibits which state that the DOE OIG had audited Defendants and that it was likely to find them in noncompliance with recruiter compensation regulations.  These exhibits include an SEC filing that cryptically references the OIG's preliminary finding of "noncompliance," and several subsequent news reports of the SEC filing.  None of these disclosures contain the essential elements of the FCA violations alleged in the FAC.

a)    <u>The Exhibits Do Not Sufficiently Describe the Fraud.</u>

The disclosures do not set forth the material elements of any fraud, let alone the sophisticated fraudulent scheme alleged in the FAC.  Nor do they set forth the facts from which a fraud can be inferred.  Instead, the disclosures merely refer to a preliminary finding of "noncompliance."  This is insufficient under the authorities

discussed above to bar Relators from proceeding with this action. *See, e.g,. Horizon West*, 265 F.3d at 1015 (requiring disclosure of allegations from which readers or listeners may conclude that a fraud has been committed); *A-1 Ambulance Service*, 202 F.3d at 1243 (Public Disclosure Bar applies only when the misrepresented state of facts and true state of facts are both in the public domain).

Indeed, these disclosures present a much easier case than *Horizon West*, in which the Ninth Circuit held that allegations of fraud were insufficient to trigger the Public Disclosure Bar because the publicly disclosed fraud did not victimize the government. In this case, by contrast, Defendants did not disclose that *any* fraud had occurred.

Nor are the publicly disclosed facts substantially similar in breadth and scope to the allegations in the FAC. *Cf. Bly-Magee*, 470 F.3d at 919 ("The public disclosure of 'mere information' relating to the claims is insufficient to trigger a jurisdictional bar to a False Claims suit; the 'material elements of the allegedly fraudulent transaction' must be disclosed."). The FAC describes a scheme to obtain federal aid under the HEA by falsely certifying to DOE compliance with the Incentive Compensation Ban. The disclosures never mention the HEA, the false certifications in the PPAs, or even the Incentive Compensation Ban.

In addition, the disclosures' vague references to "noncompliance" do not even begin to describe the manner in which the fraud was committed. As alleged in the FAC, Defendants relied on an evaluation Matrix which appeared to consider various factors other than enrollment numbers in determining a recruiter's salary, but which, in reality, was mere window dressing. In fact, salary adjustments and professional advancement depended solely on a recruiter's enrollment numbers, with Defendants concealing that fact by manipulating the non-enrollment-based portions of the Matrix to correspond to the recruiter's performance in enrolling students. Defendants' disclosures of an unspecified noncompliance issue never stated that the Matrix was a pretext used in executing the fraud.

b)     **The Exhibits Fail to Mention Defendants' Other Fraudulent Acts.**

The FAC also alleges that Defendants rewarded top recruiters with better "leads," which are a type of incentive payment, because under Defendants' compensation system, they automatically result in higher salary and promotion opportunities. *See Corinthian*, 655 F.3d at 994 (holding that when a for-profit school makes any adjustment in a recruiter's salary based "solely" on the number of students the recruiter enrolled, that adjustment is outside the Safe Harbor Provision and is a violation of the Incentive Compensation Ban). Defendants' disclosures never mention the award of leads to top recruiters.

c)     **The Exhibits Concern a Much Narrower Time Period than that of the FAC.**

Defendants' argument also fails because the OIG audit concerned only the limited period between July 1, 2006 and June 30, 2007, while the FAC alleges that the fraud occurred over a much longer period of time, from March 2005 through the end of 2011. Defs.'s Exh. B, ECF No. 84-05 (OIG Final Audit Report), p. 268 (Bates No. BP_0050743). Evidence of a past fraud is not tantamount to evidence of a subsequent fraud, and thus "does not bar other potential *qui tam* litigants from bringing additional instances of fraud to light." *United States ex rel. Hoggett v. Univ. of Phoenix*, 2012 WL 2681817, at *5 (E.D. Cal. July 6, 2012). As the Court in *Hoggett* noted, if that were not the case, "there would be no qui tam remedy for subsequent violations of the FCA by the same defendant when the government is aware of previous wrongdoing." *Id*.

d)     **The Exhibits Make No Mention of Defendants' *Scienter*.**

The FAC also contains detailed allegations that Defendants acted with *scienter* because the Relators' "managers informed them that enrollment numbers were the only factor considered in adjusting salaries, that Ashford focused obsessively on enrollment numbers by tracking enrollment activities and ranking enrollment advisors on the basis of recruiting success, that Ashford terminated or demoted enrollment advisors that did not recruit enough students, that Ashford kept these practices hidden

from government auditors, and that Ashford has also been 'quietly changing its . . . polic[ies]' to avoid detection."  ECF No. 41 at 13, citing FAC at ¶¶ 41-43, 49.  The purported disclosures do not mention *scienter* or describe any facts supporting an inference of *scienter*.

e)      The Draft OIG Report was Not Publicly Disclosed.

