# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JAMES CARTER AND ROGER LENGYL,<br><br>            Plaintiffs/Relators,<br><br>vs.<br><br>BRIDGEPOINT EDUCATION, INC., ASHFORD UNIVERSITY, LLC, AND DOES 1–500, INCLUSIVE,<br><br>            Defendants. | CASE No. 10-CV-1401 JLS (WVG)<br><br>**ORDER GRANTING DEFENDANTS' RULE 12(B)(1) MOTION TO DISMISS PURSUANT TO THE PUBLIC DISCLOSURE BAR**<br><br>(ECF No. 84-1) |

   Presently before the Court is Ashford University LLC ("Ashford") and Bridgepoint Education, Inc.'s ("Bridgepoint") (collectively, "Defendants") 12(B)(1) Motion to Dismiss Pursuant to the Public Disclosure Bar. (MTD, ECF No. 84-1.) Also before the Court is James Carter and Roger Lengyel's ("Relators") Response (Opp'n, ECF No. 104), and Defendants' Reply, (Reply, ECF No. 107).

   The motion hearing scheduled for June 11, 2015 was vacated and the matter taken under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1). Having considered the Parties' arguments and the law, the Court **GRANTS** Defendants' 12(b)(1) Motion to Dismiss Pursuant to the Public Disclosure Bar. The Court **DENIES** Relators' request for leave to amend.

# BACKGROUND

Ashford[1] is a "for-profit higher education institution," which provides "educational programs for working adult students." (First Am. Compl. ("FAC") 2, 9, ECF No. 31.) Ashford maintains a "traditional campus" in Iowa, but derives the "bulk of [its] revenue" from its online program. (*Id.* at 9.) Relators are current and former Enrollment Advisors at Ashford's San Diego, California office. (*Id.* at 3.) Relators seek damages and civil penalties on behalf of the United States arising out of Defendants making allegedly false claims to the United States Department of Education to obtain Title IV funds. (*Id.* at 2.)

Under Title IV of the Higher Education Act ("HEA"), 20 U.S.C. §§ 1070 *et seq.*, the federal government distributes funds to assist students with the costs of higher education. Educational institutions that wish to participate in the student loan programs established by Title IV must enter into a Program Participation Agreement ("PPA") with the Department of Education. *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1168 (9th Cir. 2006); 20 U.S.C. § 1094(a)(20). As part of the PPA, a school agrees to comply with "a panoply of statutory, regulatory, and contractual requirements." *Hendow*, 461 F.3d at 1168. One of these requirements is a ban on incentive compensation, which bars schools from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20).

Relators allege that from 2005 to 2011, Ashford's compensation practices violated the HEA's incentive compensation ban because Ashford adjusted salaries for enrollment advisors based solely on recruiting success. (FAC 2, 5, ECF No. 31.) Relators claim that Ashford violated the False Claims Act ("FCA") by knowingly and falsely certifying in PPAs submitted to the Department of Education that its

---

[1] Bridgepoint is Ashford's parent company.

compensation practices were lawful, misleading the Government into paying Ashford "up to half a billion dollars annually" in federal student aid funds. (*Id.* at 2.)

However, Defendants now argue that the Court lacks subject-matter jurisdiction to hear this case pursuant to the FCA's "public disclosure bar," which bars certain private actions that involve publicly disclosed information. (Not. MTD, ECF No. 84.) Accordingly, Defendants ask the Court to dismiss Relators' action. (*Id.*)

## LEGAL STANDARD

Under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, any person who "knowingly presents . . . a false or fraudulent claim for payment" to the United States government is liable for civil penalties. *U.S. ex rel. Biddle v. Bd. of Trustees of Leland Stanford, Jr. Univ.*, 161 F.3d 533, 535 (9th Cir.1998). "Congress enacted the False Claims Act to 'enhance the Government's ability to recover losses sustained as a result of fraud against the Government.'" *U.S. ex rel. Barajas v. Northrop Corp.*, 5 F.3d 407, 409 (9th Cir.1993). In order "to encourage any individual knowing of Government fraud to bring that information forward," civil actions under the FCA may be brought either by the United States or as a *qui tam* action by a private person. *U.S. ex rel. McKenzie v. BellSouth Telecomm., Inc.*, 123 F.3d 935, 938 (6th Cir.1997) (quoting S.Rep. No. 99–345 (1986), reprinted in 1986 U.S.C.C.A.N. 5266); 31 U.S.C. § 3730(a), (b). In a *qui tam* action, the private person, the relator, sues on behalf of the government as well as himself. *Id.* § 3730(b)(1).