Significantly, Defendants do not contend that the draft OIG report referred to in these disclosures independently triggers the Public Disclosure Bar.  It does not.  There is no evidence that the draft OIG report was ever made public, and unpublished government reports do not support a Public Disclosure Bar defense.  *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1072 (9th Cir. 1998) (Inspector General report not released in semi-annual statement to Congress was not publicly disclosed); *Berg v. Honeywell Intern., Inc.*, 502 Fed. Appx. 674, 676-77 (9th Cir. 2012) (unpublished Army Audit Agency report and GAO report were not public); *Sonoma County Water Agency*, 929 F.2d 1416 at 1419 (government knowledge of falsity does not preclude recovery under the FCA).

f)      Summary.

As summarized below, the purported disclosures do not disclose the following elements of the FCA violations alleged in the FAC:

- Ashford obtained federal funds by falsely certifying that it was in compliance with applicable statutes and regulations, including the Incentive Compensation Ban.  FAC ¶¶ 1, 29-37.

- Defendants made adjustments to recruiters' salaries based solely on enrollment success, in violation of the Incentive Compensation Ban.  FAC ¶¶ 17, 21.

- Defendants have developed a recruiter compensation scheme that appears to adjust a recruiter's salary based on a variety of factors, both enrollment based and non-enrollment based, but, in fact, is based solely on the recruiter's enrollment numbers and recruiting activities.  FAC ¶¶ 38-40,

44.

- Non-enrollment based evaluation factors, such as "leadership skills" and "ability to work with other enrollment advisors," were ignored or deliberately altered to correspond with recruiters' success, or lack thereof, in recruiting students.  FAC ¶ 21.

- Defendants penalized low performers with poor quality leads, which further perpetuates poor performance and increases the likelihood the enrollment advisor will lead to decrease in salary.  FAC ¶ 45.

- Defendants kept these practices hidden from government auditors.  FAC ¶¶ 20, 49.

- This fraudulent conduct occurred from March 2005 through year-end of 2011 (FAC ¶¶ 1, 29), while the OIG audit covered the time period July 1, 2006-June 30, 2007.  ECF No. 84-05 at p. 268 (Bates No. BP_0050743).

**2.      *The Anonymous Online Comment.***

The online comment alleges that:  "An advisor has a matrix that is almost sole[l]y based on performance although it is t[w]eaked just enough to challenge the incentive clause for Title IV but everyone knows the deal . . . produce or pay cut . . . produce or no promotion."  Def.'s Mot., Exh. T, ECF No. 84-23.  As stated above, an online comment does not fall into any of the statutorily enumerated categories for public disclosure.  Even if it did, however, it does not support a Public Disclosure Bar defense because it does not discuss any of the conduct at the heart of the alleged FCA violations – false certifications to DOE and other federal agencies to obtain federal aid.

Similarly, the anonymous comment does not discuss incentive payments or commissions that violate the Incentive Compensation Ban.  Instead, the comment discusses adverse employment consequences: "produce or pay cut," "produce or no promotion."  Such adverse employment consequences do not violate the Incentive

Compensation Ban or give rise to liability under the FCA.  *See U.S. ex rel.*
*Corinthian Colleges*, 655 F.3d at 993.

The online comment also fails to disclose the time period in which the alleged conduct occurred.  Because it was purportedly posted in May 2010, it cannot be referring to conduct which took place in 2011, or the second half of 2010.  Accordingly, the online comment fails to disclose either the substance or scope of the fraudulent scheme Relators have alleged.

### 3.	*The Frontline Segment.*

Finally, Defendants rely on a quote from a recruiter in a May, 4 2010 *Frontline* broadcast, who stated: "I didn't realize just how many students we were expected to recruit.  And the amount of pressure that they put on you to meet these quotas I think challenges anybody's integrity." *See* Def.'s Mot., Exh. R, ECF No. 84-21.