However, the FCA's "public disclosure bar" discourages opportunistic *qui tam* actions, where the fraud allegations or transactions were publicly disclosed, unless the relator bringing the action was the original source of information underlying the allegations. 31 U.S.C. § 3730(e)(4)(A). Congress included the public disclosure bar in order to "strike the proper balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*, 2015 WL 4080739 at *7 (9th Cir. July 7, 2015) (quoting *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010)). The

provision is meant to encourage whistle blowers to come forward with information; "[a] 'whistleblower' sounds the alarm; he does not echo it." *Wang v. FMC Corp.*, 975 F.2d 1412, 1419 (9th Cir. 1992) *overruled on other grounds by Hartpence*, 2015 WL 4080739 at *7.

Prior to 2010, public disclosure analysis was clearly jurisdictional, § 3730(e)(4) then beginning with the following clause: "No court shall have jurisdiction . . . ." *Rockwell Intern. Corp. v. United States*, 549 U.S. 457, 467–68 (2007). However, in 2010, the language was changed to the following: "The court shall dismiss an action or claim . . . ." Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010). Adjusting for this change, many courts now construe § 3730(e)(4) as creating grounds for dismissal for failure to state a claim rather than for lack of jurisdiction. *United States v. Kiewit Pacific Co.*, 2013 WL 5770514 at *5 (N.D. Cal. October 24, 2013); *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810 (11th Cir. 2015); *see also United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 916–17 (4th Cir. 2013). However, the 2010 amendments to the FCA do not apply retroactively. *Wilson*, 559 U.S. at 283 n.1. And, the "[t]he retroactivity inquiry looks to when the underlying conduct occurred, not when the complaint was filed." *May*, 737 F.3d 908, 916–17. When the conduct at issue spans both pre and post-amendment, courts have held that conduct which occurred pre-amendment is subject to the prior version of the statute. *See e.g. U.S. ex rel. Hoggett v. Univ. of Phoenix*, 2014 WL 3689764 at *4–5 (E.D. Cal. July 24, 2014); *Osherhoff*, 776 F.3d at 810–11; *U.S. ex rel. Gage v. Aviation*, 2014 WL 3007201 at *n.3 (W.D. Tex. July 2, 2014); *U.S. ex rel. Szymoniak v. Am. Home. Mortg. Servicing, Inc.*, 2014 WL 1910845 at *1–2 (D. S.C. May 12, 2014); *U.S. ex rel. Paulos v. Stryker Corp.*, 2013 WL 2666346 at *2 (W.D. Mo. June 12, 2013).

The events in this case straddle the two versions of the public disclosure bar in that the FAC alleges wrongdoing starting in 2004 and continuing through 2011. However, the Court agrees with Defendants that, "the previous version governs this

case because the relevant conduct occurred before the 2010 amendments." Specifically, the public disclosures here occurred in 2009. (MTD 5–6, ECF No. 84-1; Exhibit A 97, ECF No. 84-4; Exhibits H–T, ECF Nos. 84-11 through 84-23.) Further, Ashford signed the program participation agreement in December 2008, which was in effect until June 30, 2011. (Exhibit D, ECF No. 84-7). Although the custom and practice of submitting claims spanned the different versions of the statute, the majority of and the most important aspects of the allegedly fraudulent conduct occurred prior to March 23, 2010. Accordingly, the Court finds that the 2010 amendments do not apply in this case, the public disclosure bar remains jurisdictional, and the Court may consider materials outside the complaint in deciding Defendants' attack on jurisdiction.[2]

Having concluded that the pre-2010 version of § 3730(e)(4) applies, the Court next decides whether the public disclosure bar requires dismissal of the action. The relevant version of the public disclosure bar provides:

> No court shall have jurisdiction over an action under this section *based upon the public disclosure* of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (emphasis added). Relators bear the burden of establishing such jurisdiction by a preponderance of the evidence. *U.S. ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1199 (9th Cir.1999).