This statement merely references the intense pressure to enroll new students and the high enrollment quotas that recruiters were required to meet.  It does not discuss the submission of fraudulent certifications to receive federal aid, recruiter compensation, Matrices, the Incentive Compensation Ban, or false statements or fraud of any kind.  Simply put, it fails to make any mention whatsoever of the fraud alleged in the FAC.

Under the X + Y = Z test of *Horizon West*, 265 F.3d at 1015, sufficient facts of the fraudulent transaction must be presented so that the reader may infer fraud.  The disclosures that Defendants are relying on do not refer to any fraudulent transaction and would not alert a reader that fraud has occurred.  That inference can only be drawn if the reader is aware of elements of the fraud which were never publicly disclosed, such as that Defendants had certified that they were in compliance with the Incentive Compensation Ban in order to obtain federal funds, and that the Matrix they used to evidence this purported compliance was mere window dressing.

Similarly, the Ninth Circuit has held that, in determining whether the Public Disclosure Bar applies, "[a] guiding query is whether one could have produced the

substance of the complaint merely by synthesizing the public disclosures' description of a scheme." *Bly-Magee*, 470 F.3d at 919.  The *Frontline* segment and other purported the public disclosures, viewed separately or collectively, altogether fail to disclose a scheme to fraudulently obtain federal funds through false certifications in PPAs, and fall far short of alleging the sweeping fraudulent scheme described in the FAC.  Accordingly, the Public Disclosure Bar does not apply.

## F.   The FCA Does Not Require that Relators Be Original Sources of the Information Set Forth in the FAC.

Defendants correctly assert that Relators are not "original sources" within the meaning of the Public Disclosure Bar.  However, there is no requirement under the FCA that relators have first-hand knowledge of all, or even part, of the fraud at issue.  Instead, relators are encouraged to pursue FCA actions so long as there has been no prior public disclosure of the fraud alleged in their complaint.  Alternatively, even if there has been a public disclosure, relators can still pursue a *qui tam* action if they are "original sources" with first-hand knowledge of the allegations.  Congress recognized that a whistleblower's information can be valuable either because (1) the fraudulent scheme, including all of its essential elements, was not previously publicly disclosed, or (2) the relator adds valuable information as a person with first-hand and independent knowledge of the fraud even if it had already been exposed.[5]  Because these are alternative bases for pursuing an action, where there have been no prior public disclosures, "there is no need for a *qui tam* plaintiff to show that he is the

---

[5] Defendants nevertheless devote much of their moving papers to arguing that Relators have no direct knowledge of facts supporting their allegations.  In the course of their investigation, Relators have identified potential witnesses, including a former director of admissions, who have corroborated Relators' allegations based on their own first-hand knowledge.  *See* Declaration of Justin Bringas, concurrently filed herewith.

'original source' of the information."  *Wang v. FMC Corp.*, 975 F.2d 1412, 1416 (9th Cir. 1992).[6]

**G.    If The Court is Inclined to Grant Defendant's Motion, Relators Should be Granted Leave to Amend.**

If the Court is inclined to grant Defendants' Motion, Relators respectfully request leave to file a Second Amended Complaint.  The proposed Second Amended Complaint would set forth additional, non-public information about the fraud, including specific facts reflected in the concurrently filed Declaration of Justin Bringas ("Bringas Decl."), a former manager and director for Ashford who oversaw recruiters.  The new allegations would detail the following facts, among others:

- Defendants continued to violate the Incentive Compensation Ban after use of the Matrix was discontinued in 2011, through a scheme in which recruiters with the highest enrollment numbers received "promotions" and significantly higher salaries, but had the same responsibilities as other recruiters, and worked the same number of hours (Bringas Decl., ¶¶ 45-48);

- Additional factual detail regarding Defendants' manipulation of the Matrix, including how Bringas was ordered by upper management to (a) base every Matrix score on a recruiter's enrollment numbers; and (b) rewrite draft evaluations to reduce high scores he had awarded to recruiters in non-enrollment categories when their enrollment scores were low, because Defendants had a policy that non-recruiting category scores must align with recruiting category scores (*id.*, ¶¶ 26, 28, 33);

- Defendants' practice of rewarding recruiters who had the highest enrollment numbers with the best leads and "starts," which were a form

---

[6] Moreover, Ninth Circuit law requires an original source also to have a hand in the public disclosure.  *Wang*, 975 F.2d at 1419.  Because the Relators are not sources of any of the exhibits in Defendants' brief, they cannot qualify as original sources under *Wang*.

of indirect compensation in that they added credit to those recruiters'

enrollment scores and resulted in higher salaries (*id.*, ¶¶ 40-41);[7] and

- That Defendants' managers were given monthly budgets to draw from to reward high producing recruiters with iPods, sunglasses, restaurant meals and other valuable items. *Id.*, ¶¶ 43-44.