---

[2] Even if the amendments apply to the conduct which occurred after 2010, the result would be the same because all of the evidence at issue here is properly before the Court, regardless of which Rule 12 standard applies. The Court could take judicial notice of the contents of the materials in order to ascertain whether they disclosed the allegations upon which this lawsuit is based. Thus, the Court can consider the exhibits submitted by Defendants regardless of which version of section 3730(e)(4) applies.

## DISCUSSION

To establish federal court jurisdiction over their claims under the False Claims Act, Relators must demonstrate either: (1) that their allegations are not based upon a public disclosure of information; or (2) that they are an "original source"[3] of the information. As Relators concede that they were not original sources, (Opp'n 10, 30–31, ECF No. 104), the only issue before the Court is whether Relators' claims are "based upon the public disclosure of allegations or transactions."

In deciding whether the allegations or transactions underlying Relator's fraud claims have been publicly disclosed, the Court must determine: (1) "whether the public disclosure originated in one of the sources enumerated in the statute" and (2) whether "the content of the disclosure consisted of the 'allegations or transactions' giving rise to the relator's claim, as opposed to 'mere information.'" *A–1 Ambulance Serv., Inc. v. California*, 202 F.3d 1238, 1243 (9th Cir.2000) (citing *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1473 (9th Cir.1996)). The disclosure need not contain a specific allegation of fraud, but in order to raise the public disclosure bar, the disclosure must reveal the "material elements" of the fraudulent transaction. (*Id.*) Specifically, the disclosures must contain the "misrepresented state of facts and [the] true state of facts," such that "readers or listeners may infer . . . the conclusion that fraud has been committed." *U.S. ex rel. Foundation Aiding the Elderly v. Horizon West*, 265 F.3d 1011, 1015 (9th Cir. 2001); *see also*, *Hagood*, 81 F.3d at 1473. In order to trigger the public disclosure bar, the publicly disclosed facts must only be "substantially similar" to the relator's allegations. *Horizon West*, 265 F.3d at 1015; *Meyer*, 565 F.3d at 1199. A court should determine whether the publicly available

---

[3] To qualify as an original source, a relator must only show that he or she has "direct and independent knowledge of the information on which the allegations are based" and "voluntarily provided the information to the government before filing" his or her *qui tam* action. 31 U.S.C. § 3730(e)(4); *Hartpence*, 2015 WL 4080739 at *7 (overruling *Wang,* 975 F.2d at 1418).

information was sufficient to enable the government to adequately investigate the case and "to make a decision whether to prosecute." *Horizon West*, 265 F.3d at 1016.

Defendants argue that the "relevant information had already entered the public sphere" well before the Relators filed this lawsuit. (MTD 5, ECF No. 84-1.) From May of 2008 through August 2009, the Office of Inspector General ("OIG") completed an audit of Ashford's compliance with the HEA. (*Id.* at 7; Exhibit B 56, ECF No. 84-5.) One of the objectives of the audit was to determine whether Ashford complied with the HEA's regulations governing incentive compensation. (Exhibit B 53–56, ECF No. 84-4.) On September 2, 2009, the OIG discussed its preliminary results with Ashford and "informed Ashford at that time that it had tentatively concluded that the school's compensation policies and practices with respect to enrollment advisors were in 'noncompliance' with the [HEA]." (MTD 6, 8–11, ECF No. 84-1.) Subsequently, Bridgepoint amended its Form S-1 with the Securities and Exchange Commission ("SEC") stating, "the Office of the Inspector General of the Department of Education preliminarily found . . . that Ashford's 'compensation policies and practices with respect to enrollment advisors' were in 'noncompliance.'" (MTD 5–6, ECF No. 84-1; Exhibit A 97, ECF No. 84-4.) In addition to this disclosure, Defendants contend that other news outlets repeated and expanded upon the finding that Ashford was in noncompliance with the incentive compensation provision. (MTD 6, 8–11, ECF No. 84-1.) A summary of those articles follows:

| News Story | Key Disclosure | Exhibit |
|---|---|---|
| *Bridgepoint Shares Tumble After DoE Audit Update*, Fox Business, Sept. 4, 2009 | "Ashford University . . . has been subject to a DoE audit since May 2008, looking into the following areas: 'compensation policies and practices relating to enrollment advisors' . . . . Bridgepoint said it expects preliminary findings from the DoE's Office of the Inspector General to include recommendations for fines and corrective action at the school." | H |

| | | |
|---|---|---|
| *Bridgepoint Education drops on potential fines*, The Associated Press, CNBC.com, Sept. 4, 2009 | Bridgepoint Education "said that the Education Department's Office of Inspector General is expected to present findings from its compliance audit of Ashford University," which "focuses on compensation of enrollment advisers . . . . Bridgepoint said it expects the 'report will assert findings of noncompliance . . . .'" | I |
| *Grand Canyon, Bridgepoint Stocks Fall*, Morningstar, Sept. 4, 2009 | "Bridgepoint announced that it received an update regarding its audit from the Department of Education's Office of Inspector General. Bridgepoint now believes that the OIG's draft report (which is due within the next 30 days) will assert findings of noncompliance and offer preliminary recommendations regarding fines and corrective action relating to compensation policies of enrollment counselors and financial aid disbursement practices." | J |
| *Bridgepoint Education drops on potential fines*, The Associated Press, San Diego Source, The Daily Transcript, Sept. 4, 2009 | "The audit focuses on compensation of enrollment advisers, Title IV issues, student authorizations to retain credit balances and maintenance of supporting documentation for students' leaves of absence. The audit began in May 2008 and covered the period of March 2005 to June 2009. Bridgepoint said it expects the 'report will assert findings of noncompliance . . . .'" | K; *accord* (The Business Insider). |
| *Bridgepoint Education drops on potential fines*, The Associated Press, The [Washington] Examiner, Sept. 4, 2009 | "The audit focuses on compensation of enrollment advisers, Title IV issues, student authorizations to retain credit balances and maintenance of supporting documentation for students' leaves of absence. The audit began in May 2008 and covered the period of March 2005 to June 2009. Bridgepoint said it expects the 'report will assert findings of noncompliance . . . .'" | L |
| *Bridgepoint Education Provides Update to OIG Compliance Audit of Ashford University*, PR Newswire, Sept. 4, 2009 | "The OIG indicated it is considering audit findings in the following areas: compensation policies and practices relating to enrollment advisors . . . . Bridgepoint Education believes that Ashford University operates in substantial compliance with the regulations of the Department of Education which are applicable to the areas under review, but it expects that this report will assert findings of noncompliance | M |

| | | |
|---|---|---|
| | and include draft recommendations to the Office of Federal Student Aid with respect to fines and corrective action." | |
| *Bridgepoint shares take beating on Wall Street*, Union Tribune, SignOnSanDiego.com, Sept. 5, 2009 | "The U.S. Department of Education's inspector general opened an audit last year of Bridgepoint's Ashford University . . . . The inspector general's findings could cover Bridgepoint's compensation of enrollment officers, returns and disbursement of student aid funds." | N |
| *Bridgepoint Calls Off Secondary Offering*, San Diego Business Journal, Sept. 11, 2009 | "Earlier this month, Bridgepoint said the company expects to incur fines and corrective action as a result of a federal audit of Ashford University, one of two colleges that Bridgepoint operates. The audit focused on compensation of enrollment advisors and records maintenance, among other issues." | O |
| *The Perils Of A Private Equity-Backed Education*, The Wall Street Journal, Sept. 14, 2009 | "Bridgepoint Education's problems appear related in part to how it compensates enrollment officers. That topic is also an issue for Grand Canyon Education Inc., the third member in our PE-backed triumvirate." | P |
| *Bridgepoint in the News*, Quad-City Times, Oct. 1, 2009 | "Bridgepoint noted Sept. 2 that the U.S. Department of Education's Office of Inspector General indicated that a compliance audit may find problems with compensation of Ashford's enrollment advisers . . . ." | Q |
| Frontline, *College, Inc.* (PBS television broadcast May 4, 2010) | "Tami Barker was an enrollment adviser at another for profit school, Ashford University.<br><br>TAMI BARKER, Enrollment Adviser, Ashford Univ., 2008-09: I didn't realize just how many students we were expected to recruit. And the amount of pressure that they put on you to meet these quotas I think challenges anybody's integrity.<br><br>MARTIN SMITH: In a letter to FRONTLINE, Ashford's parent company, Bridgepoint, says they don't have quotas." | R, p. 7 |