The Ninth Circuit recently held in *Northstar Financial Advisors, Inc. v. Schwab Investments*, 779 F.3d 1036 (9th Cir. 2015), that a supplemental pleading under Rule 15(d) can be used to establish subject matter jurisdiction based on new facts, even where jurisdiction did not exist at the time the suit was filed.  In *Northstar*, the district court dismissed a class action on behalf of investors in a mutual fund for lack of standing because plaintiff Northstar did not own shares in the fund at the time the complaint was filed, but suggested the defect could be cured through amendment.  In its amended complaint, Northstar alleged that, subsequent to the filing of the initial complaint, it had obtained an assignment of claim from a client-shareholder.  The defendant again moved to dismiss, arguing that standing must be determined at the time an action is filed.  The district court disagreed, holding that Northstar had cured its standing deficiencies through its supplemental pleading.  *Id.* at 1043-44.  The Ninth Circuit affirmed, stating that, "'a lack of subject matter jurisdiction should be treated like any other defect for purposes of defining the proper scope of supplemental pleading.'"  *Id.* at 1044 (*quoting* Wright, Miller, & Kane, Federal Practice and Procedure: Civil 3d § 1505, pp. 262–63 & § 1507, p. 273); *see also U.S. ex rel. Galmines v. Novartis Pharm. Corp.*, --- F. Supp. 3d ---, 2015 WL 851837 (E.D. Pa. Feb. 27, 2015) (granting relator leave to amend FCA complaint where same underlying fraudulent scheme was continuing).

---

[7] A "start" is a student who was already signed up by a recruiter but the recruiter subsequently left the company.  Bringas Decl., ¶¶ 40-41.  Starts were doled out daily and weekly to the top performing recruiters.  *Id.*, ¶¶ 40-41.  The starts amounted to free money, because they boosted the recruiters' Matrix scores, and were awarded based solely upon the number of students that recruiters had enrolled.  *Id.*, ¶ 41.

1    Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, a party may

2 amend its pleading with "the court's leave" and "[t]he court should freely give leave

3 when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Supreme Court has

4 emphasized that "this mandate [to freely give leave] is to be heeded," and that "[i]f the

5 underlying facts or circumstances relied upon by a plaintiff may be a proper subject of

6 relief, he ought to be afforded an opportunity to test his claim on the merits."  *Foman*

7 *v. Davis*, 371 U.S. 178, 182 (1962); *see also Owens v. Kaiser Foundation Health*

8 *Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (policy favoring leave to amend "is to be

9 applied with extreme liberality"); *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696,

10 701 (9th Cir. 1990) ("The standard for granting leave to amend is generous.").

11    In accord with these authorities, if the Court is inclined to grant Defendant's

12 Motion, Relators should be given leave to amend to allege facts concerning the fraud

13 that have nowhere been publicly disclosed.

14                              **VII.    CONCLUSION.**

15    For the foregoing reasons, this Court should deny Defendants' motion to

16 dismiss for lack of jurisdiction.  Alternatively, Relators should be given leave to

17 amend.

18

19 DATED:  May 1, 2015              ISAACS FRIEDBERG & LABATON LLP

20

21                                 /s/  Mark I. Labaton
                                   Mark I. Labaton
22                                 Attorney for Relators

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2015, I electronically filed the foregoing RELATORS JAMES CARTER AND ROGER LENGYEL'S [CORRECTED] MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' RULE 12(b)(1) MOTION TO DISMISS PURSUANT TO THE PUBLIC DISCLOSURE BAR with the Clerk of the Court for the United States District Court for the Southern District of California by using the Court's CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Court's CM/ECF system.

s/ Mark Labaton       
Mark Labaton

1

177932.6

177932.6