| | | |
|---|---|---|
| *For-Profit. For Learning?*, San Diego Reader, May 12, 2010 [online version] | "In its reports to the [SEC], Bridgepoint admits that the government has found that the company may have been seriously out of compliance with the [HEA]"<br><br>As a result of the OIG's investigation, "Ashford could be required to modify Title IV administration procedures such as compensation of enrollment advisors. . . . Potentially, 85 % of the company's business could be in trouble." | S |
| Comment by anncarl online in response to *For-Profit. For Learning?*, San Diego Reader (May 14, 2010). | "An advisor can make upwards of 100k if they are high producing at this Univer[si]ty ... can you think of any education based job that would pay that kind of money? An advisor has a matrix that is almost sole[l]y based on performance although it is t[w]eaked just enough to challenge the incentive clause for Title IV but everyone knows the deal...produce or pay cut...produce or no promotion ...it is all about the numbers." | T |

Relators argue that the SEC filing and the news reports following the SEC filing do not contain the essential elements of the FCA violations as alleged in the FAC. (Opp'n 24–28, ECF No. 104.) First, Relators argue that the exhibits do not sufficiently describe the fraud because the disclosures do not set forth the material elements of a fraudulent scheme or set forth facts from which a fraud can be inferred. (*Id.* at 24.) Relators argue that the publicly disclosed facts are not substantially similar to the allegations in the FAC in breadth or scope, and the disclosures do not reference the HEA, the false certifications in the PPAs, or the incentive compensation ban. (*Id.* at 25.) In addition, "noncompliance" does not describe the manner in which the fraud was committed, i.e., use of the evaluation matrix as a "window dressing" for concealing the fraudulent scheme. (*Id.*) Second, Relators argue that the exhibits fail to mention Defendants' other fraudulent acts, such as rewarding top recruiters with better leads; another type of "incentive payment." (*Id.* at 26.) Third, Relators argue that while the OIG audit concerns the period between July 1, 2006 and June 30, 2007, the FAC alleges that the fraud occurred from March 2005 through 2011. (*Id.*) Fourth, the

disclosures make no evidence of Defendants' scienter, which is alleged in the FAC. (*Id.*) Lastly, Relators argue that a quote from a recruiter in a Frontline segment, "I didn't realize just how many students we were expected to recruit. And the amount of pressure that they put on you to meet these quotas I think challenges anybody's integrity," does not trigger the public disclosure bar. (Exhibit R, ECF No. 84-21; Opp'n 29, ECF No. 104.) Relators argue that this statement merely references the pressure to enroll new students, not the fraud alleged in the FAC. (Opp'n 29, ECF No. 104.) Accordingly, Relators argue that the purported disclosures do not refer to any fraudulent transaction and would not alert a reader that a fraud had occurred unless the reader was aware of elements of the fraud that were never publicly disclosed, such as: (1) Defendants had certified they were in compliance with the incentive compensation ban and (2) the Matrix Defendants used to evidence the alleged compliance was a "window dressing." (*Id.* at 29.)

To begin with, the Court concludes that the disclosures—the news media and the SEC filing—qualify as sources under the statute. Defendants produced a number of news articles, transcripts, and comments which originated prior to the filing of Relators' FAC. These articles qualify as public disclosures from news media under the plain language of 31 U.S.C. § 3730(e)(4).[4] In addition, under 31 U.S.C. § 3730(e)(4), the S-1 amendment qualifies as a public disclosure as an administrative report. *See U.S. ex rel. Jones v. Collegiate Funding Servs., Inc.*, 469 F. App'x 244, 257 (4th Cir. 2012) (SEC filings are administrative reports for the purposes of the public disclosure bar); *U.S. ex rel. Ryan v. Endo Pharm., Inc.*, 27 F. Supp. 3d 615, 628 n. 16 (E.D. Pa. 2014) ("[T]he 10-k filing qualifies as a public disclosure as a federal report").

---

[4] Over Relators' objections, the Court finds that the online comment made on May 14, 2010 qualifies as a public disclosure as news media. (Exhibit T, ECF No 84-23.) The web posting was a comment to a news article on the San Diego Reader website, a well-established website designed to convey the news to the public. The Court also overrules Relators' objections with respect to authentication and hearsay.

Next, the Court concludes that substantially the same allegations or transactions as alleged in this action were publicly disclosed in the SEC filing and the news media. The Court agrees with Defendants that Bridgepoint publicly disclosed "what later became the very heart of this lawsuit—an alleged violation of the incentive compensation provision." (MTD 16, ECF No. 84-1.) From the SEC filing and the subsequent news reports, there was ample information in the public sphere to enable the government to pursue an investigation. The Court agrees with Defendants that under these circumstances, the details on how this particular regulation was violated are immaterial to the public disclosure bar. *See U.S. ex rel. Harshman v. Alcan Elec. & Eng'g, Inc.*, 197 F.3d 1014, 1019 (9th Cir. 1999).) In order for the government to pursue an investigation, it needed to know that Ashford promised to comply with incentive compensation regulations in the PPA and that a government audit discovered violations of those same regulations. Ashford publicly agreed to comply with the incentive compensation regulations in its PPA. (Exhibit D, ECF No. 84-7.) Further, the SEC filing discusses that regulatory terms for participating in Title IV programs are set forth in the PPA, explains the incentive compensation ban, discloses that the OIG preliminarily found Ashford to be in noncompliance, and states that Ashford believes it is in substantial compliance with the HEA. (Exhibit A 23, 95–96, 98, ECF No. 84-4.) In addition, numerous media outlets covered the amended S-1 filing as listed above. Contrary to Relators' assertions, the disclosures do mention the HEA and the alleged noncompliance with the incentive compensation ban. Accordingly, although the disclosures lack the specificity of the complaint, they were sufficient to alert the government to the alleged fraud.

## LEAVE TO AMEND

Relators ask the Court for "leave to amend to allege the additional facts recounted in the concurrently filed Declaration of Justin Bringas, a former Ashford recruitment director," which "leaves no doubt that the scheme to defraud" the

government "was not the subject of any prior public disclosures." (Opp'n 10, ECF No. 104.) Relators state that new allegations would include: (1) Defendants continued to violate the ban even after they discontinued use of the matrix in 2011, (2) additional factual detail regarding how Defendants manipulated the Matrix, (3)additional information about how recruiters were awarded with better "leads" and "starts," and (4) information about how managers were given monthly budgets to award recruiters with various valuable items. (*Id.* at 32.)

Defendants argue that leave to amend is improper because the deadline for amending pleadings has passed and Relators have not met the requirements to amend. (Reply 15, ECF No. 107.) Also, Defendants argue that amendment would be futile as the case would still be barred from the earlier public disclosures. (*Id.*) Last, Defendants argue that under the FCA, jurisdiction must be present throughout the duration of the litigation. (*Id.*) The Court agrees with Defendants that leave to amend would be futile. None of the additional factual information contained in the Bringas Declaration would alter the fact that the current action was based upon public disclosures. Accordingly, the Court **DENIES** Relators' request for leave to amend the FAC.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' 12(b)(1) Motion to Dismiss Pursuant to the Public Disclosure Bar without leave to amend. The Clerk of the Court shall close the file.

**IT IS SO ORDERED**.

DATED: August 17, 2015

*Janis L. Sammartino*
Honorable Janis L. Sammartino
United States District Judge